**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | **Case No. 16-cv-175 (BAH)** |
| UNITED STATES ENVIRONMENTAL ) | |
| PROTECTION AGENCY, ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S COMBINED OPPOSITION TO CROSS-MOTION**
**AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant submits the following reply in support of its motion for summary judgment and opposition to Plaintiff's cross-motion for summary judgment. As discussed below, Plaintiff has failed to rebut Defendant's declarations establishing that it conducted a reasonable search and properly applied exemptions to information that was withheld.

**I.      Defendant Properly Withheld Information Under Exemption 5**

Plaintiff's principal contention is that Defendant improperly withheld information under Exemption 5 of FOIA.   Plaintiff argues that the withheld information is in the nature of purely fact-based scientific conclusions that are neither deliberative nor pertain to any "policy deliberations." (ECF No. 17 at 17).  Neither position has merit and both are based on a mischaracterization of the information that has been withheld under Exemption 5.

As a threshold matter, Plaintiff attempts to analogize a Biological Assessment under Section 7(a) of the Endangered Species Act and the "no effect" determination reflected in the Six State and Ten State Addenda. This analogy, however, is false, and incorrectly equates two

distinct agency processes. As Plaintiff correctly noted, EPA makes a "no effect" determination

by conducting an "Ecological Risk Assessment" in accordance with its obligations under FIFRA,

7 U.S.C. §§136. Plaintiff's FOIA requests and its current challenge to withheld materials, pertain

to the Six State and Ten State Addenda (and the "no effect" determinations reflected therein) for

16 states in which EPA proposed to register Enlist Duo.

Separate and distinct from the assessments required under FIFRA, is Section 7(a) of the

ESA, which obligates an agency to conduct a Biological Assessment upon finding that an agency

action "may affect" a listed species or critical habitat. Once an agency makes this "may affect"

finding, it must request either an informal or formal consultation with the U.S. Fish and Wildlife

Service (FWS) or the National Marine Fisheries Service (NMFS); both consultations require a

written submission to the Services, which is known as a Biological Assessment.[1]

As Plaintiff acknowledges, since EPA determined that Enlist Duo will have "no effect"

on listed species or critical habitat within the action area, then no consultation is required and no

Biological Assessment is provided to the Services. Because Plaintiff is not challenging the merits

of this "no effect" determination here, but rather, is simply challenging the withholding of

materials used to make this determination, it is not necessary to consider whether consultation

with the Services or the production of a Biological Assessment should have been required.

---

[1]    "Biological Assessments" are only required for "major construction activities," which
are Federal actions that may significantly affect the quality of the human environment as
referred to in the National Environmental Policy Act of 1969, while all other actions require a
"Biological Evaluation." Since the purpose of both the Biological Assessment and the
Biological Evaluation is the same--to evaluate the potential effects of the action on listed and
proposed species and designated and proposed critical habitat and determine whether any such
species or habitat are likely to be adversely affected by the action-- the term "Biological
Assessment" may be used to describe all written submissions required by the Services prior to
consultation.

In contrast, what is at issue here is the deliberative process leading up to the creation of the Six State and Ten State Addenda, including drafts and internal communications reflecting comments and opinions of staff members as part of the process of developing the final document. (Ingram Suppl. Decl. ¶¶ 3-10; *see also* Vaughn Index attached to Ingram Declaration).   The documents themselves, moreover, are part of an overall deliberative process regarding EPA's decision to register a pesticide for use in certain states and to amend that registration to permit its use in additional states.   Under the law of the D.C. Circuit, the withheld information is both pre-decisional and deliberative and thus properly withheld under Exemption 5 of FOIA.[2]

### A. The Withheld Information Is Predecisional and Part Of The Decisionmaking Process Leading To The Ultimate Registration Decision.

A document is "'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.'"   *Abtew v. DHS,* 808 F.3d 895, 898 (D.C. Cir. 2015). Exemption 5, however, is not dependent on whether a final decision ultimately resulted from the deliberations.   Were it otherwise, the purpose of the exemption would be defeated because "[a]t the time of writing the author could not know whether the decisionmaking process would lead to a clear decision, establishing the privilege, or fizzle, defeating it." *Access Reports v. Department of Justice,* 926 F.2d 1192, 1196 (D.C. Cir. 1991).   The focus of Exemption 5 instead is whether the document

---

[2]      As described in the *Vaughn* Index that accompanied Defendant's motion, certain information involving communications with the EPA Office of General Counsel also was withheld under Exemption 5 on the additional basis of attorney-client privilege. (*e.g.,* ECF No. 16-2, at ECF Page 17-18, 20).   The basis for those withholdings are set forth in the Vaughn Index and Defendant's opening motion.   Plaintiff contends that EPA has failed to meet its burden to withhold this information (ECF No. 17 at 30-32), but bases its argument on the erroneous premise that the withheld information constitutes purely factual information when the *Vaughn* Index establishes that the information withheld reflected legal advice. Defendant, moreover, does not understand Plaintiff to be contesting withholdings under Exemption (b)(6) and thus refers the Court to the evidence and argument in its motion on that issue.  *See* ECF No. 16, at 12-14.

was part of the decisionmaking process.  *Id.  see also Nat'l Archive v. CIA,* 752 F.3d 460, 463 (D.C. Cir. 2014) ("The term 'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue."); *Huntington v. Department of Commerce,* 2017 U.S. Dist. LEXIS 6477, at *34 (D.D.C. Jan. 18, 2017) ("The challenged documents precede the final patentability decision and are part of the process by which that decision is made; they therefore are predecisional and deliberative.")

Here, the documents that were withheld consisted of: (1) drafts of the Six State and Ten State Addenda and related draft documents; (2) emails transmitting these drafts and featuring comments, opinions, and proposals for revisions by EPA employees and managers; and (3) presentations and talking points in preparing for meetings.  (Suppl. Ingram Decl. ¶¶ 7-11)

These documents are pre-decisional because they were part of the process by which final versions of the Six State and Ten State Addenda were prepared, which itself was part of a larger decisionmaking process by the EPA as to whether to register the pesticide in certain states.  They are deliberative, moreover, because the process by which a "no effects" determination is made involves the consideration of a variety of factors that can be subject to discussion among staff as the assessment is undertaken such as, appropriate assumptions to be drawn during the process, exploring assumptions through assessment models (which themselves may rely on certain assumptions derived from reference materials and other sources), as well as forecasts and assumptions that form the basis for calculations. (Suppl. Ingram Decl. ¶ 4, 6) The Six State Addendum, dated February 12, 2014, is a comprehensive, 47-page document that reflects the consideration of these multiple factors, and the Ten State Addendum, dated September 26, 2014, is a comprehensive 79-page document that reflects a similar multi-factor assessment.  (Suppl.

Ingram Decl. ¶¶ 4, 6).   Before becoming final, these documents required extensive review,

discussion, and revisions from the Environmental Fate and Effects Division within EPA and

EPA's Office of General Counsel.  The withheld drafts and accompanying emails contained EPA

staff members' substantive edits, recommendations, further analysis and opinions.  (Suppl.

Ingram Decl. ¶¶ 8-9).

In general, draft documents that reflect the progression and development of editorial and

policy judgments are deliberative and exempt from disclosure under Exemption 5. *See Goodrich*

*Corp. v. E.P.A.*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) ("As a general matter, 'drafts' of

documents are exempt from disclosure under the deliberative process privilege."); *see also Nat'l*

*Wildlife Feed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1122 (9th Cir. 1988) ("To the extent that

[the requester] seeks through its FOIA request to uncover any discrepancies between the

findings, projections, and recommendations between the draft[s] prepared by lower-level

[agency] personnel and those actually adopted, . . . it is attempting to probe the editorial and

policy judgments of the decisionmakers."); *Marzen v. HHS*, 825 F.2d 1148, 115 (7th Cir. 1987)

(noting the "exemption protects not only the opinions, comments and recommendations in the

draft, but also the process itself").

Courts in this Circuit have likewise repeatedly held that "the disclosure of editorial

judgments -- for example, decisions to insert or delete material or to change a draft's focus or

emphasis -- would stifle the creative thinking and candid exchange of ideas necessary to produce

good historical work." *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569

(D.C. Cir. 1987) (citing *Russell v. Dep't of Air Force*, 682 F.2d 1045 (D.C. Cir. 1987)). This

explanation aptly describes why EPA asserted the deliberative process privilege for draft

documents and emails that offered opinions or comments in connection with the circulation of

drafts.  It also supports the withholding of talking points and briefing documents prepared prior to a meeting with the pesticide manufacturer that reflect information selected by EPA staff to inform senior officials and that contain recommendations, analysis, and opinions on what issues may be raised, how to potentially respond, and other important considerations.   (Suppl. Ingram Decl. ¶ 11)

EPA is not withholding the final version of the two Addenda, whereas in the case relied upon by Plaintiff, *Center for Biological Diversity v. U.S. Marine Corps.*, 2005 U.S. Dist. LEXIS 50151 (D.D.C. Sept. 15, 2005), the agency was withholding the final version of a Biological Assessment.  *See id.* at *7 ("This Court determines that the release of the Biological Assessment will in no way risk stifling 'honest and frank communication within the agency' nor will its release 'inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position.' . . . Defendant's Biological Assessment constitutes a final agency opinion and is, therefore, releasable to the public under the principles of the FOIA.")

The fact that these deliberations occurred in the context of a scientific determination does not deprive them of their pre-decisional or deliberative characteristics.  Courts have recognized that preliminary scientific data are properly part of an agency's deliberative process and that such data are exempt from disclosure under Exemption 5. *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (protecting preliminary scientific data generated in connection with a chemical study); *see also Horsehead Indus. v. EPA*, No. 94-1299, slip op. at 15-20 (D.D.C. Oct. 1, 1996) (finding that agency scientists' "open discussion of the effectiveness of . . . testing results and frank exchanges of view regarding the interpretation of those results reside near the core of an agency's deliberative process").

The withheld information, moreover, was not in the nature of purely formulaic computations that may not be subject to Exemption 5. *Petroleum Info. Corp. v. DOI,* 976 F.2d 1429, 1436 (D.C. Cir. 1992) ("[t]he release of materials that do not embody agency judgments--for example, materials relating to standard or routine computations or measurements over which the agency has no significant discretion--is unlikely to diminish officials' candor or otherwise injure the quality of agency decisions. Requiring disclosure of such materials is fully 'consistent with efficient government operation.'").   In contrast, the analysis that went into the creation of the Six State and Ten State Addenda was not purely formulaic and, even those aspects that involved calculations were based in part on certain forecasts and assumptions that are the product of agency judgment.  (Suppl. Ingram Decl. ¶ 4)

Plaintiff's position is thus based on an overly narrow application of Exemption 5.  It relies largely on case law outside this Circuit and in the context of a challenge under the Administrative Procedure Act ("APA"), rather than the application of the exemption under FOIA.  For instance, Plaintiff relies largely on an APA case, *Greenpeace v. Nat'l Marine Fisheries Service,* 198 F.R.D. 540, 543 (W. D. Wash. 2000), to argue that the "no effects" determination reflected in the Six State and Ten State Addenda is limited to objective, fact-based scientific conclusions that does not implicate discretionary agency policymaking.  But that argument fails to consider the process by which the final version of the Addenda was created and how the Addenda fall within the overall decisionmaking process pertaining to pesticide registration.   It also fails to acknowledge the nature of the documents being withheld, *i.e.,* draft versions of the Addenda and internal communications discussing those drafts.  As the D.C. Circuit has explained, exemption 5 protects not only deliberative materials, but also the decisionmaking process itself.  *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir.

1993) (observing that "the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material"); *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 68 (D.C. Cir. 1974) (Exemption 5 is intended to protect not just "deliberative *materials*," but also "the agency's *deliberative process.*"). That process includes the editorial process involved in finalizing an agency document. *See, e.g., Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) ("An agency need not demonstrate the extent to which the draft differs from the final document because such a showing would 'expose what occurred in the deliberative process between the draft's creation and the final document's issuance.'").

Indeed, one of the cases relied on by Plaintiff, *Northwest Envtl. Advocates v. EPA,* 2009 U.S. Dist. LEXIS 10456 (D. Or. 2009), recognized that the deliberative process privilege applied to documents that "express preliminary staff views or tentative opinions", "represent internal discussions concerning the method by which information is to be analyzed", "express doubt or confusion regarding the information before the agency or how it should be interpreted", reflect "fragmented thoughts of individuals, or embryonic draft documents that risk misinterpretation should they be subject to disclosure." *Id.* at *23-24. The court further explained that, "[a]lthough some of these drafts are of a scientific nature, substantial portions of these unpolished scientific drafts contain the personal views of agency staff or contain questions concerning the accuracy of the information or analysis contained within the draft" and that "[s]ome of these documents are emails requesting clarification on issues before the agency, or discussing the manner in which the agency plans to move forward." *Id.* at *24. Because "[t]hese documents represent the give-and-take of the agencies' internal deliberations, and their disclosure would discourage such deliberations," the court held that they "are appropriately considered a part of the "deliberative process.'" *Id.*

Although *Northwest Envtl. Advocates* largely supports EPA's position, that case still takes an unduly narrow interpretation of Exemption 5 to the extent the court there ordered the release of more "polished" draft documents.   Courts in this Circuit have recognized that "the label 'draft' goes to the merits of Exemption 5's predecisional and deliberative elements" and that drafts are generally protected under Exemption 5 because they reflect the "give-and-take" of agency decisionmaking and their release could "confuse the public" by leading the public to "mistakenly interpret the views within a draft as the views of the agency." *See Judicial Watch v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006); *Competitive Enterprise Institute v. Office of Science & Technology Policy,* 161 F. Supp. 3d 120, 129-130 (D.D.C. 2016) (citing cases and concluding that "courts in this District have held, in many instances, that drafts are protected by the deliberative process privilege").   Thus, EPA properly relied on Exemption 5 to withhold drafts of the Addenda and internal communications regarding such drafts.

### B.  EPA Segregated Out Purely Factual Material and Properly Withheld Factual Material In Drafts Or That Was Interwined With Deliberative Material.

Plaintiff also contends that the EPA failed to segregate out purely factual information that Plaintiff contends is not covered by the deliberative process privilege.   This argument fails for several reasons.

First, because EPA has released the final version of the Six State and Ten State Addenda, there is no additional non-exempt factual information that may be gleaned from the drafts that EPA withheld.   The court considered this precise issue in *Competitive Enterprise,* in which the agency withheld 10 different drafts under exemption 5.   The court held that "[t]he deliberative process privilege protects not only the content of drafts, but also the drafting process itself" and that "[a]ny effort to segregate the 'factual' portions of the drafts, as distinct from their 'deliberative' portions, would run the risk of revealing 'editorial judgments—for example,

decisions to insert or delete material or to change a draft's focus or emphasis.'" *Competitive Enterprise,* 161 F. Supp. 3d at 132.  Because "even disclosure of the factual material in the [draft documents], and nothing more, could reveal judgments made during the drafting process itself," the court declined to order disclosure of "any portion of the drafts." *Id.*

Second, the deliberative process privilege protects factual materials -- including preliminary scientific data and analyses -- that are closely intertwined with opinions, recommendations, and deliberations. *Mapother*, 3 F.3d at 1539 ("the selection of the facts thought to be relevant clearly involves 'the formulation or exercise of … policy-oriented *judgment*' or 'the process by which *policy* is formulated,' . . ., in the sense that it requires 'exercises of discretion and judgment calls.' . . .Such tasks are not 'essentially technical' in nature, . . .; rather they are part of processes with which 'the deliberative process privilege … is centrally concerned.'"); *Montrose Chemical,* 491 F.2d at 68 ("The EPA assistants here were exercising their judgment as to what record evidence would be important to the Administrator in making his decision regarding the DDT registrations. Even if they cited portions of the evidence verbatim, the assistants were making an evaluation of the relative significance of the facts recited in the record; separating the pertinent from the impertinent is a judgmental process . . . .").

Here, EPA segregated out pure facts from deliberative material in the responsive emails, but withheld under exemption 5 material that might be construed as "facts" when the context indicated that the material had been selected as part of deliberations in developing the final document and thus was inextricably linked with deliberative material.  (Suppl. Ingram Decl. ¶ 13).  Plaintiff mischaracterizes the entries in the *Vaughn* Index to argue otherwise.  For instance, Plaintiff characterizes as "factual information" (ECF No. 17 at 20-21) an entry described in the *Vaughn* Index as a draft briefing that reflects "the personal opinions and thoughts of staff

working on matters related to [Endangered Species Assessment] for Enlist Duo" (ECF No. 16-2, ECF Page 23-24); an entry described as a "draft briefing concerning Enlist Duo's effect on specific animals" (ECF No. 16-2, ECF Pages 42-43); an entry described as "[p]ortions of emails" reflecting comments on a final draft (ECF No. 16-2, ECF Page 35); and an entry described as a draft of the Ten State Addendum (ECF No. 16-2, ECF Page 29). As established by the *Vaughn* Index, the withheld information was not purely factual and, therefore, was properly withheld under Exemption 5.

### C. EPA's *Vaughn* Index Is Sufficiently Detailed

Plaintiff argues that EPA's *Vaughn* Index is too vague to satisfy Defendant's burden of establishing the basis for its exemption 5 withholdings. A simple review of Defendant's *Vaughn* Index, however, shows that Plaintiff's argument lacks merit.

"Production of a *Vaughn* index is just one way that an agency can explain its response to a FOIA request—albeit a common one." *Barouch v. U.S. Dep't of Justice*, 962 F. Supp. 2d 30, 68 (D.D.C. 2013). A *Vaughn* Index is adequate if it provides "'an adequate description of the records' and 'a plain statement of the exemptions relied upon to withhold each record."' *See Rodriguez v. U.S. Dep't of Army*, 31 F. Supp. 3d 218, 226 (D.D.C. 2014) (quoting *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C.Cir. 1986)); s*ee also Pinson v. U.S. Dep't of Justice*, 61 F. Supp. 3d 164, 185 (D.D.C. 2015) (noting that a "*Vaughn* Index must provide a relatively detailed justification, specifically identif[y] the reasons why a particular exemption is relevant and correlate those claims with the particular part of a withheld document to which they apply.")

Here, EPA's *Vaughn* Index contains columns that identify each document's identification number, whether the document is withheld in full or in part, and a particular

invoked FOIA Exemption. *See Vaughn* Index (attached to Ingram Declaration). For each

entry, the narrative describes the document type (*i.e.* email, chart, or a simple document).  The

narrative also provides a detailed description of the basis for the exemption 5 withholding.

Plaintiff, however, has misinterpreted the *Vaughn* Index, and the underlying FOIA

exemptions, as demonstrated by the examples of "plain accounts of factual information" that

the Plaintiffs offer in support of their position. (ECF No. 17 at 20).  For example, Plaintiffs

cite to PRD 1072, an email that was partially withheld under the deliberative process privilege

of Exemption 5, as illustrative of a "factual" briefing concerning Enlist's effect on specific

animals.  (*Id.*) As the *Vaughn* Index explains, however, while the email does concern the

effect of 2,4-D on bats, a "topic" relevant to the "no-effect" determination, the subject-matter

of the email was not the basis for redaction. Rather, portions of the email were withheld that

contained draft language indicative of intra-agency, pre-decisional deliberations on issues

relevant to the overarching topic (ECF No. 16-2, *Vaughn* Index at ECF Pages 45-46).  This

type of draft, preliminary discussion falls squarely under the deliberative process privilege.

Plaintiff similarly cites to PRD 771, which contains a briefing on three listed species

and the Indiana bat, as "factual biological or ecological information about specific species"

that was wrongfully withheld under the deliberative process privilege (ECF No. 17 at 20).

What the Plaintiff fails to acknowledge, however, and what is thoroughly explained in the

*Vaughn* Index, is that this briefing is a draft document that was used to develop language in

the Addendum. The document does not represent a final agency action (ECF No. 16-2,

*Vaughn* Index at ECF Page 43), but is exactly the type of pre-decisional, deliberative record

protected under exemption 5.

Finally, records that the Plaintiff identifies as consisting of "factual information regarding the effect of removing 'wind direction' from the spray drift buffer requirement for use of Enlist Duo" and "factual information about geographic areas where various species may be present in the Ten States," are nevertheless protected under the deliberative process privilege for the same reasons as the aforementioned records (ECF No. 17 at 20-21, PRDs 771, 706, 649-53). The factual *topics* of these documents do not mandate disclosure; rather, it is the content of these records, which consist of recommendations, draft language, proposals, and suggestions that warrants their protection.

Plaintiff, moreover, relies on *Peer v. EPA,* 2016 U.S. Dist. LEXIS 135537 (D.D.C. Sept. 30, 2016), to contend that EPA must identify the "function and significance" of the withheld records to rely on Exemption 5.  (ECF No. 17, at 27)   To the extent such a showing is required, EPA has provided sufficient detail in the *Vaughn* Index and accompanying declarations to establish the function and significance of the withheld documents.   *See generally Vaughn* Index and Supplemental Ingram Declaration.

**D.      EPA Did Not Waive Exemption 5**

Plaintiff contends erroneously that EPA shared records with third parties that it is withholding under exemption 5.  That is incorrect.   Plaintiff cites to portions of the *Vaughn* Index that it states "describes many communications that were either shared with, or received from, Dow." (ECF No. 17 at 35).  To the contrary, the *Vaughn* Index is describing internal discussions within EPA in preparation for an upcoming meeting with Dow.  (ECF No. 16-2, at ECF Page 19, 31).  The *Vaughn* Index explicitly states that "[t]he attachments were created for internal use and were not shared with Dow" and that the documents reflect "internal discussions concerning the appropriate way to interact with Dow."  (*Id.*; *see also* Suppl.

Ingram Decl. ¶ 11).   Likewise, no documents withheld under exemption 5 were shared with state agencies as clarified in the Supplemental Ingram Declaration correcting his prior declaration.  (Suppl. Ingram Decl. ¶ 12).[3]

## II.    EPA Conducted An Adequate Search

Under the FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents."  *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.").  A search is not inadequate merely because it failed to "uncover[] every document extant."  *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured").  Rather, a search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents."  *Oglesby*, 920 F.2d at 68.

An agency, moreover, is not required to examine "virtually every document in its files" to locate responsive records."  *Steinberg v. Dept. of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994; *see also Hall v. U.S. Dep't of Justice*, 63 F. Supp. 2d 14, 17-18 (D.D.C. 1999) (finding that agency need not search for records concerning subject's husband even though such records may have also included references to subject).  Rather, as here, it is appropriate for an

---

[3]    Mr. Ingram had erroneously indicated in his original declaration that some of the documents withheld under exemption 5 may have been shared with state agency counterparts. (Ingram Decl. ¶ 29)  Upon further review, it has been determined that none of the withheld documents had been shared with state agencies.  (Suppl. Ingram Decl. ¶ 12).

agency to search for responsive records in accordance with the manner in which its records are maintained. *Greenberg v. Department of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

The search required by FOIA, moreover, is not one of perfection. Indeed, some of the alleged deficiencies that Plaintiff identifies in the agency's search are similar to those raised by the FOIA requester, and rejected by the Court, in *Wright v. Admin. For Children & Families,* 2016 U.S. Dist. LEXIS 140314 (D.D.C. Oct. 11, 2016). There, the FOIA requester alleged that certain offices were not searched, that the agency failed to sufficiently describe what it meant by the reference in the agency declaration to "'searches of email accounts,'" and that the agency failed to submit sworn declarations of individuals within the agency to establish that they lacked responsive information. The Court rejected these arguments, explaining that an agency need not "take every step desired by a requester" or perform "the more exhaustive search the plaintiff apparently demands" after the agency already has determined that it has identified the locations reasonably likely to have responsive records. *Id.* at *16-19.

Ultimately, the plaintiff in *Wright*, as the plaintiff here, failed to acknowledge his burden "to submit 'countervailing evidence' to raise a 'substantial doubt' as to the adequacy of the agency's search" once the agency has submitted a declaration describing the search that it conducted. *Id.* at *27. Like the plaintiff in *Wright,* Plaintiff has failed to "point[] to any 'positive indications of overlooked materials,' nor has he shown that the 'agency has reason to know that certain places [not searched] may contain' additional documents responsive" to the requests. *Id.* at *17. Plaintiff's "purely speculative contentions cannot render the agency's search inadequate." *Id.* at *28.

Plaintiff's other arguments regarding EPA's search are addressed below.

### A.    The Cut-Off Date Used Was Appropriate.

Plaintiff sought records relating to the Six State Addendum dated February 12, 2014, and a Ten State Addendum dated September 26, 2014.  As set forth in the Ingram Declaration, Mr. Hartl of CBD agreed that EPA's search for responsive records would extend to September 26, 2014, the date of the second document at issue.  (Ingram Decl. ¶ 13)  Mr. Hartl acknowledges having a conversation with Mr. Ingram "regarding the search parameters of the two FOIA requests."  (Hartl Decl. ¶ 16)  Although he claims to have "no memory of agreeing to" a September 26, 2014 cut-off date, he does not deny that such an agreement was reached.  (Hartl Decl. ¶ 19)  Indeed, although criticizing EPA for failing to "memorialize that agreement," he acknowledges the possibility that "search parameters were agreed upon by EPA and me." (Hartl Decl. ¶ 18).  Based on this record, Plaintiff has failed to dispute Mr. Ingram's attestation that the parties had agreed to a September 26, 2014 cut-off date.[4]

Even if the Court were to find that issue to be in dispute, the Court should nevertheless find that September 26, 2014 is a reasonable cut-off date given the nature of the request, which sought records related to two documents, the last of which was dated September 26, 2014.  In reference to the Ten State Addendum dated September 26, 2014, Plaintiff itself characterizes the purpose of the request as "seeking 'records and correspondence' related to EPA's 'no effect' finding in the Ten State Addendum."  (ECF No. 17, Plaintiff's Statement of Facts ¶ 16).  Given that stated purpose, it was reasonable for EPA to search for responsive records up until September 26, 2014.

---

[4]      The reference to a September 23, 2014 cut-off date in the Ingram Declaration (paragraph 24) was a typographical error.  As set forth in paragraph 13 of the declaration, the cut-off date agreed to was September 26, 2014.

In terms of electronic records, moreover, EPA went beyond the agreed upon cut-off date and searched for records through October 20, 2014.   (Ingram Decl. ¶ 24)  That Plaintiff only received records dated through October 10, 2014 is not evidence of an inadequate search.  It simply shows that no documents after that date were located.  Plaintiff also claims that no meeting notes or minutes were produced while many of the records produced refer to such meetings.  The failure of an agency "to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the requested records."  *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004).

### B.    Voice Mail Recordings, IMs and Text Messages

Plaintiff contends that EPA's search was inadequate because it did not search its voicemail system for responsive records and that any search for IMs, text messages, and similar records was limited to inquiring of the relevant custodians whether they possessed such records.  As a threshold matter, these arguments fail because Plaintiff's own definition of the types of requests it sought in the FOIA requests did not include records of that sort.   Each FOIA request defined the term "documents" or "records" as including "memoranda, maps, studies, reports, data, correspondence, comments, conversation records, files, electronic mail records, phone notes, or other documents."  Had Plaintiff intended to bring records of voicemail systems or "IMs" and "text messages" within the scope of the request, those items should have been identified within the definition of "documents" or "records" set forth in the request.

Beyond that, EPA has established that voicemail is generally transitory and is only preserved for a short period in the voicemail system, and that, to the extent preserved in a

written document or email responsive to the FOIA requests at issue in this matter, it would

have been captured by EPA's search.  (Suppl. Ingram Decl. ¶ 16).   EPA's failure to locate

voicemail recordings, therefore, does not render its search inadequate.  *Debrew v. Atwood*,

792 F.3d 118, 123 (D.C. Cir. 2015) ("we do not think it is 'suspect' that the agency says it did

not retain recordings of DeBrew's conversations" and "[w]e agree with the district court that

the BoP did not violate the disclosure requirements of the FOIA by failing to produce

recordings of DeBrew's telephone conversations because the agency is not obligated, nor is it

able, to disclose a record it does not have").  Moreover, EPA complied with any obligation to

search for "IMs" and "text messages" by inquiring of the relevant custodians whether "IMs,

text messages, social media posts, Facebook or Twitter messages" were utilized to

communicate on the drafting and review of documents related to the two Addenda.  (Ingram

Decl. ¶ 15).

### C.      Plaintiff's Other Arguments Lack Merit

Plaintiff contends that, after identifying additional custodians, the agency limited its

search of those custodians to electronic material.  (ECF No. 17 at 40).   EPA has since

conducted a supplemental search and has confirmed that the additional custodians did not

have any hard copy documents responsive to the requests.  (Suppl. Ingram Decl. ¶ 17)

Plaintiff also contends that, based upon a review of the released records, "there are at

least 17 additional EPA personnel who were included on emails" but who were not among the

custodians whose records were searched.  (Hartl Decl. ¶ 33).    Of the listed individuals,

however, several were among the custodians searched.  *See* Suppl. Ingram Decl. ¶ 18.  As to

the others, the mere fact that they were copied on emails does not render them custodians

likely to have records responsive to the FOIA request.  The agency identified those custodians

likely to have responsive records, which consisted of individuals in the office involved in the

drafting of the Six State and Ten State Addendum, as well as two individuals from Office of

Pesticide Programs, and four individuals in OGC who provided legal advice in connection

with that process.  (Suppl. Ingram Decl. ¶ 19).

Although Plaintiff phrased the requests as seeking "all" documents or records "related

to" the Six State and Ten State Addendum, that overly broad language does not entitle

Plaintiff to demand that the agency conduct a boundless search in order to fulfill its obligation

to conduct a reasonable search for responsive records.  *See, e.g.*, *Sack v. CIA*, 53 F. Supp. 3d

154, 164 (D.D.C. 2014) (concluding that agency was not required to conduct a search for a

request for all records that "pertain[] in whole or in part (all years, all classifications)" to a list

of closed Inspector General reports because it lacked clarity and was overbroad); *Dale v. IRS*,

238 F. Supp. 2d 99, 104–05 (D.D.C. 2002) (holding that a request for "any and all documents,

including but not limited to files, that refer or relate in any way to" the plaintiff "amounted to

an all-encompassing fishing expedition of files at IRS offices across the country," warranting

dismissal). Such vague requests "unfairly place[] the onus of non-production" on agencies

"and not where it belongs—upon the person who drafted such a sloppy request." *Mass. Dep't

of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 727 F. Supp. 35, 36 n.2 (D. Mass.

1989).  They also leave the agency "to guess at the plaintiff's intent."  *Sack*, 53 F. Supp. 3d at

164.

"'[T]he adequacy of a FOIA search is generally determined not by the fruits of the

search, but the appropriateness of the methods used to carry out the search.'"  *Ancient Coin

Collectors Guild v. U.S Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011).   The agency,

moreover, need only search those locations "reasonably calculated" to uncover responsive

documents.   *Kowalczk v. DOJ,* 73 F.3d 386, 389 (D.C. Cir. 1996).   Plaintiff does not contend

that the areas searched by EPA were not "reasonably calculated" to locate responsive

documents.

This also is not a "rare case . . . in which an agency record contains a lead so apparent

that the [agency] cannot in good faith fail to pursue it."   *Id.*   Here, the EPA has explained that,

in a study of the magnitude of the Six State and Ten State Addenda, it is not uncommon for

there to be some incidental communications with others in the agency.   The fact that an

individual was copied on an email, therefore, does not render that individual reasonably likely

to possess additional records (beyond a copy of the email to which the person was copied)

responsive to the request.   (Suppl. Ingram Decl. ¶ 19).   Accordingly, EPA's search was not

unreasonable because it did not encompass every individual who may have been copied on

emails that were located in response to the request.

Finally, Plaintiff also makes the bare assertion that EPA failed to apply "pertinent

search terms."   (ECF No. 17, at 3).   Plaintiff, however, fails to provide support for this

assertion, which should be rejected as purely speculative.

## III.     Pattern and Practice Claim

The facts in this case do not support the rare circumstances in which courts provide relief

after an agency has provided the requested records.   While the D.C. Circuit has allowed claims

that an agency *policy or practice* will impair the party's lawful access to information in the

future, such claims have strict standards for relief. *Payne Enters., Inc. v. United States*, 837 F.2d

486, 491 (D.C. Cir. 1988) (citing *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90-92 (D.C.

Cir. 1986)); *accord City of Houston v. Dep't of Hous. & Urban Dev*., 24 F.3d 1421, 1428-30

(D.C. Cir. 1994). In *Payne*, the court found that the plaintiff's challenge was not moot because, in

addition to seeking documents the government had ultimately disclosed, Payne also alleged that the Air Force was "following an 'impermissible practice' in evaluating FOIA requests, and that it will suffer 'continuing injury due to this practice,'"  *Newport Aeronautical Sales v. Dept. of the Air Force,* 684 F.3d 160, 164 (D.C. Cir. 2012).

Plaintiff has failed to establish a factual basis sufficient to support such a conclusion here. Plaintiff asserts that it made multiple requests to EPA to provide an estimated completion date. Plaintiff does not allege, however, that EPA decided, even initially, to not produce any records that should be produced. Plaintiff merely alleges that EPA's responses to its requests have been *delayed.* This distinction is significant. "[R]ecogniz[ing] that agencies may not always be able to adhere to the timelines," the D.C. Circuit has held that the only "penalty" for delay is "that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court." *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 189  (D.C. Cir. 2013).  "This scheme provides an incentive for agencies to move quickly but recognizes that agencies may not always be able to adhere to the timelines that trigger the exhaustion requirement." *Id.*

Accordingly, delay alone, even repeated delay, is not the type of illegal policy or practice that is actionable under *Payne Enterprises. See Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 2016 U.S. Dist. LEXIS 134792, at *8 (D.D.C. Sept. 29, 2016) (policy or practice claims involve "more egregious, intentional agency conduct than mere delay"); *Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116, 120 (D.D.C. 2010) ("*Payne Enterprises* regards the repeated denial of Freedom of Information requests based on invocation of inapplicable statutory exemptions rather than the delay of an action over which the agency had discretion.").

## CONCLUSION

For the foregoing reasons and those in Defendant's Motion for Summary Judgment, the

Court should deny Plaintiffs' Motion for Summary Judgment and enter judgment in

Defendant's Favor.

Respectfully submitted,

CHANNING D. PHILLIPS
D.C. Bar # 415793
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Civil Chief

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 16-cv-175 (BAH)** |
| **UNITED STATES ENVIRONMENTAL** | ) |
| **PROTECTION AGENCY,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
LOCAL RULE 7(H) STATEMENT**

Defendant responds as follows to Plaintiff's Local Rule 7(h) Statement ("Plaintiff's Statement") filed in support of Plaintiff's cross-motion for summary judgment.

As a threshold matter, Plaintiff's Statement does not comply with Local Rule 7(h) because it consists largely of immaterial facts in violation of Local Rule 7(h).  Thus to the extent the assertions in Plaintiff's Statement are denied by Defendant, those denials do not preclude the Court from granting Defendant's Motion for Summary Judgment.   Likewise, Defendant objects to the allegations to Plaintiff's Statement to the extent they assert conclusions of law, opinion, and other matters immaterial to the legal issues in a FOIA lawsuit.  Thus, any failure to further respond to such assertions should not result in the assertion being deemed conceded because, pursuant to Local Rule 7(h), the Court may assume a fact to be admitted only to the extent it is properly deemed a "material" fact.   *See Williams v. Court Servs. & Offender Supervision Agency,* 110 F. Supp. 3d 111, 115 (D.D.C. 2015) ("Both of Mr. Williams' statements violate the Local Rule because, at 86 pages, they are certainly not '*concise* statement[s] of genuine issues

setting forth all material facts.' LCvR 7(h). His statements are replete with argument, speculation, conjecture, and assumptions. The alleged facts are largely 'not material to [his] substantive claims,'. . . , or merely 'describ[e] in lengthy detail the contextual and structural background surrounding Defendant's stated facts.'").

Responding specifically to the numbered paragraphs of Plaintiff's Statement, and using the same numbering, Defendant responds as follows:

1-5.    The referenced documents speak for themselves and Defendant disputes to the extent the assertions are not consistent with the content of those documents.

6.    This assertion does not accurately characterize the process by which the "no effect" determination was reached.   That process is more accurately set forth in the accompanying Supplemental Ingram Declaration.  *See* Suppl. Ingram Decl. ¶¶ 3-6.

7-14.    The referenced documents speak for themselves and Defendant disputes to the extent the assertions are not consistent with the content of those documents.

15-16.    These assertions do not accurately characterize the FOIA request, which are more fully set forth in the request themselves.  Ex. B and C to Ingram Decl.

17-26.    The referenced documents speak for themselves and Defendant disputes to the extent the assertions are not consistent with the content of those documents.

27.    This assertion does not accurately characterize the EPA's response to the two FOIA requests, which is addressed more fully in the Ingram Declaration and accompanying Vaughn Index.

28.    The referenced document speaks for itself and Defendant disputes to the extent the assertions are not consistent with the content of the referenced document.

29.    Not disputed.

30.     The referenced document speaks for itself and Defendant disputes to the extent the assertions are not consistent with the content of the referenced document.

31.     Not disputed.

32.     The cited paragraph of the Ingram Declaration speaks for itself and Defendant refers to that paragraph for a complete and accurate statement of its contents.

33.     The cited paragraph of the Ingram Declaration speaks for itself and Defendant refers to that paragraph for a complete and accurate statement of its contents.

34.     The cited paragraphs of the Ingram Declaration speak for themselves and Defendant refers to those paragraphs for a complete and accurate statement of their contents. *See also* Suppl. Ingram Decl. ¶ 15.

35.     The cited paragraphs of the Ingram Declaration speak for themselves and Defendant refers to those paragraphs for a complete and accurate statement of their contents. EPA also conducted a supplemental search for responsive documents in connection with these custodians.  (Suppl. Ingram Decl. ¶ 17)

36.     This assertion is incorrect as phrased by Plaintiff.  EPA has clarified and further explained paragraph 15 of the Ingram Declaration in the Supplemental Ingram Declaration.  *See* Suppl. Ingram Decl. ¶ 20.

37.     The cited paragraph of the Ingram Declaration speaks for itself and Defendant refers to that paragraph for a complete and accurate statement of its contents.

38.     This assertion is argumentative and asserts a legal conclusion based on Plaintiff's view as to what constitutes an adequate search.   Defendant refers the Court to the Ingram Declaration, paragraph 15, as well as the Supplemental Ingram Declaration, paragraph 17.

39.     This assertion is argumentative and asserts a legal conclusion based on Plaintiff's view as to what constitutes an adequate search.   EPA conducted a reasonable search of custodians reasonably likely to have responsive records based on the language in the FOIA request.  *See also* Suppl. Ingram Decl. ¶ 18-19.

40.     The referenced portions of the Vaughn Index speak for themselves.

41.     The referenced document speaks for itself.

42.     The referenced document speaks for itself.

43.     In response to the assertions in this paragraph, Defendant refers the Court to EPA's updated *Vaughn* Index (attached as an exhibit to the Supplemental Ingram Declaration), as well as to paragraph 7 of the Supplemental Ingram Declaration.

44.     Defendant does not dispute this assertion but asserts that it is argumentative to the extent it is suggesting that the search was inadequate because responsive documents were not located through the date of the second FOIA request.

45.     This assertion is not correct and the basis for this assertion has been corrected in the Supplemental Ingram Declaration.   *See* Suppl. Ingram Decl. ¶ 12.

46.     This assertion as it relates to paragraph 29 of the Ingram Declaration is not correct and has been corrected in the Supplemental Ingram Declaration.  *See* Suppl. Ingram Decl. ¶ 7.  The other cited paragraph of the Ingram Declaration speaks for itself and Defendant refers the Court to that paragraph for a complete and accurate statement of its contents.

48 [sic.].   The Ingram Declaration and Vaughn Index speak for themselves and, in further response, Defendant refers the Court to paragraph 7 of the Supplemental Ingram Declaration.

Respectfully submitted,

CHANNING D. PHILLIPS
D.C. Bar # 415793
United States Attorney

DANIEL F. VAN HORN
D.C. BAR # 924092
Civil Chief

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov