**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,

Plaintiff,

v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

Defendant.

Civil Action No. 16-175 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, the Center for Biological Diversity ("CBD"), initiated this action, pursuant

to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 701–706, against the defendant, the U.S. Environmental Protection

Agency ("EPA"), seeking an order requiring both an adequate search and disclosure of all

responsive records withheld in response to CBD's two FOIA requests.  Pl.'s Mem. Supp. Cross-

Mot. Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 13, ECF No. 18.[1]  CBD also

asks the Court "to find EPA in violation of the FOIA's requirement to provide estimated dates of

completion to requesters," and to enjoin the agency from failing to do so in response to future

FOIA requests.  *Id.* at 3.

In particular, CBD alleges in nine claims that EPA: (1) failed to provide an estimated

completion date and comply with FOIA's deadline mandates (Counts I and III); (2) engaged in a

pattern, practice, and policy of violating FOIA's estimated completion date requirement and

---

[1]        CBD "is a nonprofit environmental conservation organization that works to protect native wildlife species
and their habitats, including from exposure to toxic chemicals."  Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s
Opp'n"), at 1 n.1, ECF No. 18.

response and determination deadlines (Counts II and IV); (3) failed to conduct an adequate

search (Count V); (4) unlawfully withheld records responsive to CBD's requests (Count VI); (5)

failed to provide reasonably segregable portions of any lawfully exempt records (Count VII); and

(6) engaged in FOIA violations constituting agency action unlawful under the Administrative

Procedure Act ("APA") (Counts VIII and IX).

Pending before the Court are the parties' cross motions for summary judgment.  Def.'s

Mot. Summ. J. ("Def.'s MSJ"), ECF No. 16; Pl.'s Cross-Mot. Summ. J. ("Pl.'s XMSJ"), ECF No.

17.  Defendant's motion is granted with respect to Counts I through IV and VIII through IX;

denied with respect to Count V; granted in part and denied in part, without prejudice, with

respect to Count VI; and denied, without prejudice, with respect to Count VII.  Plaintiff's motion

is granted with respect to Count V and denied otherwise.  For the following reasons, EPA must

conduct a supplemental search, disclose any non-exempt materials, and, if it continues to

withhold any materials, submit a supplemental declaration and *Vaughn* Index that sufficiently

justifies these withholdings in accordance with, and in the format prescribed in, this

Memorandum Opinion.

## I.     BACKGROUND

The FOIA requests in this case concern EPA's determination that a new pesticide

product, Enlist Duo, manufactured by Dow AgriSciences ("Dow"), would have "no effect" on

species protected under the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531–44 *et*

*seq*.  Enlist Duo is an herbicide "developed for use on corn and soybean crops that are

genetically engineered ('GE') to be resistant to the active ingredients in Enlist Duo: glyphosate

(also known as 'Round Up') and 2,4-dichlorophenoxyacetic acid choline salt ('2,4-D')."  Def.'s

MSJ, Attach. 2, Declaration of Earl G. Ingram, Jr., Chief, Public Information and Records

2

Integrity Branch, Information Technology and Resources Management Division, Office of

Pesticide Programs, EPA ("EPA Decl.") ¶ 4, ECF No. 16-2. "Both 2,4-D and glyphosate are

chemicals that have been registered for use in the United States since the mid-1940s and 1974,

respectively," but not previously registered for use together. *Id.*

        EPA "registers" pesticides under the Federal Insecticide, Fungicide and Rodenticide Act

("FIFRA"), 7 U.S.C. §§ 136 *et seq.*, if EPA determines a pesticide "will not generally cause

unreasonable adverse effects on the environment," *id.* § 136a(c)(5)(D), "taking into account the

economic, social, and environmental costs and benefits of the use of [a] pesticide," *id.* § 136(bb).

Separate from this cost-benefit analysis, under § 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2),

EPA is directed to "insure" that any pesticide "is not likely to jeopardize the continued existence

of any endangered species or threatened species or result in the destruction or adverse

modification of habitat of such species." To comply with this section of the ESA, the statute

directs agencies to "use the best scientific and commercial data available." *Id.* Section 7(a)(2)

and its implementing regulations, 50 C.F.R. §§ 402 *et seq.*, require EPA to consult, formally or

informally, with the U.S. Fish and Wildlife Service ("FWS") for effects on terrestrial species,

and with the National Marine Fisheries Service ("NMFS") for effects on marine species, if EPA

determines a pesticide "may affect" any endangered or threatened species or their critical habitat.

50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time

to determine whether [they] may affect listed species or critical habitat"). If EPA determines that

a given pesticide will have "no effect" on any endangered or threatened species or their critical

habitat, however, then no consultation is required. *Nat'l Parks Conservation Ass'n v. Jewell*, 62

F. Supp. 3d 7, 12 (D.D.C. 2014) ("[A]n agency avoids the consultation requirement for a

proposed discretionary action only if it determines that its action will have 'no effect' on

threatened or 'endangered' species or critical habitat").  "The 'may affect' threshold for triggering the consultation duty under 7(a)(2) is low."  *Id.*.

**A.     The ESA Effects Determination and Addenda**

In January 2013, EPA conducted an "Environmental Risk Assessment," which assessed the risks of Enlist Duo.  Pl.'s Cross-Mot Summ. J. ("Pl.'s XMSJ"), Attach. 6, Memorandum from Meghan Radtke and Faruque Khan to Michael Walsh, *et al.*, (Jan. 15, 2013) ("Environmental Risk Assessment"), Ex. B, ECF No. 17-6.  This assessment recommends that Enlist Duo be labeled as "toxic to birds, mammals, fish, and aquatic invertebrates," *id.* at 4, but nevertheless found "insufficient information" to determine whether use of the pesticide would have "direct effects" on any endangered or threatened species, *id.* at 11.  To address the toxicity risks of Enlist Duo, the assessment determined that a 202 foot spray-drift buffer—an area of unsprayed land surrounding sprayed fields—would "reduce risk quotients for birds (acute), mammals (acute and chronic), and terrestrial plants below [EPA's] levels of concern."  *Id.* at 2.

About six months later, in June 2013, EPA issued an Addendum to the Environmental Risk Assessment for Enlist Duo, which "re-evaluated the spray drift buffers."  *Id.*, Attach. 7, Memorandum from Meghan Radtke and Faruque Khan to Michael Walsh, *et al.* (June 13, 2013) ("First Addendum"), Ex. C, at 1, ECF No. 17-7.  In the First Addendum, EPA reduced the spray-drift buffers needed from 202 feet to "from < 25 ft to 30 ft."  *Id.* at 2.

Eight months later, in February 2014, EPA issued another Addendum that "refined" its risk assessment of Enlist Duo to endangered species, studying the effects on 53 endangered or threatened species in six states for which EPA proposed registering the use of the pesticide: Illinois, Indiana, Iowa, Ohio, South Dakota, and Wisconsin.  *Id.*, Attach. 8, Addendum to 2,4-D Choline Salt Section 3 Risk Assessment: Refined Endangered Species Assessment for Proposed New Uses on Herbicide-Tolerant Corn and Soybean (Docket #: EPA-HQ-OPP-2014-0195-0009)

("Six State Addendum"), Ex. D, at 2–3, ECF No. 17-8.  This second addendum, called the "Six

State Addendum" by the parties, again addressed the toxicity of Enlist Duo on plants and

animals, concluding that "[p]otential direct risk concerns could not be excluded for mammals

(acute and chronic); birds, reptiles, and terrestrial-phase amphibians (acute); and terrestrial

plants," *id.* at 1–2, but nonetheless that the herbicide would have "no effect" on any endangered

or threatened species in the six states.  *Id.* at 2, 3–5, 13, 17–40.  Although EPA recognized that

53 endangered or threatened species "were identified as potentially at risk (direct or indirect

effects) in the six states," *id.* at 3, EPA concluded that 49 of the 53 species could be given a "no

effect" determination with use of a spray drift buffer as those species were unlikely to occur on

treated fields.  *Id.*  Four species were recognized as "reasonably expected to occur on treated

corn and soybean fields," but EPA concluded, based on species-specific data, that Enlist Duo

would have "no effect" on these species.  *Id.* at 3–13.  As EPA determined Enlist Duo would

have "no effect" on endangered or threatened species, no consultation with NMFS or FWS,

informally or formally, was required by regulation.  *See Nat'l Parks Conservation Ass'n v.*

*Jewell*, 62 F. Supp. 3d at 12.  Two months later, on April 30, 2014, EPA proposed to register

Enlist Duo in the six states.  *See Id.*, Attach. 9, Proposed Registration of Enlist DUO<sup>TM</sup> Herbicide

(Apr. 30, 2014), Ex. E, ECF No. 17-9.  On October 15, 2014, EPA issued its final registration

authorizing the use of Enlist Duo in the six states.  *Id.*, Attach. 10, Final Registration of Enlist

DUO<sup>TM</sup> Herbicide (Oct. 15, 2014), Ex. F, ECF No. 17-10.

On September 26, 2014, EPA issued an additional "refined endangered species

assessment" of Enlist Duo for ten states: Arkansas, Kansas, Louisiana, Minnesota, Mississippi,

Missouri, Nebraska, North Dakota, Oklahoma, and Tennessee.  *Id.*, Attach. 11, Addendum to

2,4-D Choline Salt Section 3 Risk assessment: Refined Endangered Species Assessment for

Proposed New Uses on Herbicide-Tolerant Corn and Soybean for AR, KS, LA, MN, MS, MO, NE, ND, OK, TN (Docket #: EPA-HQ-OPP-2014-0195-2419) ("Ten State Addendum"), Ex. G, ECF No. 17-11.  This "Ten State Addendum" assessed the effects of Enlist Duo on 168 endangered and threatened species, and concluded that the herbicide would have "no effect" on all 168 species.  *Id.* at 3.  As EPA determined that the herbicide would have "no effect," EPA did not consult, formally or informally, with NMFS or FWS, and on March 31, 2015, issued its decision registering Enlist Duo for use in nine of these ten states.  *Id.*, Attach. 13, Decision to Amend Enlist Duo<sup>TM</sup> Herbicide Label to Include Additional States: Arkansas, Kansas, Louisiana, Minnesota, Missouri, Mississippi, Nebraska, Oklahoma, and North Dakota (Mar. 31, 2015), Ex. I, ECF No. 17-13.

### B.      The FOIA Requests

CBD submitted the first of its two FOIA requests at issue in this matter to the EPA on June 26, 2014 ("First Request"), about two months after EPA proposed to register Enlist Duo in the six states, *see Id.*, Attach. 14, Freedom of Information Act Request for Records Related to the Environmental Protection Agency's Evaluation of 2,4-D Choline Salt Herbicide on Endangered Species ("First FOIA Request"), Ex. J, at 1, ECF No. 17-14, seeking information on what led EPA to conclude that Enlist Duo would have "no effect" on endangered or threatened species, "even as EPA simultaneously determined that Enlist Duo may harm many non-target animals," *id.*, Attach. 2, Declaration of Brett Hartl, CBD's former Endangered Species Policy Director and current Government Affairs Director ("CBD Decl.") ¶ 3, ECF No. 17-2; EPA Decl. ¶ 6. Specifically, CBD sought the following:

> All documents and correspondence related to the Environmental Protection Agency's "Addendum to 2,4-D Choline Salt Section 3 Risk Assessment: Refined Endangered Species Assessment for Proposed New Uses on Herbicide-Tolerant Corn and Soybean," (Docket #: EPA-HQ-OPP-2014-0195-0009) for the new Enlist Duo<sup>TM</sup> product.

First FOIA Request at 1.  "All documents" is defined as including, but not limited to, "all

memoranda, maps, studies, reports, data, correspondence, comments, conversation records, files,

electronic mail records, phone notes, or other documents."  *Id.*

CBD submitted a second, similar FOIA request on October 20, 2014 ("Second Request"),

shortly after EPA had issued the registration for use of the pesticide in the six states and had

proposed registering the pesticide's use in an additional ten states. The second FOIA request

sought the following:

> All records and correspondence related to the Environmental Protection Agency's
> "Addendum to 2,4-D Choline Salt Section 3 Risk assessment: Refined Endangered
> Species Assessment for Proposed New Uses on Herbicide-Tolerant Corn and Soybean for
> AR, KS, LA, MN, MS, MO, NE, ND, OK, TN."

Pl.'s XMSJ, Attach. 16, FOIA Request Letter from Brett Hartl, Center for Biological Diversity,

to EPA (Oct. 20, 2014), Ex. L at 1, ECF No. 17-16.  Like the first request, "all records" is

defined as including, but not limited to, "any and all memoranda, maps, studies, reports, data,

correspondence, comments, conversation records, files, electronic mail records, phone notes,

meeting notes and all other documents."  *Id.*

### C.    Processing of the Requests and Production

EPA's FOIA office assigned the FOIA requests to the Office of Program Management of

the Office of Chemical Safety and Pollution Prevention, which delegated the requests to the

Office of Pesticide Programs ("OPP"), since OPP is responsible for regulating pesticides under

FIFRA.  EPA Decl. ¶¶ 10-11, 14.  OPP identified the Environmental Fate and Effects Division

("EFED") within OPP as the division responsible for the FOIA request.  EPA Decl. ¶ 14.

EPA sent CBD an email on December 4, 2014, stating that the First Request was a

duplicate of the Second Request and that EPA would therefore close the First Request.  Def.'s

Statement of Material Facts Not in Genuine Dispute ("Def.'s SMF") ¶ 5, ECF No. 16; EPA Decl.

¶ 12.  After further discussion with CBD, however, EPA agreed that both requests would remain open, and EPA would search for records responsive to both requests, which concerned different states and different listed species.  Def.'s SMF ¶ 5; EPA Decl. ¶ 12.  On December 17, 2014, the parties discussed a timeline for estimated completion and search parameters, which EPA understood to include records dated through September 26, 2014, the date when the Ten State Addendum was issued.  EPA Decl. ¶ 13; *see* Ten State Addendum.  CBD denies agreeing to this cut-off date.  CBD Decl. ¶¶ 16–19.

EPA conducted three searches for responsive documents.  The first search took place sometime before this litigation began, the second search occurred on February 9, 2016, and the third search took place a year later, if the date provided by EPA is correct, on February 9, 2017.  EPA Decl. ¶¶ 14–15, 24; Def.'s Opp'n Pl.'s Cross-Mot. Summ. J. & Reply Supp. Def.'s Mot. Summ. J. ("Def.'s Reply"), Attach. 1, Supplemental Declaration of Earl G. Ingram, Jr., Chief, Public Information and Records Integrity Branch, Information Technology and Resources Management Division, Office of Pesticide Programs, EPA ("EPA Supp. Decl.") ¶¶ 15–17, ECF No. 22-1.  In the first search, EPA's FOIA staff "emailed three individuals" at EFED "to help coordinate the search."  EPA Decl. ¶ 14.  "As the requests were related to specific documents authored by EFED," EPA explains that this "division was identified as the office likely to have documents responsive to the FOIA requests and the members of that division were considered subject matter experts (SMEs)."  *Id.*  EPA "asked that employees of EFED and other OPP employees likely to have documents each search" for "potentially responsive documents" and "deposit[] them to a shared network drive."  *Id.*  FOIA staff "also emailed other OPP employees and coordinated the collection of potentially responsive documents."  *Id.*  In total, EPA identified

seven custodians whose records were searched.[2]  According to EPA, "[a]ny paper records that were provided were scanned and placed with the collection."  *Id.*  The SMEs in EFED then searched for records using the terms "2,4-D" and "Enlist."  EPA Decl. ¶ 15.  The SMEs also "subsequently confirmed" with EPA's FOIA staff that "no [instant messages ("IMs")], text messages, social media posts, Facebook or Twitter messages, or any other kind of chats were used by OPP staff to communicate on the drafting and review of documents related to the Endangered Species Assessment."  *Id.*

EPA conducted the second search on February 9, 2016, after the filing of this lawsuit. EPA Supp. Decl. ¶ 16.  EPA identified six additional custodians, including four Office of General Counsel ("OGC") attorneys, "who had advised and consulted on the underlying draft documents," as well as "two additional potential custodians from OPP's Registration Division." EPA Supp. Decl. ¶ 15; *see also* EPA Decl. ¶ 23.[3]  For both the original seven custodians and the additional six custodians, EPA then conducted an electronic search of emails "using the Agency's centralized eDiscovery search service in the Office of Environmental Information (OEI)," EPA Decl. ¶ 24; EPA Supp. Decl. ¶ 16, for emails and attachments dated from February 15, 2013 to October 20, 2014, EPA Decl. ¶ 24.[4]  The system was searched using the following terms: ("risk assessment" OR "assessment" OR "RA") AND ("Enlist" OR "Choline" OR "2,4-D") AND ("ESA" or "endangered species").  EPA Decl. ¶ 24.

---

[2]     The seven custodians are: Daniel Kenny, Meghan Radtke, Sujatha Sankula, Faruque Khan, James Cowles, Edward Odenkirchen, and Anita Pease.  EPA's Decl. ¶ 14; EPA's Supp. Decl. ¶ 15.

[3]     These six additional custodians are four OGC attorneys, Benjamin Wakefield, Michele Knorr, Ariadne Goerke, and Robert Perlis, and two individuals from OPP's Registration Division, Emily Schmid and Kathryn Montague.  EPA's Supp. Decl ¶ 15.

[4]     Although EPA states that the parties agreed to a cut-off date of September 24, 2014, EPA explains the October 20, 2014 cut-off date was used for the second search because the office was "currently handling numerous FOIAs related to Enlist Duo and Glyposate and, to avoid duplication of effort, [the FOIA office] used a date-range for this search that would be sufficient to encompass the date-range applicable to all the related Enlist Duo and Glyposate FOIA requests even if that date-range was overly broad as to some of the requests."  EPA's Decl. ¶ 24.

A year later, on "February 9, 2017," EPA apparently conducted a third search, "instruct[ing]" the six additional custodians—the four OGC attorneys and two OPP Registration Division employees—"to conduct a supplemental search of paper and non-electronic records to locate any additional responsive records that would not have been captured by the electronic search." EPA Supp. Decl. ¶ 17. According to EPA, "[n]o responsive documents were located as a result of" this third supplemental search. *Id.*

The parties' declarations do not make clear how many documents were actually released. EPA states thirty "studies" were produced on March 12, 2015, and that a total of 48 records, of an unspecified number of pages, were released between March 12, 2015 and May 1, 2015. EPA Decl. ¶¶ 18–21. EPA sent CBD a final response to both FOIA requests on October 8, 2015, indicating that approximately 150 emails and other documents were withheld under FOIA Exemption 5, as containing information protected by the deliberative process privilege and/or attorney-client privilege. EPA Decl. at ¶ 21. According to CBD, these 150 documents totaled approximately 500 pages. CBD Decl. ¶ 30. Following the initiation of litigation, however, EPA conducted its supplemental search and released an unspecified number of additional documents. EPA Decl. ¶¶ 24–26.

CBD describes a different account of the disclosures, stating that on November 19, 2014, EPA provided six records, which consisted of five emails between Dow and EPA in April and May of 2013, and an "email attachment without any context as to whom it was sent or received by." CBD Decl. ¶ 22. Based on CBD's declarations, EPA continued to release documents over the course of the next few months, including at least 138 documents of unspecified length. CBD Decl. ¶¶ 22–28 (describing disclosures made from November 19, 2014 to May 1, 2015). Then, on October 8, 2015, EPA sent final determination letters. EPA Decl. ¶ 21.

On November 6, 2015, CBD appealed EPA's closure of the requests and withholdings. EPA Decl. ¶ 22; Pl.'s Compl. ¶ 11.  EPA did not acknowledge CBD's appeals until CBD sent a letter "notifying the EPA of the violation and offering to assist," but as of the filing of this suit, EPA had not responded to CBD's appeals, and as such, CBD claims the Agency is in violation of the twenty-day response time required by the FOIA.  Pl.'s Compl. ¶ 11; Pl.'s Mem. at 12.  EPA maintains, however, that the agency sent an acknowledgement letter to CBD on November 10, 2015, EPA Decl. ¶ 22, but concedes that the agency had "not responded to [CBD's] appeals as of the filing date of the Complaint."  Def.'s Answer ¶ 11.

### D.   EPA's *Vaughn* Indices

Accompanying the release of documents, EPA produced two indices, pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), on November 23, 2016, and February 23, 2017, describing the documents withheld, either in full or in part.  EPA Decl., Ex. A, at 15–53 ("*Vaughn* Index"), ECF No. 16-1; EPA Supp. Decl., Ex. 1 ("Supp. *Vaughn* Index"), ECF No. 22-1.[5]  As summarized by EPA, the indices include three categories of documents: "(1) draft versions of Six State and Ten State Addenda and related draft documents; (2) emails transmitting these drafts and including comments, opinions, and proposals for revisions by EPA employees and managers; and (3) presentations and talking points in preparation for meetings with Dow Chemical, the manufacturer of Enlist Duo, and for internal meetings with EPA management." EPA Supp. Decl. ¶ 7.  In its initial declaration, EPA claimed that "approximately 95 documents were withheld in full or in part under the deliberative process privilege."  EPA Decl. ¶ 29.  Upon further review, however, EPA claims that "a number of duplicates of documents that had been

---

[5]   "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies."  *PrisonLegal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015). According to EPA's first declaration, the first *Vaughn* Index was provided on September 15, 2016, EPA Decl. ¶ 27, but the *Vaughn* Index is dated November 23, 2016. *Vaughn* Index at 1.

withheld in full were not accounted for" in the initial *Vaughn* Index, "which resulted in an undercounting." EPA Supp. Decl. ¶ 7. "When those duplicates are included," EPA explains that it "withheld 108 documents in full and 35 documents in part under FOIA's Exemption 5's deliberative process privilege." *Id.*[6] Five of those documents are also being withheld under the attorney-client privilege. *See* Supp. *Vaughn* Index, at 4, 6, 8–9 (entries labeled as follows: "PRD 517," "Attachment to PRD 630 and 631," "Attachment to PRD 632," "Attachment to PRD 633," and "WHF #3"). EPA also withheld the personal phone number on one document under Exemption 6, the personal privacy exemption to FOIA. *See Vaughn* Index at 22 (entry labeled "PRD 706"); *see* 5 U.S.C. § 552(b)(6) (exempting from FOIA "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy).

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc. ("Liberty Lobby")*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable

---

[6]          Not only does EPA fail to state how many documents are duplicates, the agency does not explain why EPA initially thought 150 records had to be withheld, *see* EPA Decl. at ¶ 21; CBD Decl. ¶ 30, only to reduce this number of withheld documents to 108 documents in full and 35 documents in part, EPA Suppl. Decl. ¶ 7.

jury could return a verdict for the nonmoving party'" (quoting *Liberty Lobby*, 477 U.S. at 248)).
"[T]hese general standards under [R]ule 56 apply with equal force in the FOIA context," *Wash.*
*Post Co. v. U.S. Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).  Indeed,
the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary
judgment." *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by
generally requiring federal agencies to make their records available to the public on request."
*DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice v. Julian*,
486 U.S. 1, 8 (1988)).  Reflecting the necessary balance between the public's interest in
governmental transparency and "legitimate governmental and private interests that could be
harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*,
601 F.3d 557, 559 (D.C. Cir. 2010) (alteration adopted) (quoting *Critical Mass Energy Project v.*
*Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C.Cir.1992)), the FOIA contains nine
exemptions set forth in 5 U.S.C. § 552(b), which "are 'explicitly made exclusive,' . . . and must
be 'narrowly construed,'" *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA*
*v. Mink*, 410 U.S. 73, 79 (1973) and *FBI v. Abramson*, 456 U.S. 615, 630 (1982)); *see also*
*Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for*
*Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW II*"), 746 F.3d 1082, 1088
(D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir.
2010).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy,
is the dominant objective of the Act." *Dep't of Interior v. Klamath Water Users Protective*
*Ass'n*, 532 U.S. 1, 7–8 (D.C. Cir. 2001) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361
(1976)).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagra Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (agency invoking exemption bears the burden "to establish that the requested information is exempt"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989); *DiBacco,* 795 F.3d at 195; *CREW II*, 746 F.3d at 1088; *Elec. Frontier Found. v. U.S. Dep't of Justice ("EFF")*, 739 F.3d 1, 7 (D.C. Cir. 2014); *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003).  This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure," while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur." *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d at 904–05 (alterations in original) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).[7]

An agency may carry its burden of properly invoking an exemption by submitting affidavits or declarations, a *Vaughn* Index, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate.  *See Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) ("In FOIA cases, 'summary judgment

---

[7]     "The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).

may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (alteration adopted) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006))); *Oglesby v. U.S. Dep't of Army ("Oglesby II")*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that agency affidavit "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision" (citation omitted)); *CREW*, 746 F.3d at 1088 (noting that agency's burden is sustained by submitting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))). While "an agency's task is not herculean[,]" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson,* 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson,* 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), and "directs district courts to determine *de novo* whether

non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).  As part of this review, district courts also have an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information, regardless of whether the FOIA plaintiff has raised this issue.  *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff.") (citations omitted); 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.   DISCUSSION

In evaluating the parties' cross-motions for summary judgment, the adequacy of the search (Count V) is considered first before turning to the sufficiency of EPA's justifications for withholding documents (Count VI), and its across-the-board statement that no segregable portions of any of the withheld documents can be released (Count VII).  CBD's procedural challenges, in Counts I through IV, VIII and IX are discussed last.[8]

---

[8]      For the reasons explained, *infra*, Part III.C., summary judgment is granted to EPA and denied to CBD on Counts I through IV, VIII and IX.

### A.   ADEQUACY OF THE SEARCH

CBD argues that EPA conducted an inadequate search because "EPA failed to apply

pertinent search terms, applied inconsistent and improper cut-off dates, and failed to maintain

and search entire categories of records altogether."  Pl.'s Mem. at 3.[9]  EPA defends the adequacy

of its search as reasonably calculated to uncover all relevant documents, even if the search failed

to uncover every single document.  Def.'s Reply at 14.  The legal standard for adequacy of a

FOIA search is reviewed before turning to an analysis of the searches conducted by EPA.

### 1.   *Legal Standard*

An agency "fulfills its obligations under [the] FOIA if it can demonstrate beyond material

doubt that its search was reasonably calculated to uncover all relevant documents" and

"perform[s] more than a perfunctory search" to identify responsive records.  *Ancient Coin*

*Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (citations and

internal quotation marks omitted); *see also Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C.

Cir. 1990).  "[T]he issue to be resolved is not whether there might exist any other documents

---

[9]      CBD also argues that EPA's search was inadequate because no search was conducted of its voicemail
system.  Pl.'s Mem. at 38.  EPA initially stated that "EPA does not preserve voicemail through the voicemail
system."  EPA Decl. ¶ 15.  In it supplemental declaration, EPA clarified that "voicemail is generally transitory and
is only preserved for a short period in the voicemail system," but that "[u]nder the Agency's records guidance,
voicemail where an Agency decision or commitment is made, and that is not otherwise documented (for example, in
a written memorandum or email), should be preserved in a memorandum to file or other written document."  Supp.
EPA Decl. ¶ 20.  According to EPA, "[a]ny such written document or email responsive to the FOIA requests at issue
in this matter would have been captured by the EPA's search."  *Id.*; *see also* Def.'s Reply at 17–18 (stating that "to
the extent" a voicemail was "preserved in a written document or email response to the FOIA requests at issue in this
matter, it would have been captured by EPA's search").  In light of the EPA's policy not to preserve information in
voicemail format, the agency "is not obligated, nor is it able, to disclose a record it does not have."  *Debrew v.*
*Atwood*, 792 F.3d 118, 123 (D.C. Cir. 2015).  CBD nevertheless argues that voicemails are "correspondence" and
thus are "agency records that should be preserved."  Pl.'s Mem. at 38 (citing 44 U.S.C. § 3301 (defining "records" as
"all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal
law or in connection with the transaction of public business and preserved or appropriate for preservation by that
agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures,
operations, or other activities of the United States Government or because of the informational value of data in
them") and *Competitive Enter. Inst. v. EPA*, 67 F. Supp. 3d 23, 27 (D.D.C. 2014) ("A document that qualifies as a
federal record may not be discarded except as provided by statute.")).  CBD provides no authority, however, and the
Court has been unable to find any, requiring an agency to preserve voicemails.  Accordingly, EPA's explanation for
not searching its voicemail system is reasonable and no new search will be ordered on this basis.

possibly responsive to the request, but rather whether the search for those documents was adequate." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  In this regard, "[t]here is no requirement that an agency search every record system," although "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby v. U.S. Dep't of the Army ("Oglesby I")*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Further, agencies are not obligated to search "beyond 'the four corners of the request,' nor are they 'required to divine a requester's intent.'" *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013) (quoting *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003)).

At the summary judgment stage, an agency meets its burden of demonstrating beyond material doubt that it "made a 'good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested,'" *DiBacco*, 795 F.3d at 188 (internal alterations omitted) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1990)), by submitting to the Court a "'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched,'" *Ancient Coin*, 641 F.3d at 514 (quoting *Valencia-Lucena*, 180 F.3d at 326).  Agency affidavits or declarations explaining search scope and methodology are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted); *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (recognizing substantial weight traditionally accorded agency affidavits in FOIA "adequacy of search" cases).  The FOIA requester bears the burden, then, of overcoming the presumption of good faith afforded to agency

declarations by "rais[ing] substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials," *DiBacco*, 795 F.3d at 188 (internal quotation and citation omitted), that the search was adequate. *See Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (upholding agency response to FOIA request where requester "has not presented sufficient evidence to rebut [the] presumption" accorded to the agency's averments).

### 2.   *Analysis*

EPA's descriptions of the three searches conducted for responsive records fall short of "demonstrat[ing] beyond material doubt that its search[es] w[ere] reasonably calculated to uncover all relevant documents." *Ancient Coin*, 641 F.3d at 514 (citations and internal quotation marks omitted).  In particular, four reasons demonstrate that EPA's searches were inadequate.

First, EPA fails to justify the use of September 26, 2014, or October 20, 2014, as cut-off dates for the searches.[10]  EPA alleges that CBD and EPA "discussed the search parameters in a telephone conversation on December 17, 2014" and "[i]t was agreed that the search would include documents through September 26, 2014," EPA Decl. ¶ 13, which is the date EPA issued the Ten State Addendum.  In its sworn declaration, CBD confirms communicating with EPA "regarding the search parameters of the two FOIA requests," CBD Decl. ¶ 16, but states that it has "found no evidence that EPA ever alerted [it] to, or otherwise memorialized, a 'cut-off' date of" September 26, 2014.  CBD Decl. ¶ 19.  Further, CBD memorialized the December 17, 2014 conversation in an email sent to EPA, which email made no mention of such a key search parameter as an agreed-upon cut-off date of September 26, 2014.  *See* Pl.'s XMSJ, Attach. 23,

---

[10]     EPA does not explain what cut-off date was used for the first or third search, *see* EPA Decl.,¶¶ 14–15, 24, only explaining that October 20, 2014 was used for the second electronic search because the use of that date accommodated multiple FOIA requests, *see* EPA Decl. ¶ 24.  Based on EPA's allegation that the parties agreed on September 26, 2014 as a cut-off date, *see* EPA Decl. ¶ 13, EPA presumably used September 26, 2014 as the cut-off date for the first and third searches.

Email from Brett Hartl, CBD, to Larry Gottesman and Earl Ingram, EPA, Ex. S at 2–3, ECF No. 17-23.  Although agency affidavits are afforded a presumption of good faith, *SafeCard Servs.*, 926 F.2d at 1200, a FOIA plaintiff "may nonetheless produce countervailing evidence," *Morley*, 508 F.3d at 1116.  In this case, CBD has produced such evidence calling into doubt the purported agreement to a "cut-off" date of September 26, 2014, and EPA has failed to counter this evidence to demonstrate otherwise.

In any event, the use of September 26, 2014, or October 20, 2014, as cut-off dates may nonetheless be "reasonable."  October 20, 2014, was the date of CBD's second FOIA request, CBD Decl. ¶ 9, but the D.C. Circuit has rejected the "use of a time-of-request cut-off [as] *always* reasonable," *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 642 (D.C. Cir. 2002) (emphasis in original), and has indicated that an agency must have a "compelling justification for imposing a date-of-request cut-off on a particular FOIA request," *id.* at 644.  EPA has articulated no compelling justification for using either September 26, 2014, or October 20, 2014, as a cut-off date for searches of records responsive to CBD's requests.  Although October 20, 2014 may have been "convenient" due to a large number of similar FOIA requests, "convenience" is not a compelling justification.  Accordingly, EPA should have used the "date of the search" as the cut-off date.  *See McClanahan v. U.S. Dep't of Justice*, 204 F. Supp. 3d 30, 47 (D.D.C. 2016) ("Relying on this guidance from the Circuit, a date-of-search cut-off has routinely been found to be reasonable, even if the agency performed subsequent searches."); *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 153 (D.D.C. 2013) (citing *Pub. Citizen*, 276 F.3d at 644, for the proposition that the D.C. Circuit "implicitly approv[ed] as reasonable a 'date-of-search cut-off [date]'" (second alteration in original)); *Schoenman v. FBI*, 573 F. Supp. 2d 119, 140 (D.D.C. 2008) (finding no "infirmity in the State Department's current date-of-search cut-

off policy"); *Edmonds Inst. v. U.S. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) (stating that "[t]he D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests" and explaining that "[u]nder the date-of-search approach, Edmonds can, with relative ease, file a second FOIA request for documents created since December 31, 2002."). This guidance on use of the date-of-search as a cut-off date for FOIA searches is well-established and even incorporated into the regulations of various federal agencies. *See, e.g.,* 28 C.F.R. § 16.4(a) (Department of Justice regulation that "[i]n determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date that it begins it search."); 22 C.F.R. § 171.11(j) (State Department regulation that "[i]n determining which records are responsive to a request, the Department ordinarily will include only records in its possession as of the date the search for responsive documents is initiated, unless the requester has specified an earlier time frame").

Second, documents disclosed by the EPA make apparent that the limited number of custodians searched, *see supra* notes 2–3, are not all the relevant custodians, and thus the searches likely failed to be "reasonably calculated to uncover all relevant documents." *Ancient Coin*, 641 F.3d at 514.[11] As CBD points out, at least sixteen additional EPA personnel are included in email correspondence relating to Enlist Duo but were not identified as custodians. *See* CBD Decl. ¶ 33.[12] EPA acknowledges that only six of these sixteen identified individuals

---

[11]    With respect to the first search, EPA does not explain what cut-off date was used; how possible custodians were selected and how they were instructed to search for potentially responsive documents; what record systems were searched; or what search terms were used.  Although EPA explains that the "subject matter experts" searched the records of the initial seven custodians with the terms, "2,4-D" and "Enlist," EPA's own description indicates that this search using terms took place *after* these custodians were asked to search their own records and deposit "documents responsive to the[] requests" in "a shared network drive."  EPA Decl. ¶ 14, 15.  EPA does not explain how the custodians identified responsive documents.

[12]    Although CBD identifies "at least 17 additional EPA personnel who were included on emails but who are not among the Original Custodians," CBD only refers to the following sixteen individuals: Brian Anderson, Donald Corbin, Mark Corbin, Elizabeth Donovan, Jay Ellenberger, William Jordan, Michele Knorr, Sarah Meadows,

were subject to the supplemental searches, leaving "eleven additional EPA personnel whose files plaintiff alleges should have been searched solely because they were copied on some email produced by EPA in response to the requests." EPA Supp. Decl. ¶ 18. Despite this acknowledgement, EPA fails to explain why the remaining individuals were excluded and not deemed likely to have responsive documents, despite their presence on emails discussing Enlist Duo. Given FOIA's purpose of promoting the "broad disclosure of Government records," *DiBacco*, 795 F.3d at 183, the prudent approach would have been simply to search the files of these remaining possible custodians rather than cavalierly to dismiss them as unlikely to have responsive documents. *See Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996) (an agency must pursue any "clear and certain" leads regarding potentially responsive records); *Carter, Fullerton & Hayes, LLC v. Fed. Trade Comm'n*, 637 F. Supp. 2d 1, 7 (D.D.C. 2009) (additional searches are required when an agency is apprised of "additional potentially responsive materials"); *see also Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d at 326 (concluding that an agency may not ignore "positive indications of overlooked materials").

Third, the adequacy of EPA's searches is called into question given that neither the records released, nor the *Vaughn* indices, include any correspondence or documentation of conferral with any state agencies despite EPA's statement that "deliberative communications occurred among EPA staff, and *between EPA and its state and federal partner agencies*." Def.'s MSJ at 11 (citing EPA Decl. ¶ 29) (emphasis added).[13] Also, with the exception of five emails

---

Michael Metzger, Marty Monell, Kathryn Montague, Charles Peck, Robert Perlis, Daniel Rosenblatt, Emily Schmid, Benjamin Wakefield. CBD Decl. ¶ 33.

[13]      In its supplemental declaration, EPA claims to have made a mistake in stating that "some of the withheld information had been shared with 'state and federal partner agencies.'" EPA Supp. Decl. ¶ 12. This is not, however, what the original declaration stated. Rather, the original declaration stated the withheld documents included "deliberative communications . . . between EPA and its state and federal partner agencies," EPA Decl. ¶ 29, expressly indicating that active communications occurred between EPA and state agencies, which communications may be responsive to CBD's two requests. Indeed, EPA's disclaimer about not consulting with state agencies is surprising given the ESA's explicit direction regarding "consultation as appropriate with affected

from 2013 between EPA and Dow, CBD Decl. ¶ 22, no further correspondence or documents of communications with Dow or other third parties were produced or reflected in the two *Vaughn* indices.  EPA must conduct additional searches for any responsive documents with state agencies or third parties and, if no such responsive documents are located, explain why no documents reflecting the "deliberative communications" expressly identified by the EPA as occurring nonetheless do not exist.

Finally, EPA did not search instant messages, text messages, or other electronic communications.  Although the agency disclaims any duty to search for text messages or instant messages, EPA states it "confirmed" with the "subject matter experts" that no instant messages or text messages, "or any other kind of chats were used by OPP staff to communicate on the drafting and review of documents related to the Endangered Species Assessment."  EPA Decl. ¶ 15.[14]  This statement suggests either that the subject matter experts were able to, and did, conduct a search of these kinds of communications, or that EPA conducted no search and rather relied solely on assurances of the subject matter experts.  EPA Decl. ¶ 14.  If the former, EPA must clarify how the subject matter experts conducted a search of these communications.  If the

States."  16 U.S.C. § 1536(a) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, *after consultation as appropriate with affected States*, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section." (emphasis added)).  Thus, before registering this new, potent pesticide for use in sixteen different states, EPA is expected to have complied with the ESA by engaging in discussions with the relevant states' agencies and, thus, such consultations occurring makes more sense than EPA's supplemental declaration, which attempts to wave away its original statement as a mistake.

[14]     EPA insists that if CBD wanted to request instant messages or text messages, "those items should have been identified within the definition of 'documents' or 'records' set forth in the request."  Def.'s Reply, at 17.  EPA provides no case law or statutory basis requiring such specificity in FOIA requests.  As EPA acknowledges, CBD requested all "correspondence" as well as all "conversation records" and "files."  Although agencies are not obligated to search "beyond 'the four corners of the request,'" *Am. Chemistry Council, Inc.*, 922 F. Supp. 2d at 62 (quoting *Landmark Legal Found.*, 272 F. Supp. 2d at 64), and a requester must "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3), an agency "has a duty to construe a FOIA request liberally," *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (citing *Truitt*, 897 F.2d at 544–45; *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836–37 (D.C. Cir. 1979)).

latter, EPA must either conduct a search of these communications, or if it is unable to do so, explain how it is not feasible to search these messages for responsive material, similar to the explanation the agency provided regarding preservation of voicemails, *see supra* note 9. *Cf. Defs. of Wildlife v. U.S. Dep't of Agric.*, 311 F. Supp. 2d 44, 55 (D.D.C. 2004) ("With regard to the defendants' search of the Under Secretary of the NRE's office, the bare assertion that the Deputy Under Secretary saw the FOIA request and that he stated that he had no responsive documents is inadequate because it does not indicate that he performed any search at all." (citing *Steinberg v. U.S. Dep't of Justice,* 23 F.3d 548, 551-52 (D.C. Cir. 1994); *Weisberg v. Dep't of Justice,* 627 F.2d 365, 371 (D.C. Cir. 1980))).

*          *          *

If the "record leaves substantial doubt as to the sufficiency of the search," summary judgment for the agency is not warranted. *Truitt*, 897 F.2d at 542. Here, EPA has failed to "demonstrate beyond material doubt that its search[es] w[ere] reasonably calculated to uncover all relevant documents." *Ancient Coin*, 641 F.3d at 514. Accordingly, EPA is directed to conduct a supplemental search with the following features: (1) the date of the new supplemental search must be used as the cut-off date; (2) uniform search terms most "reasonably calculated to uncover all relevant documents" must be used; (3) electronic and hard-copy documents of the initial seven custodians, the six additional custodians identified by EPA, and the ten potential custodians identified by CBD, must be searched; and (4) if it is able and has not done so already, EPA must search for responsive text messages, instant messages, or other similar agency communications. EPA is further directed to submit a supplemental declaration explaining the absence of any records of communications with state agencies or other third parties unless such records are disclosed or identified in a supplemental *Vaughn* index. Given the inadequacy of the

24

search, EPA's motion for summary judgment must be denied, and CBD's motion is granted to the extent it seeks an order directing the agency to conduct a proper and adequate search for responsive records.

### B.     EPA'S WITHHOLDINGS UNDER EXEMPTION 5

Summary judgment must be denied to EPA due to the inadequacy of the agency's search for responsive records and, consequently, resolution of other issues presented in this case may await the completion of the supplemental search.  In order to provide guidance to the agency for completing responses to the FOIA requests at issue, however, the Court proceeds to consider the parties' arguments regarding EPA's application of Exemption 5.  At the outset, the significant shortcomings in the EPA's *Vaughn* Indices are detailed, with instructions to the agency on the proper format for this important submission, followed by a summary of the applicable law for withholding under Exemption 5 and then discussion of EPA's invocation of both the deliberative process and attorney-client privilege in this case.

#### 1.     *Inadequacy of the EPA's Vaughn Indices*

Both substantively and structurally, EPA's two *Vaughn* indices are patently insufficient. EPA's "*Vaughn* Index provides, at best, thin descriptions of broad categories of materials, paired with assertions that merely parrot legal conclusions."  *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 243 (D.D.C. 2013).  Further, typically, a comprehensive *Vaughn* index will at least include the following information: "(1) an index identification number [(*i.e.*, a Bates stamp number)]; (2) the document's subject; (3) its date; (4) the author; (5) the recipient; (6) the total number of pages; . . . ([7]) the disposition (that is, whether entirely or partially withheld); ([8]) the reason for being withheld; ([9]) the statutory authority for the withholding; and ([10]) the number of pages containing withheld information."  *Judicial Watch*, 449 F.3d at 146-47.  The two *Vaughn* indices submitted in this case, however, are a jumbled and

disorganized, inspiring little confidence that EPA has adequately kept track of each withheld document or fully considered, let alone explained, the basis for withholdings.

First, EPA's slapdash identification system seems designed to create confusion. Although a legend states that documents are referred to as either "PRD" for "produced with Bates number," or "WIF" for "withheld in full," email attachments, which were withheld in full, are not given their own identification number and are referred to only as an "attachment" to an email with a "PRD" number. *See, e.g.*, Supp. *Vaughn* Index at 33 (referring to a document as "Attachment to PRD 1075"). Other parts of the *Vaughn* indices abandon any consistent numbering system altogether. For example, documents are referred to as "Document PRD 8/15 #1," "WHF#1," "WH#4," "9/15 red#1," and "9/15 Redaction 2," without any explanation as to what these identifiers are supposed to mean. *See* Supp. *Vaughn* Index at 33, 34, 36, 40, 41. The lack of any consistent system of identifying and numbering documents raises serious questions about EPA's efforts to track responsive documents and fulfill the purposes of the Vaughn Index of providing sufficient information to the requester and the Court for a fair evaluation of the propriety of any withholding.

Second, at least two documents are listed on the supplemental *Vaughn* index as withheld with no explanation whatsoever—only a Bates number is provided. *See* Supp. *Vaughn* Index at 29–30 (entries "PRD 828" and "PRD 833"). The *Vaughn* indices do not explain whether these documents were withheld, in full or in part, or whether they are duplicates of other documents, and, if so, which ones. The *Vaughn* indices suggest that the documents may be duplicates of a document numbered "PRD 91," but no document labeled "PRD 91" appears in the *Vaughn* indices.

Third, as CBD points out, EPA's revised *Vaughn* Index obscures rather than clarifies. *See* Pl.'s Mem. at 27–28. EPA unhelpfully fails to provide any explanation as to what changes were made to the first *Vaughn* index, leaving to opposing counsel and the Court the difficult task of comparing the two indices in an effort to figure out which materials EPA is in fact withholding. Although some information regarding the authors and recipients of several documents is added to EPA's supplemental 42-page index, at the same time other entries are eliminated from the original 39-page index—with no explanation.

For these reasons, after completion of the supplemental search, EPA is directed to submit a second supplemental *Vaughn* index for any documents the agency continues to withhold in full or in part. As the two submitted *Vaughn* indices are patently insufficient, the Court prescribes the following format for any supplemental *Vaughn* index to include a separate numbered entry for each document, including for each email (or email chain) and for each email attachment (which shall be separately listed in consecutive order after its associated email): (1) a document number; (2) an index identification number (*i.e.*, a Bates stamp number); (3) the document's subject or title; (4) its date; (5) the author and the author's job title; (6) the recipient and the recipient's job title; (7) the total number of pages; (8) the disposition (whether it is entirely or partially withheld); (9) the reason for being withheld; (10) the statutory authority for the withholding; and (11) the number of pages with redacted, withheld information. *See Judicial Watch*, 449 F.3d at 146–47.

### 2. Legal Standard For Evaluating Withholdings Under Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the

Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  In this case, the EPA relies upon both the governmental attorney-client privilege and the deliberative process privilege, each of which is described below.

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law,'" and it aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  "The objectives of the attorney-client privilege apply to governmental clients" seeking to obtain "legal advice founded on a complete and accurate factual picture," and thus "the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *Id.* at 169–70. "Like all privileges . . . the attorney-client privilege is narrowly construed and is limited to those situations in which its purposes will be served." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 862 (D.C. Cir. 1980).  "The privilege 'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" *Id.* (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).  To establish that the attorney-client privilege applies in the FOIA context, an agency must show that (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the information is confidential," and (3) the "communication is based on confidential

information provided by the client." *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253–54 (D.C. Cir. 1977).

The deliberative process privilege, which is intended to protect "open and frank discussion" among government officials to enhance the quality of agency decisions, "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Abtew*, 808 F.3d at 898 (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n ("Klamath Water")*, 532 U.S. 1, 8–9 (2001)). The privilege allows federal agencies to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water*, 532 U.S. at 8–9. "To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citing *Coastal States,* 617 F.2d at 866); *Whitaker v. U.S. Dep't of State*, No. 14–5275, 2016 WL 9582720, at *2 (D.C. Cir. Jan. 21, 2016) (per curiam) (quoting *Abtew*, 808 F.3d at 898). In general, "[a] document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S. 168, 184 (1975)); *see also Leopold v. CIA*, 89 F. Supp. 3d 12, 19 (D.D.C. 2015) (quoting *Petroleum Info. Corp.,* 976 F.2d at 1434). While the D.C. Circuit has observed that the "term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014), "'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on

the relevant issue," *id.* (citing *Russell v. U.S. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

"Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt." *Petroleum Info. Corp.*, 976 F.2d at 1434 (citations omitted). Nonetheless, "the D.C. Circuit has cautioned against overuse of the factual/deliberative distinction." *Goodrich Corp. v. U.S. Envtl. Prot. Agency*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (citing *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). Instead, "the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Ancient Coin*, 641 F.3d at 513 (citation omitted); *see also Petroleum Info. Corp.*, 976 F.2d at 1435 ("To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment.*" (emphasis in original; citation omitted)); *Wolfe v. U.S. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (noting that, although "the fact/opinion distinction 'offers a quick, clear, and predictable rule of decision,' for most cases," courts "must examine the information requested in light of the policies and goals that underlie the deliberative process privilege" (quoting *Mead Data*, 566 F.2d at 256 (noting that "[i]n some circumstances, . . . the disclosure of even purely factual material may so expose the deliberative process within an agency that it must" enjoy the deliberative process privilege))); *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) ("Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies.").

An agency may not, therefore, rely on this privilege unless disclosure of the withheld information would reveal the agency's deliberative process for its ultimate conclusion, *see Playboy Enters., Inc. v. U.S. Dep't of Justice*, 677 F.2d 931, 936 (D.C. Cir. 1982), or if the factual information that is withheld is "inextricably intertwined with the deliberative sections of documents," *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). To be precise, the "deliberative process privilege is . . . dependent upon the individual document and the role it plays in the administrative process." *Playboy Enters.*, 677 F.2d at 935 (citation omitted). Thus, when claiming the deliberative process privilege, the agency must, at the very least, explain in its *Vaughn* Indices and/or declarations, for each contested document withheld in part or in full, (1) "'what deliberative process is involved," *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868), (2) "the role played by the documents in issue in the course of that process,'" *id.* (quoting *Coastal States*, 617 F.2d at 868), and (3) "'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents,'" *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d, 157 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F.2d 254, 258 (D.C. Cir. 1982)).

### 3. EPA's Application of Exemption 5's Deliberative Process Privilege

According to EPA's supplemental declaration, EPA is withholding 108 documents in full and 35 documents in part under FOIA Exemption 5's deliberative process privilege.[15] EPA Supp. Decl. ¶ 7. EPA largely justifies withholding documents related to the "no effect"

---

[15] CBD has raised no dispute regarding EPA's withholding of the personal phone number of an EPA employee under Exemption 6, the personal privacy exemption. *See* 5 U.S.C. § 552(b)(6). Accordingly, summary judgment is granted to EPA with respect to this issue.

determination, including drafts of the Six State and Ten State Addenda, Supp. EPA Decl. ¶ 8, by

contending the documents are deliberative "because they are part of an iterative process, one that

requires the Agency to weigh and evaluate scientific data, studies, reports and other relevant

information in order to reach a determination," *id.* ¶ 9; *see also* Def.'s Reply at 4 (asserting that

documents are deliberative "because the process by which a 'no effects' determination is made

involves the consideration of a variety of factors that can be subject to discussion among staff as

the assessment is undertaken such as, appropriate assumptions to be drawn during the process,

exploring assumptions through assessment models (which themselves may rely on certain

assumptions derived from reference materials and other sources), as well as forecasts and

assumptions that form the basis for calculations") (citing EPA Supp. Decl. ¶¶ 4, 6)).

CBD vigorously disputes EPA's reasoning and contends that the withheld documents do

not fall under the deliberative process privilege because "fact-based, scientific processes and

conclusions about the effects of agency actions to species are not 'deliberative processes' within

the scope of the deliberative process privilege." Pl.'s Mem. at 17.  CBD avers that EPA had to

"make a simple, factual determination with only two outcomes, whether an action has 'no effect'

or 'may effect' endangered species" and "[t]hus, there are no policy deliberations embedded in

the species effects determinations that EPA made in the Addenda." *Id.* at 17–18.

CBD's point is well taken, though may be overstated to the extent its argument would bar

application of the deliberative process privilege to *any* records associated with the EPA's "no

effect" determination.  In other words, as CBD contends, given that the "no effect" determination

is statutorily required to be based on "the best scientific and commercial data available," 16

U.S.C. § 1536(a)(2), EPA has generally failed to explain how this determination involves the

type of policy judgment protected by Exemption 5.  Moreover, the explanations that are provided

by EPA for withholding documents under the deliberative process privilege fall well short of its obligations to provide particularized reasons for withholding each document.  This is the case for at least two primary reasons.  First, EPA fails to explain "the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents."  *Elec. Frontier Found.*, 826 F. Supp. 2d at 168.  Second, EPA has failed to sufficiently demonstrate that non-exempt material cannot be segregated from any exempt portions of the withheld documents.  Each of these deficiencies is assessed in turn.

> ### a) EPA Has Not Explained the Nature of the Decisionmaking Authority Vested in the Office or Person Issuing the Documents, or the Positions in the Chain of Command of the Parties to the Documents

For nearly all of the documents, EPA has not explained "the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents."  *Elec. Frontier Found.*, 826 F. Supp. 2d at 168.  "A document's context is the *sine qua non* of the court's assessment of whether or not the document is predecisional and deliberative."  *Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 61 (D.D.C. 2014), *aff'd*, No. 15-5131, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015).  Indeed, "[t]he need to describe each withheld document when Exemption 5 is at issue is particularly acute [precisely] because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'"  *Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States,* 617 F.2d at 867).  "For example, '[a] document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient.'"  *Conservation Force*, 66 F. Supp. 3d at 61 (quoting *Access Reports,* 926 F.2d at 1195).  In contrast, a document

"moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports,* 926 F.2d at 1195. Additionally, where a document does not "invite a response from the requesting official," it is not likely to fall under the deliberative process privilege at all. *Schlefer v. United States,* 702 F.2d 233, 243 (D.C. Cir. 1983). The *Vaughn* indices provide little to no information as to the "identities, positions, and job duties of any of the authors or recipients of the withheld documents; consequently, this Court simply cannot properly determine whether the deliberative process privilege applies." *Conservation Force,* 66 F. Supp. 3d at 61 (citing *SafeCard,* 926 F.2d at 1204) (agency could not withhold based on the deliberative process privilege where the agency did not "explain such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained; and whether such decisions are treated, in later agency decisionmaking, as precedents"); *Animal Legal Def. Fund,* 44 F. Supp. 2d at 299 (concluding an agency "failed to establish that the documents contributed to the deliberative process" because while the agency "identified the deliberative process at issue," it "utterly failed to specify the role played by each withheld document in the course of developing that policy"). If EPA is unable to provide adequate justification addressing the salient factors for invocation of the deliberative process privilege for its withholdings, the information must be released.

### b)      *EPA Has Not Justified Decision to Withhold Documents In Full*

Under FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "Exemption 5 applies only to the deliberative portion of a document and not to any purely factual, non-exempt information the document contains." *Army Times Publ'g Co. v. U.S.*

*Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).  "Non-exempt information must be

disclosed if it is 'reasonably segregable' from exempt portions of the record, . . . and the agency

bears the burden of showing that no such segregable information exists."  *Id.*  When withholding

the entirety of a document, EPA must demonstrate that exempt material cannot be segregated

from non-exempt portions and disclose as much as possible, in accordance with FOIA's pro-

disclosure policy.  *Kimberlin v. U.S. Dep't of Justice,* 139 F.3d 944, 949–50 (D.C. Cir. 1998).

For nearly every document referenced in the *Vaughn* indices, EPA claims "[t]here is no

additional reasonably segregable information in [these] documents."  *See* Supp. *Vaughn* Index at

1–41.[16]  In the context of this case, where the FOIA requests seek records regarding the agency's

straight-forward task of making factual determinations derived from the best available science,

this conclusory statement is wholly insufficient to meet EPA's burden of demonstrating that non-

exempt material related to facts and science cannot be segregated and disclosed.

  As an initial matter, EPA has not shown with sufficient particularity that the withheld

documents reflect "policy judgments" exempt from disclosure under the deliberative process

privilege.  *See Coastal States,* 617 F.2d at 868 ("[T]he agency has the burden of establishing

what deliberative process is involved, and the role played by the documents in issue in the course

of that process.").  The touchstone of the deliberative process privilege is that in order to fall

within the privilege, the materials in question "must bear on the formulation or exercise of

agency policy-oriented *judgment.*"  *Petroleum Info. Corp.*, 976 F.2d at 1435 (Ginsburg, B. R., J.)

(emphasis in original).  "The deliberative process privilege . . . is centrally concerned with

protecting the process by which *policy* is formulated."  *Id.* (emphasis in original); *Jordan v. U.S.*

---

[16]    For two documents, EPA adds that "[t]o the extent there are facts in this document, the selection of those facts are an integral part of the deliberations in developing the final document."  Supp. *Vaughn* Index at 11, 27 (entries "Attachments to PRD 634 also PRD 884" and "Attachment to PRD 736, 832")

*Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) *rev'd, in part, on other grounds,* 691 F.2d

514 (D.C. Cir. 1982); *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C.

Cir. 1981) (explaining that to be deliberative, a document "must actually be related to the process

by which policies are formulated"). Thus, Exemption 5 protects "preliminary positions or

ruminations about how to exercise *discretion* on some *policy* matter." *Petroleum Info. Corp.*,

976 F.2d at 1435 (emphasis added). "Conversely, when material[s] could not reasonably be said

to reveal an agency's or official's mode of formulating or exercising policy-implicating

*judgment,* the deliberative process privilege is inapplicable." *Id.* (emphasis added). At bottom,

"[p]urely factual reports and scientific studies cannot be cloaked in secrecy by an exemption

designed to protect only 'those internal working papers in which opinions are expressed and

policies formulated and recommended.'" *Bristol-Myers Co. v. FTC.*, 424 F.2d 935, 939 (D.C.

Cir. 1970) (footnote omitted).

As EPA concedes, the vast majority of the withheld documents, draft addenda and draft

assessments, "weigh and evaluate scientific data, studies, reports and other relevant information

in order to reach a determination" of whether Enlist Duo "may affect" an endangered or

threatened species. EPA Supp. Decl. ¶ 9.[17] As part of this binary determination—whether a

pesticide does or does *not* "affect" an endangered or threatened species—EPA is directed to "use

---

[17] EPA relies heavily on the fact that the vast majority of the withheld documents are "drafts," *see* Def.'s Reply at 4–5, but the D.C. Circuit "has made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege." *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004) (quoting *Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F.2d 254, 257 (D.C. Cir. 1982) ("The designation of . . . documents . . . as 'drafts' does not end the inquiry, however. *Coastal States* [, 617 F.2d at 866,] forecloses the . . . argument that any document identified as a 'draft' is per se exempt.")). While "recommendations, draft documents, proposals, [and] suggestions" are typically protected by the deliberative process privilege, *Coastal States,* 617 F.2d at 866, the privilege only extends so far as the documents are actually "deliberative," meaning that "it reflects the give-and-take of the consultative process." *Id.* "[N]otwithstanding its status as a 'draft,' a document that does not reflect the genuine evolution of an agency's decisionmaking process and instead merely recites 'factual information which does not bear on [ ] policy formation,' is not entitled to protection under the deliberative process privilege." *Conservation Force*, 66 F. Supp. 3d at 60 (internal citation omitted).

the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). To be sure, even scientific determinations depend on certain assumptions, and reasonable people can and do disagree about scientific forecasts and projections. "The process may be taxing, but it does not appear to involve the breadth of discretion, and the wide range of considerations, the many forecasts and 'judgment calls' involved in making" the kinds of policy determinations protected by the deliberative process privilege. *Petroleum Infor. Corp.*, 976 F.2d at 1438. For example, to determine the toxicity of a pesticide on an endangered or threatened species, EPA is significantly constrained by species-specific data that informs the scientific conclusion of whether a given dose of pesticide would exceed an acceptable "level of concern" for that particular species. These kinds of analyses are a far cry from the "exercise[s] of discretion and judgment calls" that are typically protected by the deliberative process privilege. *Ancient Coin*, 641 F.3d at 513.

Addressing similar kinds of documents under § 7 of the ESA, other courts have reasoned that non-discretionary, factual, and scientific documents are not "deliberative." For example, in *Greenpeace v. National Marine Fisheries Serv.,* No. C98-492Z, 2000 WL 151915 (W.D. Wash. Feb. 2, 2000), the court addressed whether documents related to a "jeopardy" and "adverse modification" decision under § 7 of the ESA could be withheld under the deliberative process privilege. Concluding that the deliberative process privilege did not apply, the court stressed that a "jeopardy" and "adverse modification" decision under § 7 is factual and scientific rather than a legal or policy determination. *Id.* at *2. Notably, on motion for reconsideration, the court clarified that its holding did not depend on the documents containing purely factual information; rather, the court based its decision on a conclusion that the *process* of making a § 7 determination was not policy-oriented. *See Greenpeace v. National Marine Fisheries Serv.*, 198 F.R.D. 540, 543–45 (W.D. Wash. Apr. 11, 2000). The Court explained that although "scientific

expertise is brought to bear" in the production of the documents in question, that fact "'does not transform interpretations of facts into communications protected by the deliberative process privilege.'"  *Id.* at 544 (quoting *Seafirst Corp. v. Jenkins*, 644 F. Supp. 1160, 1163 (W.D. Wash. 1986)).  In other words, to fall under the deliberative process privilege, expert opinion must relate to an exercise of discretionary policy-making judgment.  *See id.*  As "Section 7 of the ESA does not require, nor permit, discretionary policy-making," and "[a] determination of jeopardy or adverse modification is limited to objective, fact-based scientific conclusions," the Court concluded that the "process as a whole is not 'deliberative' within the meaning of the privilege." *Id.*

Similarly, in *Greenpeace v. Mineta*, Order Affirming in part and Reversing in part Magistrate Judge's Order Denying Plaintiffs' Motion to Strike Claims of Privilege and Granting Defendants' Motion for Protective Order, 00-0068, at 12 (D. Haw. Mar. 30, 2001), the District Court for the District of Hawaii held that the deliberative process privilege did not apply to documents prepared as part of NMFS's § 7 consultation "pertaining to various agency actions affecting the Hawaiian monk seal."[18]  The court contrasted these decisions with true discretionary policy decisions, such as "whether to close [a] lobster fishery in a certain year." *Id.* at 13.  As these latter kinds of decisions require discretionary judgment and "contain discussion and facts pertaining to policy decisions," documents related to those kinds of decisions were "protected under the deliberative process privilege." *Id.*

In this case, EPA has withheld most documents in full.  Given that non-discretionary, factual, and scientific determinations are unlikely to reflect "preliminary positions or ruminations about how to exercise *discretion* on some *policy* matter," *Petroleum Info. Corp.*, 976 F.2d at

---

[18]     This Order is not published but is attached to plaintiff's Cross-Motion for Summary Judgment as Exhibit DD.  *See* Pl.'s XMSJ, Ex. DD, ECF No. 17-34.

1435, at least some portions of document withheld in full are likely non-exempt and can be

disclosed.  Instead, however, EPA has issued a blanket declaration that for nearly every

document, "[t]here is no additional segregable information."  *See, e.g.*, Supp. *Vaughn* Index at 1

(entry "PRD 85–86").  This conclusory statement is insufficient here because, given the context,

it "does not 'show with reasonable specificity why the documents cannot be further segregated'

and additional portions disclosed."  *Hertzberg v. Veneman,* 273 F. Supp. 2d 67, 90–91 (citing

*Armstrong v. Exec. Office of the President,* 97 F.3d 575, 578 (D.C. Cir. 1996)).  "[A] blanket

declaration that all facts are so intertwined to prevent disclosure under the FOIA does not

constitute a sufficient explanation of non-segregability."  *Wilderness Soc'y,* 344 F. Supp. 2d at

19.  "Rather, for *each* entry the defendant is required to 'specify in detail which portions of the

document are disclosable and which are allegedly exempt.'"  *Id.* (quoting *Animal Legal Def.*

*Fund,* 44 F. Supp. 2d at 302 (emphasis in original)).  Accordingly, if EPA intends to withhold

any document, in full or part, and disclaims any segregable information, EPA must provide a

particularized explanation of non-segregability for *each* document.  Further, if EPA is

withholding a document under the deliberative process privilege, EPA must explain how the

withheld information reflects a discretionary mode of policy-making judgment.

### 4. EPA Has Not Sufficiently Justified its Withholdings Under the Attorney-Client Privilege

EPA also withheld five documents as protected by attorney-client privilege.  *See* Supp.

*Vaughn* Index at 3–5, 6–7, 7–8, 9–10, 36 (entries "PRD 517," "Attachment to PRD 630 and

631," "Attachment to PRD 632," "Attachment to PRD 633," and "WHF#3").  Using the same

boiler-plate language for each document in the *Vaughn* indices, EPA claims that these five

documents "present[] information and legal advice," that the withheld information "contains

communications between EPA attorneys relating to potential legal issues," and that information

was "circulated on a limited, need-to-know basis." *See* Supp. *Vaughn* Index at 4–5, 6–7, 8, 9–10, 36. This meager information, however, is insufficient to conclude that the documents withheld were sent "for the purpose of securing *primarily* either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (emphasis added) (internal quotation marks omitted). That a document was shared with or by an attorney does not magically render a communication privileged. EPA must, at the very least, (1) describe with sufficient particularity the nature of the legal issue or issues for which advice was sought; (2) explain whether the communications sought legal advice, conveyed legal advice, or both; and (3) provide evidence that the communications were confidential.[19] *Coastal States*, 617 F.2d at 862–63 (attorney-client privilege "'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'" (quoting *Fisher,* 425 U.S. at 403)); *Mead Data*, 566 F.2d at 252 (the attorney-client privilege shields only "confidential communications" between an attorney and client "relating to a legal matter for which the client has sought professional advice"). The "brief justifications fail[] to provide the Court with much of the information required to substantiate an attorney-client privilege claim." *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 21 (D.D.C. 2013).

*          *          *

Accordingly, for the foregoing reasons, summary judgment is denied to EPA for any current withholdings, without prejudice. EPA may either disclose the documents or must submit a supplemental declaration and *Vaughn* Index in the prescribed format that provides sufficient

---

[19] Additionally, with respect to the document labeled "Attachment to PRD 633" in the supplemental *Vaughn* index, there appears to be two documents: an email from one OGC attorney to another OGC attorney, and an attached draft registration. *See* Supp. *Vaughn* Index at 9. It is unclear whether EPA is claiming that solely the email is privileged or that the attached draft is privileged as well.

information to assess whether the documents may be properly withheld under the deliberative process privilege or the attorney-client privilege.  For documents withheld under the deliberative process privilege, EPA shall describe the relevant deliberative process, the role the document played in that process, the nature of the decisionmaking authority vested in the office or person issuing the document, and the positions in the chain of command of the parties to the documents. As for documents withheld under the attorney-client privilege, EPA shall show how the documents were "confidential communications" between an attorney and client "relating to a legal matter for which the client has sought" legal advice.  *Mead Data*, 566 F.2d at 252.  For any documents withheld, EPA shall also adequately explain why further nonexempt material cannot be segregated from any exempt material.

### C.  CBD's Procedural Claims

In addition to the FOIA claims, CBD asserts four claims based on alleged deficiencies in EPA's compliance with FOIA, including the agency's failure to provide an estimated date of completion, as required by FOIA, 5 U.S.C. § 552(a)(7)(B)(ii), (Count I), and complying with the determination deadline of 20 days, as required by FOIA, 5 U.S.C. § 552(a)(6)(A)(i),(ii), (Count III); and the agency's pattern, practice and policy of violating FOIA's estimated completion date requirement (Count II) and determination deadlines (Count IV).  *See* Compl. ¶¶ 82–104.  In its motion for summary judgment, CBD focuses on the policy and practice claims, asserting that "EPA has an unlawful policy or practice of ignoring [CBD's] numerous requests for estimated dates of completion of the FOIA Requests at issue in this case" and that "these violations are ongoing, as EPA continues to ignore requests for estimated dates of completion in connection with additional FOIA requests that are still pending before the agency."  Pl.'s Mem. at 41 (citing Pl.'s XMSJ, Attach. 3, Declaration of Stephanie M. Parent, Senior Attorney, Environmental Health Program, CBD ("CBD's 2nd  Decl.") ¶¶ 7–11, ECF No. 17-3).

As background for these claims, CBD explains that it sent EPA requests for status updates on the estimated completion date on three different occasions for two specific FOIA requests and on one date for the appeals.  Despite these seven different requests, CBD alleges that EPA has thus far failed to provide an estimated completion date.  *See* CBD Decl. ¶¶ 12–14; *id.* at 29 ("After hearing nothing for five months since receipt of the records that EPA provided on May 1, 2015, on October 2, 2015, the Center again requested an estimated completion date for a determination on both FOIA Requests.  EPA did not provide any estimated dates of completion in response to [CBD's] requests."); *id.* at 32 ("On December 11, 2015, [CBD] requested an estimated date of completion for EPA's determination on the Appeals.  EPA did not respond to the Appeals or provide an estimated completion date for its determination on the Appeals.").

EPA responds that CBD "has failed to establish a factual basis sufficient to support" these claims, asserting that CBD "merely alleges that EPA's responses to its requests have been *delayed*" and that "delay alone, even repeated delay, is not the type of illegal policy or practice that is actionable."  Def.'s Reply at 21 (citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) and *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 211 F. Supp. 3d 143, 147 (D.D.C. 2016) (stating that *Payne Enterprises* and its progeny recognize policy and practice clams that involve "more egregious, intentional agency conduct than mere delay")).

In evaluating these claims, the fact is undisputed that EPA did not completely ignore CBD's requests.  EPA was in direct contact with CBD regarding CBD's two FOIA requests, emphasizing that "due to the voluminous amount of records potentially involved in these requests and due to [EPA's] limited resources, it will take more than twenty business days to complete these requests."  Pl.'s XMSJ, Attach. 20, Email from Earl Ingram, EPA, to Brett Hartl,

CBD (Dec. 4, 2014), Ex. P at 1, ECF No. 17-20.  Further, the parties conducted a conference call on December 16, 2014, during which EPA "explained that there was a voluminous amount of information received from the Subject Matter Experts and that upon review of any applicable FOIA exemptions, our office would continue to send information to you on an interim basis *with the goal to be completed within 60 days.*"  *Id.*, Attach. 22, Letter from Kimberly Smith, EPA, to Brett Hartl, CBD (Dec. 16, 2014), Ex. R at 1, ECF No. 17-22 (emphasis added).  Indeed, according to CBD, EPA "assured [CBD] that the Center's FOIA request [would] be completed within 45-60 days, approximately between February 2nd and February 18th[, 2015.]"  *Id.*, Attach. 23, Email from Brett Hartl, CBD, to Earl Ingram and Larry Gottesman, Ex. S at 2, ECF No. 17-23.  On this record, EPA did, in fact, provide CBD with anticipated, estimated dates of completion even if EPA did not actually comply with those dates.

CBD relies on *Payne Enterprises* as authority to proceed on the policy and practice claims set out in Counts II and IV, but this reliance is misplaced.  The D.C. Circuit held in *Payne Enterprises* "that there 'may very well be circumstances in which prolonged delay in making information available or unacceptably onerous opportunities for viewing disclosed information require judicial intervention.'"  *Payne Enters., Inc.*, 837 F.2d at 491 (quoting *Lybarger v. Cardwell,* 577 F.2d 764, 767 (1st Cir. 1978)).[20]  In *Payne*, however, officers at Air Force Logistics Command ("AFLC") effectively refused to comply with their FOIA obligations despite orders from the Secretary of the Air Force to disclose documents to the requester.  *Id.* at 487.

---

[20]   In *Payne Enterprises*, the Air Force Logistics Command had refused to release records sought by the plaintiff, compelling the plaintiff to pursue "frustrating" and "costly" administrative appeals to obtain the records. *Payne Enters., Inc.*, 837 F.2d at 490, 494.  The plaintiff's challenge to the practice was dismissed as moot because the plaintiff eventually "received all of the material it had requested," *id.* at 488, but the D.C. Circuit reversed, holding that "even though a party may have obtained relief as to a *specific request* under the FOIA, this will not moot a claim that an agency *policy or practice* will impair the party's lawful access to information in the future."  *Id.* at 491 (emphasis in original).  Thus, even if a party receives all the documents requested, a "policy or practice" claim is not subject to the general rule that a "plaintiff's specific claim regarding a FOIA request is moot [once] the requested documents have been released."  *Muttitt v. U.S. Cent. Command*, 813 F.Supp.2d 221, 228 (D.D.C. 2011).

"For almost two years, officers at AFLC bases refused to fulfill Payne's requests for copies of bid abstracts when there was limited competition for a contract, thus forcing Payne to seek administrative review." *Id.* at 494.  Although "the Secretary's Office sent letters to AFLC commanders, admonishing them for their refusals to grant Payne's requests because no FOIA exemption applied," "[t]he AFLC officers . . . continued to deny Payne's requests, and the Secretary refrained from taking firm action to end their recalcitrance." *Id.*  This is wholly unlike the situation here, where EPA not only disclosed documents, but took steps to communicate with CBD about the pending FOIA requests.  CBD does not allege that EPA ever decided to refuse to produce any records.  *See Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116, 120 (D.D.C. 2010) ("*Payne Enterprises* regards the repeated denial of Freedom of Information requests based on invocation of inapplicable statutory exemptions rather than the delay of an action over which the agency had discretion.").  Consequently, the undisputed factual record does not support CBD's pattern and practice claims.  Accordingly, summary judgment is granted to EPA on Counts I through IV.[21]

---

[21]       In Counts VIII and IX, CBD alleges that the conduct underlying CBD's FOIA claims constitutes, in the alternative, a violation of the APA, 5 U.S.C. § 706(2)(A)." Compl. at ¶¶ 124-131.  The APA permits judicial review of "final agency action[s] for which there is no other adequate remedy in court."  *See* 5 U.S.C. § 704; *Bowen v. Mass.,* 487 U.S. 879, 903 (1988) (noting that APA's judicial review provision "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures").  "[W]here a statute affords an opportunity for *de novo* district-court review" of the agency action, APA review is precluded since "Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the statute's review provision] and the APA."  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health and Human Servs.,* 396 F.3d 1265, 1270 (D.C. Cir. 2005).  Thus, "APA claims arising out of an agency's response to a FOIA request must be dismissed when they seek relief that can be obtained through a FOIA claim itself." *Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency,* 795 F. Supp. 2d 85, 95 (D.D.C. 2011); *see also Feinman v. FBI,* 713 F. Supp. 2d 70, 76 (D.D.C. 2010) ("This Court and others have uniformly declined jurisdiction over APA claims that sought remedies made available by FOIA."); *Edmonds Inst. v. U.S. Dep't of Interior,* 383 F. Supp. 2d 105, 111–12 (D.D.C. 2005).  That is the case here.  Accordingly, summary judgment is granted to EPA as to Counts VIII and IX.

**IV.     CONCLUSION**

For the foregoing reasons, the defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part, without prejudice, and the plaintiff's Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part, without prejudice.

Specifically, EPA is granted summary judgment with respect to CBD's procedural claims (Counts I, II, III and IV) and APA claims (Counts VIII and IX), and for the withholding under Exemption 6, but summary judgment is otherwise denied, without prejudice.  EPA is directed to conduct a supplemental search of all custodians likely to have responsive documents, in accordance with this Memorandum Opinion.  Should EPA decide to continue to withhold responsive documents, the agency may renew its motion for summary judgment, supported by a supplemental declaration and *Vaughn* Index, prepared in accordance with this Memorandum Opinion.

CBD's motion for summary judgment is granted as to the inadequacy of EPA's search for responsive records, as alleged in Count V, but otherwise denied as to Counts I, II, III, IV, VIII and IX, and as to other claims, without prejudice.

An appropriate order accompanies this Memorandum Opinion.

Date:  September 28, 2017

_____
BERYL A. HOWELL
Chief Judge