## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**CENTER FOR BIOLOGICAL DIVERSITY,**      )
                                          )
        **Plaintiff,**                    )
                                          )
        **v.**                            )
                                          )   **Case No. 16-cv-175 (BAH)**
**UNITED STATES ENVIRONMENTAL**           )
   **PROTECTION AGENCY,**                 )
                                          )
        **Defendant.**                    )
_____)

### DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

Defendant, by undersigned counsel, moves for summary judgment in this action brought by Plaintiff, Center for Biological Diversity, as to the remaining claims under the Freedom of Information Act ("FOIA"), that were not resolved in the Court's prior memorandum decision dated September 28, 2017. Accompanying this filing is a supporting memorandum, supporting declarations and a proposed order.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  ____/s/_____
JEREMY S. SIMON
D.C. Bar # 447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2528
Jeremy.Simon@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
**CENTER FOR BIOLOGICAL DIVERSITY,**　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　**Plaintiff,**　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　**v.**　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　**Case No. 16-cv-175 (BAH)**
**UNITED STATES ENVIRONMENTAL**　　)
　**PROTECTION AGENCY,**　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　**Defendant.**　　　　　　　　)
———————————————————————)


**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

　　　　Pursuant to Local Civil Rule 7(h), Defendant respectfully submits this Statement of Material Facts Not in Genuine Dispute in support of Defendant's Renewed Motion for Summary Judgment.

**Request No. 2014-007846**

　　　　1.　On June 26, 2014, CBD submitted a FOIA request to the EPA seeking "[a]ll documents and correspondence related to the Environmental Protection Agency's 'Addendum to 2,4-D Choline Salt Section 3 Risk Assessment: Refined Endangered Species Assessment for Proposed New Uses on Herbicide-Tolerant Corn and Soybean' . . . for the new Enlist Duo product."  (Compl. ¶ 48; ECF No. 16-2, Ingram Decl. ¶ 8 and Ex. B thereto).

　　　　2.　This request was assigned No. 2014-007846.  (Compl. ¶ 49)

**Request No. 2014-000652**

　　　　3.　On October 20, 2014, CBD submitted its second FOIA request to EPA seeking "[a]ll documents and correspondence related to the Environmental Protection Agency's 'Addendum to 2,4-D Choline Salt Section 3 Risk Assessment: Refined Endangered Species Assessment for

Proposed New Uses on Herbicide-Tolerant Corn and Soybean for AR, KS, LA, MN, MS, MO, NE, ND, OK, TN.'"  (ECF No. 16-2, Ingram Decl. ¶ 9 and Ex. C thereto)

4.   The October 2014 request was assigned No. 2014-000652.  (Compl. ¶ 53)

**Processing of the FOIA Requests Following the Court's September 28, 2017 Decision**

5.   On September 28, 2017, the Court ruled on the parties' cross-motions for summary judgment and ordered EPA to "conduct a supplemental search, disclose any non-exempt materials, and, if it continues to withhold any materials, to submit a supplemental declaration and *Vaughn* Index that sufficiently justifies these withholdings in accordance with, and in the format prescribed in, this Memorandum Opinion."   (ECF No. 28 at 2.)

6.   By order dated October 23, 2017, the Court modified its prior decision to establish March 23, 2015, as the cut-off date for the supplemental search, and to establish March 1, 2018, as the date for any supplemental production and updated *Vaughn* Index by EPA.  (ECF No. 30)

7.   EPA conducted a supplemental search and, in accordance with the October 23, 2017 Order, EPA made a supplemental production to CBD on March 1, 2018, and produced an updated *Vaughn* Index.  (Third Supp. Ingram Decl. ¶¶ 5-9.)

8.   In a status report dated March 15, 2018, CBD identified the documents listed on the updated *Vaughn* Index that remain in dispute and also identified the following other matters that remain in dispute from its standpoint:  "whether EPA has produced all scientific studies to the extent responsive to the FOIA requests, and whether EPA has accounted for all attachments to emails either listed on the Vaughn Index or included in its document production."  (ECF No. 35.)

9.   The parties subsequently conferred on the issues identified by CBD in the March 15,

2018 status report and, in an effort to further narrow issues in the dispute, EPA further updated its *Vaughn* Index, and that final, updated index appears as an attachment to the accompanying Ingram Declaration.  (Third Supp. Ingram Decl. ¶¶ 13, 17.)

10. As reflected on the final *Vaughn* Index, EPA has withheld the challenged documents in whole or in part under Exemption 5 of FOIA.  (Third Supp. Ingram Decl. ¶¶ 14-15 and accompanying *Vaughn* Index.)

11. Most of the withheld information has been withheld on the basis of the deliberative process privilege because it is predecisional and deliberative.  (Sankula Decl. ¶ .)

12. Certain other information has been withheld on the basis of attorney-client privilege. (Third Supp. Ingram Decl. ¶¶ 15-21.)

**<u>Segregability</u>**

13. All reasonably segregable, non-exempt responsive documents subject to FOIA have been produced to the Plaintiff.   (Third Supp. Ingram Decl. ¶ 12; Sankula Decl. ¶ 21.)

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   _/s/_____
JEREMY S. SIMON
D.C. Bar # 447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2528
Jeremy.Simon@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **Case No. 16-cv-175 (BAH)** |
| **UNITED STATES ENVIRONMENTAL** | ) |
| **PROTECTION AGENCY,** | ) |
| | ) |
| **Defendant.** | ) |
_____)

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Center for Biological Diversity ("CBD"), brought this action against Defendant, the United States Environmental Protection Agency ("EPA"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, challenging the responses to FOIA requests to EPA seeking documents and correspondence related to two specified "Addendum" issued by EPA concerning endangered species risk assessments for the new Enlist Duo product. (Compl. ¶¶ 4-6; ECF No. 16-2, Ex. B and C to Ingram Decl.)

The Complaint asserts seven counts under FOIA: (1) that EPA failed to provide CBD with an estimated date of completion of its processing of the FOIA requests and FOIA appeals; (2) that EPA has engaged in a pattern and practice of violating FOIA's estimated completion date requirement; (3) that EPA failed to provide a final determination within the time period provided under FOIA; (4) that EPA has engaged in a pattern and practice of violating the final determination deadline; (5) that EPA failed to conduct an adequate search; (6) that EPA unlawfully withheld responsive records; and (7) that EPA failed to provide reasonably segregable portions of any lawfully exempt records. The Court already has granted summary

judgment to EPA with respect to Counts I-IV.  (ECF No. 26 at 44.)  In addition, the Complaint asserted, in the alternative, two counts (Counts VIII and IX) under the Administrative Procedure Act ("APA") based on the same alleged conduct.  The Court also granted summary judgment to EPA with respect to those counts.  (ECF No. 26 at 44 n.21.)

Summary judgment should be granted on the remaining counts (Counts V-VII) because the EPA has now conducted a reasonable search for responsive records, and has now produced all non-exempt, segregable documents subject to FOIA.

## FACTUAL BACKGROUND

The subject matter of the requests at issue concerns the EPA's review of whether a pesticide, Enlist Duo, may be used in certain states.  As part of that process, the EPA evaluated Enlist Duo's potential use in two different groups of states.  EPA issued a Risk Assessment for each group of states with Addendums that explained EPA's analysis and valuation of the risks for use of Enlist Duo.  (ECF No. 16-2, Ingram Decl. ¶¶ 6-7)  Plaintiff's FOIA request for "[a]ll documents and correspondence related to" each Addendum, therefore, sought information underlying EPA's deliberations in evaluating and creating the two Addendums to the risk assessments.  Because of the type of information sought in the FOIA requests, a portion of the responsive material implicated FOIA Exemption 5's deliberative process privilege as explained more fully in the accompanying Sankula Declaration.[1]

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[1]      The other exemption implicated – Exemption 6 – was applied only to redact a personal telephone number that appeared in a document.  The Court already has granted summary judgment to EPA on that withholding.  (ECF No. 26 at 31 n.15.)

law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 248. A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

The "vast majority" of FOIA cases are decided on motions for summary judgment. *See Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *Media Research Ctr. v. U.S. Dep't of Justice*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment."); *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Labor*("*CREW*"), 478 F. Supp. 2d 77, 80 (D.D.C. 2007). An agency may be entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records and each responsive record that it has located either has been produced to the plaintiff or is exempt from disclosure. *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980).

To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations. *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Media Research Ctr.*, 818 F. Supp. 2d at 137. "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW*, 478 F. Supp. 2d at 80 (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Media Research Ctr.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## ARGUMENT

The FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions.  5 U.S.C. § 552(b); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150-51 (1989).  Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under the FOIA and the FOIA claim is moot.  *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982); *Muhammad v. U.S. Customs & Border Prot.*, 559 F. Supp. 2d 5, 7-8 (D.D.C. 2008).  As demonstrated below, Defendant satisfied its obligation to conduct adequate searches for records responsive to Plaintiff's FOIA requests and properly withheld exempt information pursuant to Exemption 5 of FOIA.

I.   **EPA Conducted Searches Reasonably Calculated to Uncover Responsive Records in Response to the Requests**

**A.  Legal Standard**

Under the FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents."  *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.").  A search is not

inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured").  Rather, a search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68.  An agency, moreover, is not required to examine "virtually every document in its files" to locate responsive records." *Steinberg v. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994; *see also Hall v. U.S. Dep't of Justice*, 63 F. Supp. 2d 14, 17-18 (D.D.C. 1999) (finding that agency need not search for records concerning subject's husband even though such records may have also included references to subject).  Rather, as here, it is appropriate for an agency to search for responsive records in accordance with the manner in which its records are maintained.  *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

Once an agency demonstrates the adequacy of its search, the agency's position can be rebutted "only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993).  Hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of an agency's search. *Oglesby*, 920 F.2d at 67 n.13.  "Agency affidavits enjoy a presumption of good faith that withstands purely speculative claims about the existence and discoverability of other documents." *Chamberlain v. U.S. Dep't of Justice*, 957 F. Supp. 292, 294 (D.D.C. 1997), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997).

**B.  EPA's Supplemental Search**

As established in EPA's prior motion, in response to the FOIA requests at issue, EPA identified offices reasonably likely to have responsive information and those offices conducted a reasonable search for responsive records.  The request sought documents related to two specified Addendum (referred to in the requests by their specific title), which CBD sought, according to the Complaint, to understand the basis for EPA's "no effect" findings underlying its decision to register, or propose to register, Enlist Duo in certain states.  (Compl. ¶¶ 45-48)  Specifically, on October 15, 2014, EPA decided to register Enlist Duo in six states (Illinois, Indiana, Iowa, Ohio, South Dakota, and Wisconsin) and later proposed to register Enlist Duo in 10 additional states (EPA ultimately amended the registration for use in only 9 of the 10 proposed states).  (Compl. ¶¶ 46-47; ECF No. 16-2, Ingram Decl. ¶¶ 6-7 and n. 2))

EPA determined that the office likely to have responsive information was EPA's Office of Pesticide Programs ("OPP") and, specifically, the Environmental Fate and Effects Division ("EFED") of OPP because the request related to specific documents that were authored by EFED.  (ECF No. 16-2, Ingram Decl. ¶ 14) EPA collected documents from relevant custodians within this Division of OPP and conducted a supplemental search of the custodians' email using a centralized email search program.  (ECF No. 16-2, Ingram Decl. ¶¶ 14, 23-24)  In addition, EPA identified additional custodians (i.e., attorneys involved in reviewing and revising documents) and conducted a search of those individuals' email using the centralized search program.  (ECF No. 16-2, Ingram Decl. ¶¶ 23-24.)

In the Court's prior decision, the Court found EPA's search deficient in four respects: (1) with respect to the cut-off date of October 20, 2014 utilized by EPA for its search;[2] (2) with

---

[2]     As noted by the Court in its September 28, 2017, decision, EPA used two cutoff dates in previous searches, September 26, 2014, and October 20, 2014.   The September 26, 2014, date

respect to EPA's failure to search the records of individuals who were copied on certain responsive emails; (3) with respect to any conferrals with state agencies; and (4) with respect to text messages, instant messages, or other similar agency communications. (ECF No. 26 at 19-24.)  As discussed below, EPA has addressed the deficiencies identified by the Court and renews its motion for summary judgment with respect to the adequacy of its search.

The Court, in its order dated October 23, 2017, established March 31, 2015, as the cut-off date for EPA's supplemental search. (ECF No. 30.)  Moreover, in the Court's order dated September 28, 2017, the Court directed EPA to include in its search ten additional individuals whose names allegedly appear on emails discussing Enlist Duo or explain why those individuals were not reasonably likely to have responsive documents.[3] (ECF No. 26 at 22.)

EPA has now conducted a supplemental search using the March 31, 2015, cut-off date and included within that search nine of the 10 individuals that had been identified by CBD. (Third Supp. Ingram Decl. ¶ 6 n. 3.)  EPA has no record of the remaining individual ever working at EPA and, therefore, could not search that individual's records. (*Id.* at n. 2.)

---

was the cutoff date used for a non-centralized search completed prior to litigation. Subsequently, a centralized electronic search for all 13 original custodians using the cutoff date of October 20, 2014, was later completed, fully encompassing and supplementing the earlier September 26, 2014, search. (ECF No. 16-2, Ingram Decl. ¶ 24; Third Supp. Ingram Decl. at n. 4.)  Since the second search fully encompassed the first search for the original custodians and extended that search to October 20, 2014, EPA's supplemental search following the Court's September 28, 2017, decision began with the October 20, 2014 date and extended it through March 31, 2015, for the original 13 custodians.

[3]    Although CBD claimed there were 17 individuals copied on emails discussing Enlist Duo whose records were not searched, the Court determined that CBD only had identified 16. (ECF No. 26 at 21 n.12.)  Moreover, the Court also recognized that six of those 16 already were among the original custodians whose records were subject to EPA's search, those leaving only 10 individuals identified by CBD who allegedly were not the subject of EPA's search. (ECF No. 26 at 21-22.)

EPA conducted the supplemental search as follows.  EPA searched the email of the 13 original custodians from the end date of EPA's prior search of their records, October 20, 2014, through the cut-off date of March 31, 2015.  (Third Supp. Ingram Decl. ¶ 7.)   Moreover, EPA conducted a search of the email of the nine additional custodians from the start date of EPA's earlier search, February 15, 2013, through March 31, 2015.  (Third Supp. Ingram Decl. ¶ 7.)  The search of that email – as with the search of the original custodians' email – was conducted utilizing a centralized electronic search by EPA's eDiscovery Services search tool.  (Third Supp. Ingram Decl. ¶ 7.)   The centralized eDiscovery search tool not only captures emails sent to or from any user with an Outlook email account, but also captures instant messages sent to or from that user.  (*Id.*)

To the extent still employed at EPA, each custodian also was asked to perform a search of their non-Outlook records, including local or shared hard drives, OneDrive (EPA's Microsoft cloud-based service), SharePoint sites, mobile devices (including text messages and photographs), external hard drives and discs, and hard copy files for any documents responsive to the request that they had not already submitted in the previous searches or were not otherwise accounted for through the centralized electronic search.   Of the 13 original custodians, 12 still were employed by EPA at the time of the supplemental search and provided any documents that were located from the additional timeframe established by the Court.  (Third Supp. Ingram Decl. ¶ 8.)  With respect to the one original custodian who no longer worked at EPA, the non-Outlook records provided by that individual upon that individual's departure had been uploaded onto an Agency shared drive.  Those records were searched and no responsive documents were located. (Third Supp. Ingram Decl. ¶ 9 and n. 3.)

Of the nine additional custodians, three no longer worked at EPA at the time of the supplemental search. (Third Supp. Ingram Decl. ¶ 6 n. 3.) Of the remaining six, any documents located were provided to the agency's Office of General Counsel for review and processing. (Third Supp. Ingram Decl. ¶ 8.)   With respect to the three employees who no longer worked at EPA, the non-Outlook records provided by those individuals upon their departure were searched and no responsive documents were located.  (Third Supp. Ingram Decl. ¶ 9.)

With respect to the final issue – documents reflecting any conferrals with state agencies – EPA has clarified in the accompanying Ingram Declaration that none of the information withheld reflects any conferrals with state agencies.   (Third Supp. Ingram Decl. ¶ 19.)  Nor do any of the released documents reflect any such conferrals.  (*Id.*)  This is not unexpected as EPA is not aware of any requirement that it confer with state agencies in connection with the refined assessment at issue in the two FOIA requests.  Thus, the absence of such documents does not call into question the reasonableness of EPA's search.

EPA acknowledges that, in the Court's September 28, 2017 decision, the Court highlights language in the Endangered Species Act ("ESA") that the Court interpreted as requiring EPA and other federal agencies to consult with "affected States."  (ECF No. 26 at 22 n.13, quoting 16 U.S.C. § 1536(a)(2) (emphasis added).   EPA respectfully submits that the language from the ESA highlighted by the Court in it its prior decision does not impose such a requirement on EPA. That section instead refers to a determination made "by the Secretary [of the Interior or Commerce], after consultation as appropriate with affected States," with respect to the designation of "critical habitat" for federally listed species. *See* 16 U.S.C. § 1536(a)(2); *see also* 16 U.S.C. § 1532(15) (defining the term "Secretary").   In other words, the phrase "after consultation as appropriate with affected States" highlighted by the Court imposes an obligation

9

on the Secretary of Interior (or Commerce as appropriate) to consult with the "affected States" in determining the habitat that is "critical."   It does not direct such a consultation between other federal agencies and the affected States.   Indeed, the comprehensive consultation regulations of the National Marine Fisheries Service and the United States Fish and Wildlife Service (the "Services") implementing section 1536 make clear that the consultation obligation for federal agencies is addressed through consultation with the Services and make no reference to any obligation on the part of federal agencies to consult on the effects of their actions to listed species with the States.  *See* 50 CFR §§ 402.01 to 402.48.  The consultation obligation imposed by section 1536 on a "federal agency" is an obligation to consult with the Secretary of the Interior (or Commerce as appropriate) with respect to any "action authorized, funded, or carried out by such agency." *See* 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall, in consultation with and with the assistance of the Secretary . . . .")

Thus, EPA has conducted a reasonable search for responsive documents.  *See Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (observing that the adequacy of an agency's search "is measured by the reasonableness of the effort in light of the specific request"); *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, No. 11-1971 (JEB), 2012 WL 5928643, at *4 (D.D.C. Nov. 27, 2012) (finding that agency's methodology was "sound" where agency compared the FOIA request to its program offices' functions in order to determine which component offices to search).   Accordingly, summary judgment should be granted as to the adequacy of EPA's search.

## II.  **EPA Properly Withheld Information Under Exemption 5**

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. § 552(b)(5). This exemption shields documents of the type that would be privileged in the civil discovery context, including materials protected by the attorney-client privilege and the executive deliberative process privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 601 (D.C. Cir. 2001).

Plaintiff continues to challenge approximately 91 documents that have been withheld in full or in part under the deliberative process privilege. These documents are addressed in Section II.A below. The Exemption 5 withholdings also encompass less than a handful of documents withheld on the basis of attorney-client privilege, which are addressed in Section II.C below.

A.      **The Deliberative Process Privilege**

1.      **Applicable Standard**

The deliberative process privilege is designed to prevent injury to the quality of agency decisions by (1) encouraging open, frank discussions on matters of policy between subordinates and superiors; (2) protecting against premature disclosure of proposed policies before they are adopted; and (3) protecting against public confusion that might result from the disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's decision. *See Sears, Roebuck*, *supra,* 421 U.S. at 151-53; *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *CREW v. U.S. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL, supra,* 698 F. Supp. 2d at 81.

To invoke the deliberative process privilege, an agency must show that the exempt document is both pre-decisional and deliberative. *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991); *Coastal States Gas*, 617 F.2d at 868; *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997). For a document to be pre-decisional, it must be antecedent to

the adoption of an agency policy. *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir.1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made[.]").  To show that a document is pre-decisional, however, the agency need not identify a specific final agency decision; it is sufficient to establish "'what deliberative process is involved, and the role played by the documents at issue in the course of that process.'"  *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States Gas*, 617 F.2d at 868); *see Gold Anti-Trust Action Committee ("GATA") v. Board of Governors,* 762 F. Supp. 2d 123, 135-36 (D.D.C. 2011) ("even if an internal discussion does not lead to adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process.").

Thus, a document is "'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.'"  *Abtew v. DHS,* 808 F.3d 895, 898 (D.C. Cir. 2015). Exemption 5, however, is not dependent on whether a final decision ultimately resulted from the employee's deliberations.  Were it otherwise, the purpose of the exemption would be defeated because "[a]t the time of writing the author could not know whether the decisionmaking process would lead to a clear decision, establishing the privilege, or fizzle, defeating it." *Access Reports,* 926 F.2d at 1196.   The focus of Exemption 5 instead is whether the document was part of the decisionmaking process.  *Id.  see also Nat'l Archive v. CIA,* 752 F.3d 460, 463 (D.C. Cir. 2014) ("The term 'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue."); *Huntington v. Dep't of Commerce,* 234 F. Supp. 3d 94, 110 (D.D.C. 2017) ("The challenged documents

precede the final patentability decision and are part of the process by which that decision is made; they therefore are predecisional and deliberative.")

A document is "deliberative" if it "'reflects the give-and-take of the consultative process.'" *McKinley v. FDIC,* 744 F. Supp. 2d 128, 138 (D.D.C. 2010). Thus, "'pre-decisional materials are not exempt merely because they are pre-decisional; they also must be part of the agency give-and-take of the deliberative process by which the decision itself is made.'" *Jowett, Inc. v. U.S. Dep't of the Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C Cir. 1975)). The privilege protects factual material if it is "inextricably intertwined" with deliberative material, *FPL Group v. IRS,* 698 F. Supp. 2d 66, 81 (D.D.C. 2010), or if disclosure "would 'expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990)) (quoting *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). "The 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195.

### 2.   EPA's Withholdings Under the Deliberative Process Privilege

As explained in the accompanying declaration, three categories of documents were withheld in full or in part under the deliberative process privilege: (1) portions of emails were withheld that reflected internal deliberations with respect to certain decision points in the refined risk assessment that is at issue in the two FOIA requests; (2) briefing material prepared to assist agency employees in their discussions with the pesticide manufacturer or with upper-level management were withheld in full; and (3) drafts of the Six State and Ten State Addendum and

related draft documents from early stages of the refined screening process were withheld in full under Exemption 5.  (Sankula Decl. ¶¶ 15-21.)

As explained in the accompanying Sankula declaration, a refined risk assessment is the second step in the five-step process of developing an overall risk assessment leading to biological evaluations and effects determinations of a proposed pesticide.  (Sankula Decl. ¶ 9.) The Six-State Assessment and Ten-State Addendum identified in the two FOIA requests reflect the final, publicly issued refined risk assessment for Enlist Duo, and they are the result of a process that involves multiple decision points in which a wide array of EPA participants confer, share ideas, opinions, and develop options for the consideration of decisionmakers.  (Sankula Decl. ¶ 15-21.)   Those ideas and proposed options also are reflected in the drafts that were circulated internally within EPA as part of the process of reaching a resolution at these various decision points.  (Sankula Decl. ¶¶ 19-21.)

The portions of emails that have been withheld under Exemption 5 pertain to the internal deliberations in reaching a resolution on various decision points in the refined risk assessment process.   These decision points include such things as: (1) whether to include registrant-submitted information to address assumptions made in the screening level ecological risk assessment; (2) whether potential analytical methods could be employed to demonstrate whether particular tank mixtures and spray nozzles would result in spray drift greater than predicted with data used in the earlier screening level ecological risk assessment; (3) whether to incorporate vapor transport data into the screening ecological risk assessment; (4) whether to include empirical evidence from the registrant concerning volatilization of Enlist Duo's active ingredient in the screening level ecological risk assessment; (5) the decision to identify different approaches to ascertain whether the effects observed in a later short-term exposure study should be adopted

as a new reasonable effects threshold for mammalian wildlife; and (6) weighing potential options for measures that could be incorporated into the broader registration action to avoid an effect to an endangered plant species.   (Sankula Decl. ¶ 15.)

These are all decisions relevant to the overall refined risk assessment process that can only be reached after internal discussion and deliberation and in which various outcomes are possible besides the one ultimately reached.   (*Id.*)   Accordingly, these documents are pre-decisional because they were part of the process by which final versions of the Six State and Ten State Addenda were prepared, which itself was part of a larger decisionmaking process by the EPA as to whether to register the pesticide.  They are deliberative, moreover, because the process by which these decisions were reached was not formulaic, but instead involved a give-and-take among EPA staff.

EPA has withheld in full drafts of the refined risk assessment that reflect the internal deliberations in reaching a resolution on various decision points, including those described above.  (Sankula Decl. ¶ 19-21.)   These drafts include: (1) unformatted rough drafts of portions of the what became the final documents; (2) early drafts of the documents where many of the policy issues discussed above resulted in revisions throughout the documents by staff with differences on how these issues were ultimately discussed and described; and (3) drafts that had yet to undergo management and/or final legal review and reflect revisions and comments proposed by staff attorneys and managers with no final decision-making ability.  (Sankula Decl. ¶ 19.)  In contrast, EPA has released drafts at a more final stage of development and closer in substance to the final, published documents.  (Sankula Decl. ¶ 21.)

The withheld drafts thus reflect the development of editorial and policy judgments and are deliberative and exempt from disclosure under Exemption 5. *See Goodrich Corp. v. EPA*,

593 F. Supp. 2d 184, 189 (D.D.C. 2009) ("As a general matter, 'drafts' of documents are exempt from disclosure under the deliberative process privilege."); *see also Nat'l Wildlife Feed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1122 (9th Cir. 1988) ("To the extent that [the requester] seeks through its FOIA request to uncover any discrepancies between the findings, projections, and recommendations between the draft[s] prepared by lower-level [agency] personnel and those actually adopted, . . . it is attempting to probe the editorial and policy judgments of the decisionmakers."); *Marzen v. HHS*, 825 F.2d 1148, 115 (7th Cir. 1987) (noting the "exemption protects not only the opinions, comments and recommendations in the draft, but also the process itself").

Courts in this Circuit have likewise repeatedly held that "the disclosure of editorial judgments -- for example, decisions to insert or delete material or to change a draft's focus or emphasis -- would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Commc'ns*, 815 F.2d at 1569 (citing *Russell v. Dep't of Air Force*, 682 F.2d 1045 (D.C. Cir. 1987)). This case authority further supports EPA's assertion of the deliberative process privilege for draft documents, as well as emails (such as those described above) that offered opinions or comments in connection with the circulation of drafts.

The third category of documents – also withheld in full – consist of briefing documents prepared in connection with meetings with the pesticide manufacturer that reflect information selected by EPA staff to inform senior officials and that contain recommendations, analysis, and opinions on what issues may be raised, how to potentially respond, and other important considerations.   (ECF No. 22-1, Suppl. Ingram Decl. ¶ 11; Sankula Decl. ¶ 17.)  Other withheld documents in the Agency's *Vaughn* Index described as briefing documents for high-level Agency officials concerned EPA's effort to develop new methodologies for approaching the

overall ESA consultation process, provide comparison to other ongoing actions, and were intended to inform management consideration of this evolving process.  (Sankula Decl. ¶ 18.) These briefing materials were withheld in full under Exemption 5.

The fact that the deliberations that form the basis for all of EPA's withholdings occurred in the context of a scientific determination does not deprive them of their pre-decisional or deliberative characteristics.  As described in the Sankula declaration, the information withheld under Exemption 5 concern decision points relevant to the overall refined risk assessment process that could only be reached after internal discussion and deliberation and in which various outcomes were possible besides the one ultimately reached in this matter.  (Sankula Decl. ¶ 15-21.)

In other words, the withheld information was not in the nature of purely formulaic computations that may not be subject to Exemption 5. *Petroleum Info. Corp. v. DOI,* 976 F.2d 1429, 1436 (D.C. Cir. 1992) ("[t]he release of materials that do not embody agency judgments--for example, materials relating to standard or routine computations or measurements over which the agency has no significant discretion--is unlikely to diminish officials' candor or otherwise injure the quality of agency decisions. Requiring disclosure of such materials is fully 'consistent with efficient government operation.'").  To the contrary, the withheld information involved a pre-decisional deliberative process that occurred in the context of a scientific assessment. Indeed, even those aspects that involved calculations were based in part on certain forecasts and assumptions that are the product of agency judgment.  (ECF No. 22-1, Suppl. Ingram Decl. ¶ 4; Sankula Decl. ¶ 16 a.-e.)

The fact that the final outcome involved the application of scientific analysis does not preclude application of the deliberative process privilege to the multiple decision points that

were part of the analytical process. *See Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118 (D.D.C. 1984) (protecting preliminary scientific data generated in connection with study of chemical); *see also Horsehead Indus. v. EPA*, No. 94-1299, slip op. at 15-20 (D.D.C. Oct. 1, 1996) (finding that agency scientists' "open discussion of the effectiveness of . . . testing results and frank exchanges of view regarding the interpretation of those results reside near the core of an agency's deliberative process").

Plaintiff's position to the contrary is based on an overly narrow application of Exemption 5. In its prior motion, Plaintiff relied largely on case law outside this Circuit and in the context of a challenge under the APA, rather than the application of the exemption under FOIA. For instance, Plaintiff relied on an APA case, *Greenpeace v. National Marine Fisheries Service,* 198 F.R.D. 540, 543 (W. D. Wash. 2000), to argue that the "no effects" determination reflected in the Six State Assessment and Ten State Addendum is limited to objective, fact-based scientific conclusions that does not implicate discretionary agency policymaking. But that argument fails to consider the various decision points that are part of the overall process by which the final version of these documents was created. It also fails to acknowledge the nature of the documents being withheld, i.e., draft versions of the documents and internal communications discussing those drafts in the context of internal deliberations regarding various decision points in the process.

As the D.C. Circuit has explained, Exemption 5 protects not only deliberative materials, but also the decisionmaking process itself. *Mapother v. U.S. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (observing that "the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material"); *Montrose Chem. Corp. v. Train,* 491 F.2d 63, 68 (D.C. Cir. 1974) (Exemption 5 is intended to protect not just "deliberative

*materials,*" but also "the agency's *deliberative process*"). That process includes the editorial

process involved in finalizing an agency document. *See, e.g., Reliant Energy Power Generation,*

*Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) ("An agency need not demonstrate the

extent to which the draft differs from the final document because such a showing would 'expose

what occurred in the deliberative process between the draft's creation and the final document's

issuance.'").

Indeed, one of the cases previously relied on by Plaintiff, *Northwest Environmental*

*Advocates v. EPA,* No. 05-1876, 2009 U.S. Dist. LEXIS 10456 (D. Or. 2009), recognized that

the deliberative process privilege applied to documents that "express preliminary staff views or

tentative opinions", "represent internal discussions concerning the method by which information

is to be analyzed", "express doubt or confusion regarding the information before the agency or

how it should be interpreted", reflect "fragmented thoughts of individuals, or embryonic draft

documents that risk misinterpretation should they be subject to disclosure." *Id.* at *23-24.  The

court further explained that, "[a]lthough some of these drafts are of a scientific nature, substantial

portions of these unpolished scientific drafts contain the personal views of agency staff or

contain questions concerning the accuracy of the information or analysis contained within the

draft" and that "[s]ome of these documents are emails requesting clarification on issues before

the agency, or discussing the manner in which the agency plans to move forward." *Id.* at *24.

Because "[t]hese documents represent the give-and-take of the agencies' internal deliberations,

and their disclosure would discourage such deliberations," the court held that they "are

appropriately considered a part of the "deliberative process.'" *Id.*

Although *Northwest Environmental Advocates* largely supports EPA's position, that case

still takes an unduly narrow interpretation of Exemption 5 to the extent the court there ordered

the release of more "polished" draft documents.   Courts in this Circuit have recognized that "the label 'draft' goes to the merits of Exemption 5's predecisional and deliberative elements" and that drafts are generally protected under Exemption 5 because they reflect the "give-and-take" of agency decisionmaking and their release could "confuse the public" by leading the public to "mistakenly interpret the views within a draft as the views of the agency." *See Judicial Watch v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006); *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy,* 161 F. Supp. 3d 120, 129-130 (D.D.C. 2016) (citing cases and concluding that "courts in this District have held, in many instances, that drafts are protected by the deliberative process privilege").   Nevertheless, in its supplemental production pursuant to the Court's October 23, 2017 order, EPA released in full drafts of the Six-State Assessment and Ten-State Addendum that were at a stage closer to the final, published versions.  (Sankula Decl. ¶ 21.)

## B.     Attorney Client Privilege

EPA also withheld under Exemption 5 a small group of documents protected by the attorney-client privilege.  The documents withheld under this exemption contained confidential communications exchanged among EPA staff and legal counsel in EPA- HQ.  In addition, the documents withheld included some exchange between non-legal personnel, reflecting legal advice.  (ECF No. 16-2, Ingram Decl. ¶ 30; Third Supp. Ingram Decl. ¶ 15-16.)   The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data,* 566 F.2d at 252.  "Like the deliberative process privilege, the attorney-client privilege helps improve the quality of agency decision making by safeguarding the free flow of information that is a necessary predicate for sound advice." *Murphy v. Tenn. Valley Auth.,* 571 F. Supp. 502, 506 (D.D.C. 1983).  The privilege applies "'primarily to facts divulged by client to attorney, but …

also includes opinions from attorney to client based on those facts,'" *id.* (quoting *Brinton v. Dep't of State,* 636 F.2d 600, 605-06 (D.C. Cir. 1980)), "as well as communications between attorneys that reflect client-supplied information." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.,* 384 F. Supp. 2d 100, 114 (D.D.C. 2005).    The attorney-client privilege is "not limited to communications made in the context of litigation or even a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." *Coastal States,* 617 F.2d at 862.   The agency has an affirmative obligation to show that the communication was, and continues to be, confidential, *id.* at 863; however, limited circulation within an agency to employees involved in a matter for which advice is sought does not breach confidentiality. *Murphy,* 571 F. Supp. at 506.   "The privilege applies to confidential communications made to an attorney by both high-level agency personnel and lower-echelon employees." *Elec. Privacy,* 384 F. Supp. 2d at 114.

Here, each entry on the updated *Vaughn* asserting a claim of attorney-client privilege describes with particularity the legal issue being discussed between the agency attorney and its client. Each withheld document or portion of a document was not shared with any person outside of the Agency attorneys and their clients in the Office of Pesticide Programs. The withheld text in each reflects candid advice from the agency attorneys to their clients during the ongoing consideration of the proposed registration and the questions asked relates to legal advice solicited by OCSPP.   (Third Supp. Ingram Decl. ¶ 15.)

For example, Office of General Counsel advice was solicited to discuss the potential legal ramifications of phrasing used in the Ten-State Addendum, to decide the appropriate legal definition of "buffer limit," to ensure the correct terminology was used in the Ten-State Addendum to avoid Administrative Procedure Act issues, and, more broadly, to provide OGC

input on briefings to discuss potential legal vulnerabilities with the ESA and interplay with ongoing litigation.  (*Id.*)  Accordingly, EPA properly withheld this information under Exemption 5 of FOIA.

### C. Defendant Complied with FOIA's Segregability Requirement

Under the FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information subject to FOIA must be disclosed after redaction of the exempt information.  5 U.S.C. § 552(b).  Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions."  *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, where non-exempt information could be segregated from exempt information, EPA segregated and disclosed the non-exempt information from the records that were withheld in part.  (Third Supp. Ingram Decl. ¶ 12; Sankula Decl. ¶ 21.)  Therefore, the Court should find that EPA properly complied with its duty to segregate exempt from non-exempt information.

To the extent Plaintiff contends, as it did in its prior motion, that the EPA failed to segregate out purely factual information from drafts of the Six-State Assessment and Ten-State Addendum, that argument fails for several reasons.

First, because EPA has released the final version of the Six-State Assessment and Ten-State Addendum, there is no additional non-exempt factual information that may be gleaned from the drafts that EPA withheld.   The court considered this precise issue in *Competitive Enterprise,* in which the agency withheld 10 different drafts under exemption 5.  The court held that "[t]he deliberative process privilege protects not only the content of drafts, but also the drafting process itself" and that "[a]ny effort to segregate the 'factual' portions of the drafts, as distinct from their 'deliberative' portions, would run the risk of revealing 'editorial judgments— for example, decisions to insert or delete material or to change a draft's focus or emphasis.'" *Competitive Enterprise,* 161 F. Supp. 3d at 132.  Because "even disclosure of the factual material in the [draft documents], and nothing more, could reveal judgments made during the drafting process itself," the court declined to order disclosure of "any portion of the drafts."  *Id.*; *see also Reliant Energy*, 520 F. Supp. 2d at 204 ("An agency need not demonstrate the extent to which the draft differs from the final document because such a showing would 'expose what occurred in the deliberative process between the draft's creation and the final document's issuance.'").

Second, the deliberative process privilege protects factual materials -- including preliminary scientific data and analyses -- that are closely intertwined with opinions, recommendations, and deliberations. *Mapother*, 3 F.3d at 1539 ("the selection of the facts thought to be relevant clearly involves 'the formulation or exercise of … policy-oriented *judgment*' or 'the process by which *policy* is formulated,' . . ., in the sense that it requires 'exercises of discretion and judgment calls.' . . .Such tasks are not 'essentially technical' in nature, . . .; rather they are part of processes with which 'the deliberative process privilege … is centrally concerned.'"); *Montrose Chem.,* 491 F.2d at 68 ("The EPA assistants here were exercising their judgment as to what record evidence would be important to the Administrator in

making his decision regarding the DDT registrations. Even if they cited portions of the evidence verbatim, the assistants were making an evaluation of the relative significance of the facts recited in the record; separating the pertinent from the impertinent is a judgmental process . . . .").

The drafts at issue here are developmental drafts of lengthy and complicated documents that were evolving through different decision points as discussed above.  Consequently, EPA determined that the deliberative material could not be reasonably or meaningfully segregated from the material included in the final public versions.  (Sankula Decl. ¶ 21.)

## CONCLUSION

For the reasons set forth above, Defendant respectfully requests that this Court grant summary judgment in favor of Defendant as to all remaining claims in this case.

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  /s/ Jeremy S. Simon
JEREMY S. SIMON
D.C. Bar # 447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
Tel: (202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendant