# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,

        Plaintiff,

        v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY,

        Defendant.

Civil Action No. 16-175 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

This is the second round of summary judgment briefing in this lawsuit instituted by the plaintiff, Center for Biological Diversity ("CBD"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for the disclosure of records relating to the U.S. Environmental Protection Agency's ("EPA") findings, set out in two addenda issued in 2014, that a new pesticide named Enlist Duo, when used according to the restrictions in its labeling, would have "no effect" on endangered species or their habitats, after the EPA had earlier concluded in 2013 that this pesticide was "toxic to birds, mammals, fish, and aquatic invertebrates" and considered stricter usage restrictions than are reflected in the two addenda. After granting partial summary judgment to each party on their initial cross-motions for summary judgment, the parties continue to dispute whether EPA has conducted an adequate search, sufficiently justified the withholding of 80 records under FOIA's Exemption 5, and segregated non-privileged information for disclosure. Pending before the Court are EPA's Renewed Motion for Summary Judgment ("Def.'s 2d MSJ"), ECF No. 37, and CBD's Renewed Motion for Summary Judgment ("Pl.'s 2d XMSJ"), ECF No. 38. For the reasons set forth below, each party is again granted partial summary judgment, which resolves this case.

1

# I.     BACKGROUND

The facts underlying this action have been explained in the Court's prior Memorandum

Opinion and need not be repeated in detail here.  *See Center for Biological Diversity v. EPA*

*("Ctr. for Biological Diversity")*, 279 F. Supp. 3d 121, 129-36 (D.D.C. 2017).  A brief review of

the factual and procedural background provides context for the remaining disputes between the

parties.

## A.     Factual Background

CBD's two FOIA requests at issue in this case seek "all documents and correspondence"

related to EPA's addenda, issued in February 2014 and September 2014, assessing the risk of

Enlist Duo to endangered species in a total of sixteen states.  *See* Pl.'s Cross-Mot. Summ. J.

("Pl.'s 1st XMSJ"), Exs. J & L, Letters from Brett Hartl, CBD, to EPA (June 26 and Oct. 20,

2014, respectively) ("CBD FOIA Requests"), ECF Nos. 17-14, 17-16; *id*., Ex. D, Addendum to

2,4-D Choline Salt Section 3 Risk Assessment: Refined Endangered Species Assessment for

Proposed New Uses on Herbicide-Tolerant Corn and Soybean ("Six-State Assessment"), ECF

No. 17-8; *id*., Ex. G, Addendum to 2,4-D Choline Salt Section 3 Risk Assessment: Refined

Endangered Species Assessment for Proposed New Uses on Herbicide-Tolerant Corn and

Soybean for AR, KS, LA, MN, MS, MO, NE, ND, OK, TN ("Ten-State Addendum"), ECF No.

17-11 (collectively, "the Addenda").  While EPA's original January 2013 Environmental Risk

Assessment for Enlist Duo considered whether a 202 foot spray-drift buffer could be used to

reduce the "acute" toxicity risk of the pesticide for birds, mammals and plants, the Addenda

concluded that Enlist Duo would have "no effect" on endangered species or their habitats in the

sixteen states when used according to the restrictions in its labeling, which restrictions reduced

the buffer from 202 feet to 60 feet and then to 30 feet.  *Compare id*., Ex. B, Memorandum from

Meghan Radtke, Biologist, EPA, and Faruque Khan, Senior Scientist, EPA, to Michael Walsh,

Risk Manager Reviewer, EPA, *et al*. (Jan. 15, 2013) (Environmental Risk Assessment) at 2, ECF No. 17-6, *with* Six-State Assessment at 2 (noting that "spray drift mitigation language that has been added to the label . . . requires the use of a 60 ft on-field buffer") and Ten-State Addendum at 2 (noting that "spray drift mitigation language that has been added to the label . . . requires use of a 30 ft on-field buffer").

EPA relied upon the Addenda when deciding, in 2015, to approve Enlist Duo for use in fifteen of the sixteen states, pursuant to the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 *et seq*. *See* Pl.'s 1st XMSJ, Ex. F, Final Registration of Enlist Duo Herbicide (Oct. 15, 2014) at 19, ECF No. 17-10; *id*., Ex. I, Decision to Amend Enlist Duo Herbicide Label to Include Additional States: Arkansas, Kansas, Louisiana, Minnesota, Missouri, Mississippi, Nebraska, Oklahoma, and North Dakota (Mar. 31, 2015) at 2, ECF No. 17-13.

Separate from Enlist Duo's registration under FIFRA, the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq.*, requires that "[e]ach Federal agency . . . insure that any action authorized, funded, or carried out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species," 16 U.S.C. § 1536(a)(2), and in so doing, "each agency shall use the best scientific and commercial data available," *id.* Although the ESA states that the agency "shall" make its "not likely to jeopardize" determination "in consultation with and the assistance of the Secretary [of the Interior or Commerce]," *id.*, the practice has long been to allow agencies to make an initial determination on their own accord without consultation. *See* Final Rule, Interagency Cooperation Under the Endangered Species Act, 2008 WL 5210535, 73 Fed. Reg. 76,272, 76,279 (Dec. 16, 2008) ("[T]he Services have long implemented section 7(a)(2) through

regulations that exclude from case-by-case consultation those actions that the action agency determines will have 'no effect' on listed species or critical habitat even though the statute makes no express exception for such actions.").[1]

By regulation, only if the agency first determines that its action "may affect listed species or critical habitat," 50 C.F.R. § 402.14(a), does the agency then have an obligation to engage in consultations. *See* Def.'s 2d MSJ, Ex. 3, Decl. of Sujatha Sankula, Branch Chief, Environmental Fate and Effects Division ("EFED"), EPA ("First EPA EFED Decl.") ¶ 9, ECF No. 37-3 ("[U]nder the Services' implementing consultation regulations . . . action agencies have the initial obligation to determine whether their actions 'may affect' listed species or habitat, in which case consultation is required, or will have 'no effect' on listed species or habitat."); *see also Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 475 (D.C. Cir. 2009) ("If the agency determines that its action will not affect any listed species or critical habitat, . . . then it is not required to consult with NMFS or Fish and Wildlife."); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) ("An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat."); *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, 575 F.3d 999, 1019 (9th Cir. 2009) ("An agency's finding that its action will have no effect on listed species or critical habitat obviates the need for consultation."). With respect to Enlist Duo, the EPA determined, as part of the Addenda used to register Enlist Duo pursuant to FIFRA, that the pesticide would have "no effect" on endangered species, nullifying any requirement for

---

[1]     By regulation, the Secretaries' consulting authority has been delegated to the Director of the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Services ("NMFS") (collectively, "the Services"). *See* Final Rule, Interagency Cooperation Under the Endangered Species Act, 2008 WL 5210535, 73 Fed. Reg. 76,272, 76,279 (Dec. 16, 2008) ("Authority to administer the Act has been delegated by the Secretary of the Interior to the Director of the Fish and Wildlife Service and by the Secretary of Commerce through the Administrator of the National Oceanic and Atmospheric Administration to the Assistant Administrator for National Marine Fisheries Service.").

consultation with the Fish and Wildlife Service ("FWS") and the National Marine Fisheries

Services under ESA's section 7(a)(2). *See* Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n

Def.'s Mot. Summ. J. ("Pl.'s 1st Opp'n") at 19, ECF No. 17 (acknowledging that "these records

are where EPA chose to make its 'no effect' determinations"); Pl.'s Reply Supp. Cross-Mot.

Summ. J. ("Pl.'s 1st Reply") at 4, ECF No. 24 ("In the particular circumstances of this case,

EPA's Section 7(a)(2) process for each determination culminated in the Addenda."); Def.'s

Reply Supp. Mot. Summ. J. ("Def.'s 1st Reply") at 2, ECF No. 22 ("Plaintiff is not challenging

the merits of this 'no effect' determination here, but rather, is simply challenging the withholding

of materials used to make this determination.").

### B.      Procedural History

In the first round of cross-motions for summary judgment, CBD raised, *inter alia*, initial

challenges to the adequacy of EPA's search for responsive records, justifications for

withholdings and segregation of disclosable information. *See* Pl.'s 1st Opp'n at 2-3.[2]  With

respect to the adequacy of EPA's search, summary judgment was granted to CBD because

EPA's prior three searches were inadequate to establish "beyond material doubt that its

search[es] w[ere] reasonably calculated to uncover all relevant documents." *Ctr. for Biological

Diversity*, 279 F. Supp. 3d at 140.  Several deficiencies in EPA's searches were described,

including that (1) the searches used September 26, 2014 as the cut-off date, but EPA "articulated

no compelling justification for using" that date over CBD's objection, *id.* at 141; (2) the searches

---

[2]      EPA was granted summary judgment on six of the nine claims in CBD's Complaint, ECF No. 1, alleging
that EPA had failed to provide an estimated completion date and to comply with FOIA's deadline mandates,
engaged in a pattern, practice and policy of violating FOIA's estimated completion date requirement as well as
response and determination deadlines, and had engaged in FOIA violations constituting agency action unlawful
under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*. *See Ctr. for Biological Diversity*, 279 F.
Supp. 3d at 129-30; Order (Sept. 28, 2017), ECF No. 25 (granting partial summary judgment to EPA on Counts I
through IV, VIII and IX).  The remaining claims, in Counts V, VI and VII, Compl. ¶¶ 105-22, relating to the
adequacy of EPA's search, withholdings, and segregation, respectively, are at issue in the pending cross-motions for
summary judgment.

covered only 13 custodians, despite EPA's records revealing a greater number of individuals

involved in communications regarding Enlist Duo, *id*. at 141-142; and (3) EPA was unclear

whether the searches covered all forms of communications, such as instant messages, text

messages, "or any other kind of chats" that may have been "used by OPP staff to communicate

on the drafting and review of documents related to the Endangered Species Assessment," *id*. at

143.

EPA was therefore "directed to conduct a supplemental search with the following

features": (1) use of the new supplemental search date as the cut-off date; (2) use of uniform

search terms most reasonably calculated to uncover all relevant documents; (3) expanded search

locations of electronic and hard-copy documents of the initial custodians and ten potential

custodians identified by CBD; and (4) "text messages, instant messages, or other similar agency

communications," if feasible and not already searched. *Id.* at 143.[3]  In addition, if, after

conducting its supplemental search, EPA continued not to disclose or identify "any records of

communications with state agencies or other third parties," EPA was directed to "submit a

supplemental declaration explaining the absence of any [such] records." *Id.* at 143-44.

In addition to inadequacies identified in the searches, EPA's *Vaughn* indices were found

to be "patently insufficient" in explaining withholdings under the deliberative process privilege

and attorney-client privilege. *Id*. at 144, 153.  EPA was therefore directed, "after completion of

the supplemental search," to "submit a second supplemental *Vaughn* index for any documents

the agency continues to withhold in full or in part," *id.* at 145, and to include specific categories

of information, including each withheld document's title, date, the author and the author's job

title, the recipient and recipient's job title, the total number of pages, the disposition (whether

---

[3]     The parties subsequently requested that March 31, 2015 be used as the search cut-off date, which request
was granted.  *See* Order (Oct. 23, 2017), ECF No. 30.

withheld partially or in full), the reason for the withholding, the statutory authority for the

withholding, and the number of pages with redacted, withheld information, *id.*

Finally, EPA was directed, with respect to any document withheld pursuant to Exemption

5, to "describe the relevant deliberative process, the role the document played in that process, the

nature of the decisionmaking authority vested in the office or person issuing the document, and

the positions in the chain of command of the parties to the documents," *id.* at 153, and to

"adequately explain why further nonexempt material cannot be segregated from any exempt

material," *id.*, and to do so with "a particularized explanation of non-segregability for *each*

document," *id.* at 152.  After EPA produced its next *Vaughn* index, however, CBD was unable to

cross-reference its entries with the entries in EPA's previous *Vaughn* indices, and accordingly,

could not distinguish newly-released documents from previously released documents.  *See* Joint

Status Report (Dec. 21, 2017) ("2017 JSR") at 6, ECF No. 32.  EPA was then directed to clarify,

with respect to each entry, whether it had been previously identified in one of EPA's *Vaughn*

indices, and if so, to provide information to facilitate cross-referencing.  *See* Memorandum and

Order (Jan. 5, 2018) at 4-5, ECF No. 34.

### C.     EPA's New Searches and Withholdings

EPA conducted a new search, which the agency avers "addressed the deficiencies

identified by the Court."  Def.'s Reply Mem. Supp. Def.'s Renewed Mot. Summ. J. & Opp'n

Pl.'s Mot. ("Def.'s 2d Reply") at 3, ECF No. 42.  In particular, EPA searched using the terms

"('risk assessment' OR 'assessment' OR 'RA') AND ('Enlist' OR 'Choline' OR '2,4-D') AND

('ESA' or 'endangered species')," Third Supp. Decl. of Earl Ingram, Jr., Chief, Public

Information and Records Integrity Branch ("PIRIB"), Office of Pesticide Programs, EPA

("Fourth EPA PIRIB Decl.") ¶ 7, ECF No. 37-2, which are "the very terms that were common to

both FOIA requests," Def.'s 2d Reply at 7, and "identified 51,871 potentially responsive

documents, of which only 201 were identified as responsive and not accounted for in previous productions," Fourth Supp. Decl. of Earl Ingram, Jr. ("Fifth EPA PIRIB Decl.") ¶ 1, ECF No. 42-3.

After completing the new search, EPA, on December 4, 2017, released to CBD 87 new records, of which 34 records were withheld in part, along with a third *Vaughn* index.  Joint Status Report (Dec. 21, 2017) at ¶ 8, ECF No. 32; EPA's Supplemental *Vaughn* Index ("Third *Vaughn* Index"), ECF No. 33.  In addition, EPA withheld in full an additional 31 documents pursuant to FOIA Exemption 5's deliberative process privilege, 12 of which were withheld in full under both the deliberative process privilege and attorney client privilege.  *Id.*  EPA made another supplemental production on March 1, 2018, along with an updated *Vaughn* index, *see* Letter from Casey Pickell, Attorney-Advisor, Office of General Counsel, EPA, to Margaret Townsend, CBD (Mar. 1, 2018), Attach. ("Fourth *Vaughn* Index"), ECF No. 38-10, by which date EPA had "completed its production of all nonexempt records subject to FOIA in accordance with the Court's Order."  Joint Status Report (Mar. 15, 2018) ("2018 JSR") at ¶ 5, ECF No. 35.  By the same date, the parties reported that the list of records remaining in dispute was narrowed to 88 records, *id*. ¶ 6, and proposed a briefing schedule with time to continue discussions to narrow the remaining disputes, *id*. ¶ 8.

Upon the timely filing of the parties' cross-motions, along with EPA's fifth *Vaughn* index, *see* Fourth EPA PIRIB Decl., Ex. A. ("Fifth *Vaughn* Index"), ECF No. 37-2, and submission of the 80 records that remain in dispute for *in camera* review, *see* EPA's Notice Compliance Ct. Order *In Camera* Submission, ECF No. 45, the pending cross-motions for summary judgment are ripe for review.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) ("[A]n agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced or is wholly exempt from the Act's inspection requirements.'" (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978))).  Most FOIA cases will be resolved on summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)).  To balance the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (alterations omitted)), FOIA has nine exemptions, set forth in 5 U.S.C.

§ 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). When the sufficiency of "the release of information under the FOIA" is challenged, "the agency has the burden of showing that requested information comes within a FOIA exemption." *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904-05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)) (alterations in original).

## III. DISCUSSION

CBD has renewed its motion for summary judgment again challenging the adequacy of EPA's search for responsive records, and the appropriateness of EPA's withholding of 80 records pursuant to Exemption 5's deliberative process and attorney-client privilege. Pl.'s Mem.

Supp. Renewed Cross-Mot. Summ. J. & Opp'n Def.'s Renewed Mot. Summ. J. ("Pl.'s 2d

Opp'n") at 5, ECF No. 38.[4]  EPA counters that it has conducted an adequate search consistent

with the Court's prior order and has disclosed all responsive records, including reasonably

segregable portions of privileged records.  Def.'s Mem. Supp. Renewed Mot. Summ. J. ("Def.'s

2d Mem.") at 2, ECF No. 37.  The adequacy of EPA's search is considered first before turning to

the sufficiency of EPA's justifications for withholding documents and EPA's efforts to ensure

that segregable portions of any of the withheld documents are released.

### A.    Adequacy of the Search

As noted *supra* Part I.B, EPA was directed to conduct a supplemental search that: (1)

used March 31, 2015 as the search cut-off date; (2) used uniform search terms most 'reasonably

calculated to uncover all relevant documents'; (3) covered electronic and hard-copy documents

of the initial custodians and ten potential custodians identified by CBD; (4) included responsive

text messages, instant messages, or other similar agency communications, if such searches were

feasible; and (5) if no responsive "records of communications with state agencies or other third

parties" were identified, to "submit a supplemental declaration explaining the absence of any

[such] records."  *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 143-44; Order (Oct. 23, 2017),

ECF No. 30.  CBD takes issue with EPA's compliance with only two of these directions, *i.e.*, the

second and third, but none of CBD's criticisms are persuasive.[5]

---

[4]      CBD's Memorandum in Support of its Renewed Cross-Motion for Summary Judgment, ECF No. 38, and
Memorandum in Opposition to EPA's Motion for Summary Judgment, ECF No. 39, are identical and, for simplicity,
citations will be only to the memorandum docketed at ECF No. 38.  Similarly, EPA's Memorandum in Opposition
to CBD's Renewed Cross-Motion for Summary Judgment, ECF No. 41, and Reply in Support of its Renewed
Motion for Summary Judgment, ECF No. 42, are identical and citations will be only to EPA's Reply Memorandum
docketed at ECF No. 42.

[5]      EPA's compliance with the other three directions are clear from the record.  First, EPA confirms that
March 31, 2015 was used as the cut-off date, *see* Fourth EPA PIRIB Decl. ¶ 7, which CBD does not contest.  As to
the fourth direction, EPA has clarified that the "centralized eDiscovery search tool" used to search Outlook email
accounts "also captures instant messages sent to or from that user." Def.'s 2d Mem. at 8.  In addition, each custodian
still employed at EPA "was asked to perform a search of their non-Outlook records, including local or shared hard
drives, OneDrive (EPA's Microsoft cloud-based service), SharePoint sites, mobile devices (including text messages

## 1.  *Uniform Search Terms*

EPA understood its original search terms to be "'reasonably calculated to uncover all relevant documents,'" *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 143 (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)), and therefore "utilize[ed] the same search terms used in the previous eDiscovery search ('risk assessment' OR 'assessment' OR 'RA') AND ('Enlist' OR 'Choline' OR '2,4-D') AND ('ESA' or 'endangered species')." Fourth EPA PIRIB Decl. ¶ 7.  The plaintiff takes issue with EPA's approach, contending, first, that "EPA failed to provide a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched,'" Pl.'s 2d Opp'n at 21, and, second, that EPA should have used "the names of the listed species that EPA assessed, including the American burying beetle, whooping crane, Canada lynx, and Indiana bat, and the names of the 16 states where Enlist Duo is approved for use," *id.* at 21-22.

Contrary to CBD's contention, EPA has provided detailed information regarding the search terms selected and used, and explained why those terms and the locations, or custodians, searched "were reasonably calculated to locate any communications concerning the two refined

---

and photographs), external hard drives and discs, and hard copy files for any documents responsive to the request that they had not already submitted in the previous searches or were not otherwise accounted for through the centralized electronic search," *id.*, and that "[a]ny documents located by the custodians were provided," Fourth EPA PIRIB Decl. ¶ 8.  For custodians no longer employed by EPA, EPA conducted similar searches of the non-Outlook records left with the agency upon termination, *id.* ¶¶ 8-9, but "[n]o responsive documents from these individuals were located," *id.* ¶ 9.  CBD does not challenge EPA's compliance with the Court's directive regarding the search of non-email communications.  Finally, as to the fifth directive, EPA states unequivocally that "none of the information withheld reflects any conferrals with state agencies," *id.* ¶ 19, and further explains that this "is not unexpected as EPA is not aware of any requirement that it confer with state agencies in connection with the refined assessment at issue in the two FOIA requests," *id*, and that it had, in fact, produced records reflecting communications with third parties such as Dow, *see* Def.'s 2d Reply at 13, including emails with Dow that were included in CBD's "own exhibit 'FF' submitted in the prior round of summary judgment briefing," *id.*  EPA also states that it "produced the registrant data that it received from Dow, which encompassed 48 scientific studies prepared by Dow, and those studies also are part of an administrative record that is publicly available," *id.*; Fifth EPA PIRIB Decl. ¶ 14.  CBD, again, does not dispute this explanation.

risk assessments at issue in Plaintiff's FOIA requests."  Fifth EPA PIRIB Decl. ¶ 13; Decl. of

Earl Ingram, Jr. ("First EPA PIRIB Decl.") ¶ 24, ECF No. 16-2 (setting forth EPA's search

terms).  EPA explains that the "search utilized the very terms that were common to both FOIA

requests."  Def.'s 2d Reply at 7.  Using these terms, EPA's supplemental search "identified

51,871 potentially responsive documents, of which only 201 were identified as responsive and

not accounted for in previous productions."  Fifth EPA PIRIB Decl. ¶ 13.  This huge volume of

search returns, EPA posits, means "if anything, these terms were overbroad as reflected by the

fact that the search results produced far more potentially responsive documents than were

identified to be actually responsive."  Def.'s 2d Reply at 6-7.

As for CBD's suggestion that EPA should have used *different* search terms, CBD has

waived this claim.  EPA "has been in discussions with Plaintiff concerning the search parameters

for the requests at issue in this case since December of 2014."  Fifth EPA PIRIB Decl. ¶ 12.

Nonetheless, according to EPA, "[a]t no point has the Plaintiff raised concerns with the search

terms used in any of the Agency's searches up to this point."  *Id.*  In support of its first cross-

motion for summary judgment, CBD claimed only in the most conclusory fashion that "EPA

failed to apply pertinent search terms," Pl.'s 1st Opp'n at 3, even though EPA's precise search

terms were stated on the record in EPA's original summary judgment motion, filed in November

2016, *see* First EPA PIRIB Decl. ¶ 24; Fifth EPA PIRIB Decl. ¶ 4.  EPA was transparent in its

intent to use these same terms in satisfaction of the Court's direction to conduct a supplemental

search, *see* Second Supp. Decl. of Earl Ingram, Jr. ("Third EPA PIRIB Decl.") ¶ 8, ECF No. 27-

4; Def.'s 2d Reply at 5, and CBD raised no qualms.  Indeed, prior to this second round of

summary judgment briefing, the parties submitted two joint status reports, which identified the

issues remaining in dispute, *see* 2017 JSR; 2018 JSR, and CBD never raised any issue with

EPA's search terms. CBD's belated challenge to EPA's search terms at this procedural juncture is far too late.

In any event, CBD "does not explain how [additional proposed] terms should have been integrated into the search or why Plaintiff believes doing so would have increased the search results," Def.'s 2d Reply at 8. As discussed above, EPA avers that its search revealed far more records than were responsive to CBD's request and, thus, ironically, simply "adding the name of a particular state to the existing search string" would only narrow the results. *Id.* Moreover, searching for a generic term, as suggested by the plaintiffs, such as "'Dow' without any limitation in EPA's search would have generated an even greater number of non-responsive records because Dow AgroSciences engages with EPA on many other different pesticides, herbicides, fungicides, and insecticides matters." *Id.* at 8 n.5. These obvious, common sense explanations for not adopting different terms, such as those proposed by CBD, amply explain the reasonableness of the search terms employed by EPA.

Accordingly, EPA has adequately explained the selection of the terms used to search for responsive records.

### 2. *Search of Ten Additional Custodians*

With respect to the ten individuals identified by the plaintiff as copied on relevant emails but not included in EPA's initial search of custodians, *see Ctr. for Biological Diversity*, 279 F. Supp. 3d at 141-42, EPA represents that the supplemental search included nine of the ten individuals, but that the agency "has no record of the remaining individual ever working at EPA and, therefore, could not search that individual's records." Def.'s 2d Mem. at 7; *see also* Fourth EPA PIRIB Decl. ¶ 6 n.2; Def.'s Resp. Pl.'s Statement of Material Facts ("Def.'s Resp. Pl.'s SMF") ¶¶ 38-39, ECF No. 42-1. CBD then clarified that the original name provided was in error

and the correct name was that of the Former Director of EPA's Environmental Fate and Effects Division ("EFED"). *See* Pl.'s Statement of Material Facts ("Pl.'s SMF") at 8 n.2, ECF No. 38-1. In response, EPA explains that the former EFED Director "was not identified by EPA as a custodian likely to have responsive records because his deputy, not [the former EFED Director], was involved in the day to day work on Enlist Duo," and the deputy was a custodian, whose records were subject to the supplemental search. Fifth EPA PIRIB Decl. ¶ 11. Moreover, EPA explains that "it is unlikely that [the former EFED Director] originated records that were not already captured by the expansive search completed for other custodians." *Id.* CBD offers no quarrel with EPA's explanation for why the former EFED Director was not identified as a custodian. *See generally* Pl.'s 2d Opp'n; Pl.'s Reply Supp. Renewed Cross-Mot. Summ. J. ("Pl.'s 2d Reply"), ECF No. 44.

Nonetheless, despite EPA's inclusion of nine additional custodians in the supplemental search, in CBD's view, EPA's search remains inadequate because other agency employees should have been included. *See* Pl.'s 2d Opp'n at 24-25. Specifically, CBD points to EPA's Fifth *Vaughn* Index, which identifies 26 agency employees as "Relevant Personnel," but EPA does not "state that it actually searched the files of these so called 'relevant' staff or identified any such records in its *Vaughn* indices." *Id.* at 24. "At a minimum," CBD asserts, "the agency must explain why the agency evidently failed to search their files." *Id.* EPA does just that.

EPA's designation of "Relevant Personnel" was made "at the Court's direction to provide the name and job title of each individual included on the emails, regardless of whether or not they actively participated in the discussion," Def.'s 2d Reply at 10-11; Fifth EPA PIRIB Decl. ¶ 8, but "the listing of any name in the *Vaughn* Index under the heading 'Relevant Personnel' in no way suggested that any of these individuals should be considered to have any additional records

responsive to Plaintiff's request," Def.'s 2d Reply at 11; Fifth EPA PIRIB Decl. ¶ 8. Moreover, EPA explains that "many of the individuals identified by Plaintiff were copied on emails circulated broadly across the Office of Pesticide Programs concerning meetings that may have mentioned Enlist Duo as one of many topics to be discussed or in connection with the development of a press release," Def.'s 2d Reply at 11, and that "EPA confirmed two were only involved with press inquiries and a public event, and 21 were not in the Environmental Fate and Effects division ('EFED') that completed the assessments at issue," *id.* "Of the four that worked in EFED, one was an intern and not even an employed member of the division," *id.*, whereas "[t]he other three were not on the EFED team that developed the risk assessments that were the subject of the Plaintiff's requests," *id.* Therefore, EPA claims that with respect to all 26 individuals whose records CBD argues should have been searched, the agency "properly determined that these individuals did not have a level of involvement in the development of the Six- or Ten-State Risk Assessments at issue in Plaintiff's request that would render them reasonably likely to have additional responsive documents not already located by Defendant's searches." *Id.*; *see also* Def.'s Resp. Pl.'s SMF ¶ 42 ("EPA disputes any suggestion . . . that the use of the term 'relevant personnel' was intended to suggest that the listed individuals were appropriate custodians for EPA's supplemental search.").

As with EPA's use of particular search terms, which the plaintiff did not contest until late in this litigation, EPA points out that, "with limited exception," CBD was already aware of these "relevant personnel" because they were "included in emails provided to Plaintiff in the original productions by EPA, but were not identified by Plaintiff in its list of additional custodians that Plaintiff asserted should be searched in its prior summary judgment opposition," Def.'s 2d Reply at 11-12; Def.'s Resp. Pl.'s SMF ¶ 42 (noting that the list of "relevant personnel" was provided

to CBD on March 1, 2018 but that "CBD failed to raise this issue in the March 15, 2018 status report").  Plaintiff's claim that these persons should have been included as custodians all along is, in EPA's view, an effort by the plaintiff to "unfairly move the goal posts for resolution of this matter."  Def.'s 2d Reply at 10.

EPA is correct that the Court's direction was to identify relevant personnel and explain why they are—or are not—relevant custodians.  *See Ctr. for Biological Diversity*, 279 F. Supp. 3d at 142 ("EPA fails to explain why the remaining individuals were excluded and not deemed likely to have responsive documents, despite their presence on emails discussing Enlist Duo."). Clearly the identification of relevant personnel does not automatically transform these individuals into relevant *custodians* whose records should necessarily have been searched, as the plaintiff would have it.  EPA has therefore satisfied both its obligation to search the ten additional custodians and to explain why the additional individuals copied on the released records are unlikely to be custodians of additional records responsive to CBD's requests.

*     *     *

Having "demonstrate[d] beyond material doubt that its search was reasonably calculated to uncover all relevant documents," *Ancient Coin*, 641 F.3d at 514, EPA is entitled to summary judgment as to the adequacy of the search.

## B.     EPA's Withholdings Under Exemption 5

As noted, the parties dispute the withholding of 80 records, in whole or in part, under

Exemption 5's deliberative process privilege, three of which records are email chains also

partially withheld pursuant to the attorney-client privilege.  *See* Def.'s 2d Reply at 22-24; Fifth

EPA PIRIB Decl. ¶¶ 17-19.[6]  FOIA Exemption 5 protects from disclosure "inter-agency or intra-

agency memorandums or letters that would not be available by law to a party other than an

agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption "incorporates the

privileges that the Government may claim when litigating against a private party, including the

governmental attorney-client and attorney work product privileges, the presidential

communications privilege, the state secrets privilege, and the deliberative-process privilege."

*Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  Here, EPA relies

upon both the governmental attorney-client privilege and the deliberative process privilege.

CBD challenges EPA's claim that three records are subject to withholding under the

attorney-client privilege and, as a categorical matter given the statutory requirements under

which the Addenda were developed, application of the deliberative process privilege to any of

---

[6]     CBD lists 79 disputed records, *see* Pl.'s 2d Opp'n at 8 n.3; Pl.'s 2d XMSJ, Decl. of Stephanie M. Parent, Senior Attorney, Environmental Health Program of the Center for Biological Diversity ("CBD Counsel Decl.") ¶ 4, ECF No. 38-3 (stating that 79 records remain at issue), but that list does not include Fifth *Vaughn* Index entry number 37, which CBD references as disputed in its briefing, *see* Pl.'s 2d Opp'n at 19; Pl.'s 2d Reply at 10-11.  EPA defends the withholding of this document. S*ee* Fifth EPA PIRIB Decl. ¶ 17; Def.'s 2d Reply at 23; Letter from Janet Bressant, PIRIB, EPA, to Margaret Townsend, CBD (Mar. 1, 2018), Attach. at 1, ECF No. 38-13 (listing entry no. 37 as disputed as of March 1, 2018).  Therefore, the Court assumes that the parties continue to dispute *Vaughn* index entry no. 37, and that the total number of records in dispute is 80.  In sum, EPA withholds under Exemption 5's attorney-client privilege the records described in *Vaughn* index entries 14, 37, and 64, and under the deliberative process privilege those same entries as well as the following entries: 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 36, 40, 45, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 66, 67, 68, 72, 74, 75, 76, 81, 82, 83, 84, 89, 90, 91, 92, 94, 95, 106, 107, 109, 117, 120, 122, 123, 124, 125, 129, 131, 134, 137, 138.  The Court notes that entry 106 indicates partial withholding pursuant to the "Deliberative/Attorney Client/Attorney Work Product," but only the deliberative process privilege is addressed in the parties' briefing.  Thus, any reliance by EPA on attorney-client or attorney work product privileges is waived.

the records.  The merits of the parties' arguments as to application of Exemption 5 are addressed

in that order.

### 1.	*Application of The Attorney-Client Privilege*

CBD disputes EPA's application of the attorney-client privilege to three records: Fifth

*Vaughn* Index entry nos. 14, 37, and 64, s*ee* CBD's 2d Reply at 10, of which 14 and 37 are email

chains with partial redactions, and 64 is withheld in full.  The EPA has sufficiently explained the

basis for these withholdings, as explained below.

The attorney-client privilege aims "to encourage full and frank communication between

attorneys and their clients and thereby promote broader public interests in the observance of law

and administration of justice."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169

(2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  These objectives apply

equally to governmental clients seeking to obtain "legal advice founded on a complete and

accurate factual picture," and thus "the Government may invoke the attorney-client privilege in

civil litigation to protect confidential communications between Government officials and

Government attorneys."  *Id.* at 170.  To establish that the attorney-client privilege applies in the

FOIA context, an agency must show that (1) "the information in [the] documents was

communicated to or by an attorney as part of a professional relationship," (2) "the information is

confidential," and (3) the "communication is based on confidential information provided by the

client."  *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253-54 (D.C. Cir. 1977).

EPA states that the three emails withheld under the attorney-client privilege were "not

shared with any person outside of the Agency attorneys and their clients in the Office of

Pesticide Programs."  Fourth EPA PIRIB Decl. ¶ 15; *see also* Fifth *Vaughn* Index at 43, 70

(stating that entries 37 and 64 were kept confidential).  With respect to entry nos. 14 and 37,

EPA explains that "[i]n the redacted portion of each of the emails, OPP employees directly discussed advice provided to them by OGC attorneys on the potential legal vulnerabilities of possible policy options OPP was considering at the time." Fifth EPA PIRIB Decl. ¶ 17; *see also* Fifth *Vaughn* Index at 18 (stating that redacted portion of entry no. 14 "reflects OGC's impression of potential legal vulnerabilities for the draft ESA in its form at the time of the email"). CBD takes issue with the fact that "EPA did not identify an attorney as the author or recipient," Pl.'s 2d Reply at 11, but the absence of an attorney participating in communications among agency personnel relaying an attorney's legal advice does not preclude application of the privilege. *See Story of Stuff Project v. U.S. Forest Serv.*, 345 F. Supp. 3d 79, 96 (D.D.C. 2018) (upholding application of the attorney-client privilege to emails which "relay among agency employees confidential advice supplied by the agency's lawyer"); *Evans v. Atwood*, 177 F.R.D. 1, 6 (D.D.C. 1997) (noting that "circulating truly confidential information among concerned officials does not defeat the privilege since all the recipients shared the attorney-client privilege with each other").

Finally, entry no. 64 is comprised of two emails in a chain, with only the second email withheld. Fifth EPA PIRIB Decl. ¶ 19. This second email is a communication between two EPA attorneys which, EPA avers, "is entirely comprised of a legal analysis of a specific portion of the draft six-state risk assessment." *Id.*; *see also* Fifth *Vaughn* Index at 71 (stating that the legal advice "relate[s] to applicable statutes and EPA regulations" bearing on the proposed registration of Enlist Duo). This explanation suffices to assert the privilege.

Notwithstanding the firm basis in the EPA's explanations for assertion of the attorney-client privilege, CBD claims "there is still a mystery as to why EPA's Office of General Counsel had to provide legal advice about scientific determinations in the endangered species risk

assessments." Pl.'s 2d Reply at 11. Nothing here needs further inquiry or explanation to resolve. Consultation by EPA staff with EPA attorneys about their legal obligations under the ESA and FIFRA, or other applicable statutes and regulations, is both expected and necessary, not mysterious.

Accordingly, the EPA is entitled to summary judgment on withholding the three records described at *Vaughn* index entry nos. 14, 37, and 64, pursuant to Exemption 5's attorney-client privilege.

### 2. *Application of the Deliberative Process Privilege*

The remaining 77 disputed records are withheld by EPA under Exemption 5's deliberative process privilege.[7] The deliberative process privilege permits an agency to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Dep't of Interior v. Klamath Water User Protective Ass'n*, 532 U.S. 1, 8-9 (2001), in order that agencies may "craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public," *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 847 F.3d 735, 739 (D.C. Cir. 2017).

CBD posits that EPA may not rely on the deliberative process privilege here because the records at issue were "generated in EPA's attempt to comply with Section 7(a)(2) of the

---

[7]  These remaining withheld records include: 39 email chains; 21 draft Addenda, 11 PowerPoint presentations, one draft response to comments, and five internal agency briefing documents, described as: "talking points for EPA staff," an "informal paper for EPA staff to prepare for a meeting," an "internal annotated agenda for a briefing of the Assistant Administrator," a "talking points and background for EPA staff to prepare for a meeting," and an "internal status report for a briefing of the Assistant Administrator." *See* Fifth *Vaughn* Index entry nos. 1, 2, 3, 4, 5, 6, 7, 8, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 36, 40, 45, 47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 66, 67, 68, 72, 74, 75, 76, 81, 82, 83, 84, 89, 90, 91, 92, 94, 95, 106, 107, 109, 117, 120, 122, 123, 124, 125, 129, 131, 134, 137, 138.

Endangered Species Act" and thus "involve technical and scientific determinations about Enlist Duo's effects, including EPA's determinations in the Addenda that Enlist Duo would have 'no effect' based on mitigated impacts to listed species," for which determinations EPA cannot "identify any 'policy-making judgment.'"  Pl.'s 2d Reply at 3 (quoting *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).  Put another way, in CBD's view, withholding intra-agency records is proper only if the records "'bear on the formulation or exercise of agency policy-oriented *judgment*,'" Pl.'s 2d Opp'n at 3 (quoting *Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis in original)), and such judgment cannot apply here because ESA's section 7(a)(2) does not allow it.  EPA counters that "[t]he fact that the deliberations that form the basis for all of EPA's withholdings occurred in the context of a scientific determination does not deprive them of their pre-decisional or deliberative characteristics," Def.'s 2d Mem. at 17, and that CBD's "position to the contrary is based on an overly narrow application of Exemption 5," *id.* at 18.  EPA has the better arguments both as to CBD's categorical challenge to the applicability of the deliberative process privilege to agency actions under ESA's section 7(a)(2) and to application of Exemption 5 to the specific documents at issue.

### a)  EPA's Actions under ESA's Section 7(a)(2) May Be Deliberative

CBD's argument that the deliberative process privilege is unavailable to exempt the disputed records from disclosure is predicated on the fact that ESA's section 7(a)(2) decision has "only two outcomes, whether an action has 'no effect' or 'may effect' endangered species."  Pl.'s 1st Opp'n at 17.  Due to the binary and scientific nature of this decision, CBD leaps to the conclusion that "there are no policy deliberations embedded in species effects determinations that EPA made in the Addenda."  Pl.'s 1st Opp'n at 17-18; *see also* Pl.'s 2d Reply at 2 ("[R]ecords—generated as part of EPA's duty under Section 7(a)(2) of the Endangered Species

Act—are not part of a deliberative process within the meaning of Exemption 5."). This is a leap too far.

While CBD is correct that EPA's decision under section 7(a)(2) as to Enlist Duo depends on a scientific assessment of toxicity risks to endangered and threatened species, this does not divest the agency's decisionmaking process of eligibility for Exemption 5 protection. EPA has described in detail the full scope of considerations implicated in the required risk assessment, starting with determining what scientific evidence would be relevant for such an analysis of Enlist Duo. *See* First EPA EFED Decl. ¶ 15 (explaining that EPA decided "whether to include registrant-submitted information" concerning "the screening level ecological risk assessment" and "volatilization of Enlist Duo's active ingredient"); *id.* (averring that EPA considered "whether to incorporate vapor transport data into the screening ecological risk assessment"). EPA also had to determine the analytical methods and assumptions to apply to test the pesticide. *See id.* (averring that EPA considered "whether potential analytical methods could be employed to demonstrate" how particular tank mixtures and spray nozzles would affect spray drift).

Further, EPA's determination of whether Enlist Duo may affect endangered species does not happen in a vacuum, but rather, depends on the parameters of the pesticide's permitted use. Once the relevant data and analytical methods have been selected, the question is not whether any amount of Enlist Duo in any location will affect endangered species, but rather, whether Enlist Duo, under its approved conditions for use, may affect endangered species. EPA therefore considered what modifications may be made to EPA's proposed registration in order "to avoid effects to listed species," plus "the technical basis for such modifications" and the real-world "enforceability of contemplated measures." Supp. Decl. of Sujatha Sankula ("Second EPA EFED Decl.") ¶ 4, ECF No. 42-4. This included, for example, consideration of how "in-field

spray drift buffer setbacks on the product label" could be used to protect endangered species.

First EPA EFED Decl. ¶ 16c.[8]  According to EPA, the "deliberative discussions allow decision makers to have access to a variety of possible risk avoidance measures and ensure that such risk avoidance measures are consistent with EPA authority under FIFRA, enforceable, and practically applicable under actual field conditions."  Second EPA EFED Decl. ¶ 4.

In short, multiple decisions contribute to formulating what data to collect and how, and the relevant analytical tests to conduct and under what conditions, to reach a decision under ESA's section 7(a)(2).  Consequently, EPA's "may affect" determination under the ESA is properly considered "deliberative" both because determining what information to include and how to assess that information is itself deliberative, and because, as here, EPA's decisionmaking about whether, and under what conditions, to register Enlist Duo is intertwined with discussions of how to limit the terms of its registration such that the pesticide will not affect endangered species.

Other courts have reached the same conclusion that the deliberative process privilege is available for records associated with EPA's actions under ESA's section 7(a)(2).  *See, e.g.*, *Sierra Club v. Kempthorne*, 488 F. Supp. 2d 1188, 1191-92 (S.D. Ala. 2007) (upholding FWS' application of the deliberative process privilege, explaining that "[w]hile a [] determination [under ESA section 7(a)(2)] may sound purely factual, it is a decision based on a welter of

---

[8]     In an effort to minimize the decision-making process involved in EPA's "may affect" determination under ESA's section 7(a)(2), CBD argues that the ESA process should occur separately from its FIFRA-based decision-making, so that "EPA cannot convert the development of scientific effects determinations in ESA assessments into an exercise of policy judgment simply because it used discretion to purportedly eliminate effects to species through modification of the registration action." Pl.'s 2d Reply at 6.  CBD fails to explain, however, why EPA must treat these two determinations—whether Enlist Duo "may affect" under ESA, and the conditions for its approval to avoid unreasonable adverse environmental effects under FIFRA—as if they were entirely walled-off from one another. EPA explains that "the Agency, at its discretion, can and often does use its authority under the FIFRA to modify federal actions (i.e., the pesticide registration issued under FIFRA) to avoid effects to listed species."  Second EPA EFED Decl. ¶ 4.

subsidiary decisions that cannot easily be so characterized, involving such things as what actors to consider, how to weigh them, how to address gaps in the evidence, and how to reconcile inconsistencies in the evidence"); *Ctr. for Biological Diversity v. Norton*, 336 F. Supp. 2d 1155, 1160 (D.N.M. 2004) (upholding application of the deliberative process privilege to draft documents pertaining to FWS' decision not to list a species as endangered because "the statute does not prohibit the agency from creating such documentation during its process even if it must rely only on the best scientific and commercial data in reaching its final listing decision" (internal quotations removed)).

　　This conclusion is also consistent with well-established law in this Circuit that the deliberative process privilege operates to shield from disclosure agency decision-making reflecting the collection, culling and assessment of factual information or scientific data. *See Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (Kavanaugh, J.) (upholding application of the deliberative process privilege to a draft agency history because "[i]n producing a draft agency history, the writer necessarily must 'cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose,' and 'identify the significant issues'" (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1538 (D.C. Cir. 1993)); *Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 261 (D.D.C. 2017) (A.B. Jackson, J.) (upholding application of the deliberative process privilege to "emails and other internal [EPA] records" regarding EPA's conducting a scientific study and developing an emissions model); *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 161 F. Supp. 3d 120, 129-30 (D.D.C. 2016) (Mehta, J.) ("[B]ecause even disclosure of the factual material in [a White House Office of Science & Technology Policy] Letter, and nothing more, could reveal judgments made during the drafting process itself, the court will not order disclosure of any portion of the drafts."); *VitroPharma Inc.*

*v. Dep't of Health & Human Servs.*, 839 F. Supp. 2d 184, 193 (D.D.C. 2012) (Friedman, J.) ("[The Food and Drug Administration's] choice of what factual material and prior final agency opinions to include or remove during the drafting process [of an agency guidance] is itself often part of the deliberative process, and thus is properly exempt under Exemption 5."); *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (Bates, J.) ("[E]ven if the data plugged into the model is itself purely factual, the selection and calibration of data is part of the deliberative process to which Exemption 5 applies.").

Indeed, CBD concedes as much, stating that "some courts in this district have found that discussions of science can be deliberative," Pl.'s 2d Reply at 7 (citing, as an example, *Chem. Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 600 F. Supp. 114, 118-19 (D.D.C. 1984) (upholding the Consumer Product Safety Commission's application of the deliberative process privilege to withhold draft copies of a scientific report)). Notwithstanding the weight of this authority, CBD presses its position that the deliberative process privilege is unavailable here with heavy reliance on *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) and *Ctr. for Biological Diversity v. U.S. Marine Corps*, Civ. No. 00-2387 (TFH), 2005 WL 3262901 (D.D.C. Sept. 19, 2005).[9] Neither case dictates the result urged by CBD.

---

[9] CBD also relies on three non-binding, Ninth Circuit district court cases, which CBD describes as examples of "courts that have reviewed withholdings of records related to Section 7(a)(2) determinations [and] have found that such records may not be withheld under the deliberative process privilege." Pl.'s 2d Reply at 7 (citing *Greenpeace v. Nat. Marine Fisheries Serv. ("Greenpeace")*, 198 F.R.D. 540 (W.D. Wash. 2000), *Greenpeace v. Mineta ("Mineta")*, 122 F. Supp. 2d 1123 (D. Haw. Nov. 15, 2000), and *Nw. Envtl. Advocates v. EPA*, No. 05-1876-HA, 2009 WL 349732 (D. Or. Feb. 11, 2009)). These cases are inapposite and unhelpful to CBD's position. Neither *Greenpeace* nor *Mineta* addressed FOIA Exemption 5's deliberative process privilege since both were APA actions. In fact, the *Greenpeace* Court expressly declined to find binding the Ninth Circuit's ruling on the scope of Exemption 5's deliberative process privilege in *Nat. Wildlife Fed. v. U.S. Forest Service*, 861 F.2d 1114 (9th Cir. 1988), because that case "is a FOIA case," *Greenpeace*, 198 F.R.D. at 544 n.3. The *Mineta* Court adopted the same approach. *See* 122 F. Supp. 2d at 1128. Remarkably, but unremarked upon by the parties, other Ninth Circuit district courts have explicitly declined to follow the reasoning in *Greenpeace* and *Mineta* even in APA cases. *See, e.g.*, *Ctr. for Biological Diversity v. Norton*, No. CIV. 01-409 (TUC ACM), 2002 WL 32136200, at *2 (D. Ariz. July 24, 2002) (holding that *Greenpeace*'s "definition of 'deliberative', which appears to focus solely on 'policy' decisions is overly narrow" and "inconsistent with Ninth Circuit precedent and should not be followed"); *Ocean Mammal Inst. v. Gates*, Civil No. 07-00254 DAE-LEK, 2008 WL 2185180, at *12 (D. Haw. May 27, 2008).

In *Petroleum Info. Corp.*, the D.C. Circuit rejected the Bureau of Land Management's

("BLM") withholding under the deliberative process privilege of a computer database comprised

of information about public lands drawn "exclusively from documents now publicly available,"

976 F.2d at 1436, which database the agency intended eventually to make public, *id.* at 1432.

The creation of this database was an "essentially technical and facilitative" task "to organize

public records in a more manageable form, and to correct any error it finds in the process." *Id.* at

1437. Focusing on the two facts that the information was publicly available and that BLM's

"mission" and "task" in creating the database had the "salient characteristic" of "lack[ing] []

association with a significant *policy* decision," *id.* (emphasis in original), the D.C. Circuit

concluded that the database "is not deliberative," *id.* at 1436. In reaching this conclusion, the

Court acknowledged that BLM had a "choice of data elements" that may "demand special care

and technical skill," *id.* at 1438, but the nature of the task itself—"reorganiz[ing] and

repackag[ing] a mass of dispersed public information" rather than "winnow[ing] a mass of

information into a small set of facts which, if revealed, would unveil the agency's reasoning by

showing what it considered relevant (and irrelevant)," *id.*—was described as having an

"essentially technical, record-keeping nature," *id.*, that "circumscribes [BLM]'s exercises of

<hr />

(rejecting *Greenpeace* and *Mineta* holdings because their "definition of 'deliberative process' is unduly narrow and ignores numerous cases holding that the deliberative process privilege applies to the process for formulating government 'decisions' as well as government 'policies'" (quoting *Ctr. for Biological Diversity*, 336 F. Supp. 2d at 1152)). More on point, in fact, the Ninth Circuit recently upheld application of Exemption 5's deliberative process privilege to withhold an agency's draft jeopardy biological opinion under ESA section 7(a)(2), *see Sierra Club, Inc. v. U.S. Fish & Wildlife Serv.*, 911 F.3d 967, 979 (9th Cir. 2018), rendering entirely defunct CBD's strained reliance on *Greenpeace* and *Mineta*. The last out-of-circuit district court case relied upon by CBD is *Nw. Envtl. Advocates,* which, notably, expressly disagreed with *Greenpeace*'s "conclusion that no documents related to the § 7(a)(2) consultation process are deliberative." 2009 WL 349732, at *7. Moreover, while ordering EPA to release "some of the withheld documents," *id.* at *8, which were "relatively polished drafts," *id.* at *7, the *Nw. Envtl. Advocates* Court *upheld* application of Exemption 5's deliberative process privilege to "many documents" that "express preliminary staff views or tentative opinions," "represent internal discussions concerning the method by which information is to be analyzed," or "express doubt or confusion regarding the information before the agency or how it should be interpreted," because such documents "represent the give-and-take of the agencies' internal deliberations, and their disclosure would discourage such deliberations," *id.* at *8. Thus, this last district court case from the Ninth Circuit provides no support for CBD's categorical position.

discretion and judgment calls," to such extent that, in combination with the "technical, objective tenor" of the database contents, "reduces the likelihood that disclosure would result in public criticism of individual BLM employees," *id*. Noting that even "mundane" tasks within an agency "could be said to reflect the exercise of agency discretion in some sense," the Court explained that "[t]o be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future." *Id*. at 1436 n.8.

CBD seizes on the *Petroleum Info. Corp.* Court's focus on requiring agency action to relate to a "significant *policy* decision," *id.* at 1437 (emphasis in original), as a pre-requisite for the deliberative process privilege, in an effort to squeeze the scientific analysis required under ESA's section 7(a)(2) into the box of merely "technical, objective" collection of factual data that the D.C. Circuit found not to be deliberative. This effort falls far short by ignoring at least three considerations highlighted by the D.C. Circuit. First, CBD's position ignores the breadth of discretion and wide range of considerations that go into making the section 7(a)(2) risk assessment, as detailed by EPA, *supra*. *See* First EPA EFED Decl. ¶¶ 14-16; Second EPA EFED Decl. ¶¶ 4-9. Second, rather than merely piggy-backing on publicly available data from defined sources as in *Petroleum Info. Corp.,* the section 7(a)(2) risk assessment involves determining what tests to run and data to collect for analysis; and third, due to both those factors, the likelihood is heightened, not "reduced," *Petroleum Info. Corp.*, 976 F.2d at 1438, that if these "'candid or personal' decisions," *id.* at 1439 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)), were "revealed prematurely" they "would be likely to 'stifle honest and frank communication within the agency," *id*. As to the last factor, EPA indicates that release of the withheld records "would have a chilling effect on my staff's ability

to have open and frank discussions weighing, considering, and evaluating scientific data, studies, reports and other relevant information in order to assist Agency management with finalizing a decision document. As with any scientific discussion, individual scientists may interpret the collection of facts and data in different was, depending upon their professional expertise and the context for which the evaluation of data takes place." Second EPA EFED Decl. ¶ 10. This consideration about chilling internal agency discussions due to the nature of the task at issue prompted the D.C. Circuit in *Petroleum Info. Corp.* to caution, in the last footnote, that "[a]n internal [BLM] memorandum expressing an official's opinion about the merits of proposed data elements, codes or formats might present a significantly different case for exemption." 976 F.2d at 1438 n.13.

Finally, *U.S. Marine Corps*, 2005 WL 3262901, which CBD also relies upon, actually undercuts CBD's position. There, the Marine Corps was ordered to release its *final* Biological Assessment, prepared pursuant to ESA section 7(a)(2) and 50 C.F.R. § 402.12(a), because the document "does not reflect the personal views of individuals employed by Defendant, but instead is Defendant's official position on the impact of military and other base activities on listed threatened and endangered species, which indicates that the assessment is not predecisional." 2005 WL 3262901 at *2. Crucially, the analogous documents in the instant case, the Addenda, reflecting the agency's final position, have already been made public. *See* Def.'s 1st Reply at 6 ("EPA is not withholding the final version of the two Addenda, whereas in the case relied upon by Plaintiff, [*U.S. Marine Corps*, 2005 WL 3262901], the agency was withholding the final version of a Biological Assessment."); *see also* Def.'s 2d Mem. at 14; First EPA EFED Decl. ¶ 21. Notably, in *U.S. Marine Corps*, the agency's application of FOIA Exemption 5's deliberative process privilege was *upheld* with respect to documents which "express the writer's

opinion" and "[do] not reflect a final view of the agency," because their release "may [have] a chilling effect on open discourse about policies within the agency." *Id.* at *3. Thus, *U.S. Marine Corps* provides no basis for the proposition advanced by CBD that records generated pursuant to a section 7(a)(2) determination cannot be withheld under the deliberative process privilege.

### b) *Remaining Disputed Records*

Having rejected CBD's categorical argument that Exemption 5's deliberative process privilege does not apply to documents generated by EPA as part of its ESA section 7(a)(2) assessment, the sufficiency of EPA's justifications for applying this privilege to the 77 remaining withheld records must next be examined. These remaining disputed records fall into three categories: internal email chains, internal briefing documents, and draft documents. *See* Second EPA EFED Decl. ¶ 3. As confirmed in the Fifth *Vaughn* Index, each withheld record is dated prior to the issuance of the final document to which the record relates, and CBD raises no issue with each record being "predecisional." *See generally* Fifth *Vaughn* Index (providing the date of each document withheld and the document to which it is pre-decisional); Pl.'s 2d Opp'n; Pl.'s 2d Reply. As discussed below, EPA has also sufficiently explained the deliberative content for each category of withheld records.

With respect to the internal emails withheld under the deliberative process privilege, *see* Fifth *Vaughn* Index entry nos. 2, 4, 5, 8, 14, 16, 18, 20, 23, 25, 29, 30, 33, 40, 45, 47, 48, 49, 51, 53, 55, 56, 57, 60, 61, 62, 68, 74, 81, 82, 83, 91, 94, 95, 106, 120, 122, 129, 131, EPA explains that they "reflect internal give-and-take with respect to decision points that were part of the risk screening assessment process," First EPA EFED Decl. ¶ 16; *see also id.* ¶ 21. These emails "include a discussion of changes made to early drafts that are attached to the emails." *Id.* ¶ 16. Issues discussed in the emails centered on "whether to include registrant-submitted information and data," *id.* ¶ 16a, and whether those data "were of sufficient rigor in methodological

30

approach," *id.*; what "potential analytical methods [] could be employed to demonstrate whether particular tank mixtures, formulations, and spray nozzles would result in spray drift greater than predicted with data used in the screening level ecological risk assessment," *id.* ¶ 16b; and the "proposed language on the buffer setbacks to be considered by management," *id.* ¶ 16c.

With respect to the internal briefing documents, including eleven PowerPoint presentations, *see* Fifth *Vaughn* Index entry nos. 12, 54, 58, 59, 66, 67, 84, 89, 107, 109, 123, and five other documents described as "talking points for EPA staff," an "informal paper for EPA staff to prepare for a meeting," an "internal annotated agenda for a briefing of the Assistant Administrator," "talking points and background for EPA staff to prepare for a meeting," and an "internal status report for a briefing of the Assistant Administrator," s*ee* Fifth *Vaughn* Index entry nos. 6, 7, 11, 26, and 76, respectively, EPA has listed the authors, the recipients, the date, the senior EPA officers being briefed, and the ESA-related issued involved.  EPA explains that entry nos. 6, 7, and 26 "reflect information selected by EPA staff to inform senior officials and that contain recommendations, analysis, and opinions on what issues may be raised, how to potentially respond (i.e., talking points), and other important considerations," First EPA EFED Decl. ¶ 17, and also summarize for internal use EPA's discussions with Dow regarding "measures that could be incorporated into a modified registration action to avoid an effect" to a listed plant species, the spring creek bladderpod, *id.*  Furthermore, *Vaughn* index entry nos. 11, 12, 54, 58, 59, 66, 67, 76, 84, 89, and 123 "concerned EPA's effort to develop new methodologies for approaching the overall ESA consultation process, provide comparison to other ongoing actions, and were intended to inform management consideration of this evolving process."  *Id.* ¶ 18.  Finally, *Vaughn* index entry nos. 107 and 109 are "substantively the same" document, Fifth *Vaughn* Index at 124, sent on October 8, 2014 and October 13, 2014,

respectively, and are presentations "that provide[] context and issues faced by [Office of Chemical Safety and Pollution Prevention] staff during the development of the initial registration of Enlist Duo and technical aspects of the registration for deliberation by Agency management," Fifth *Vaughn* Index at 122. Thus, EPA avers that both the emails and the briefing documents reflect "give and take discussions among Agency personnel involved in developing the numerous drafts of the six- and ten-state Assessments, described as withheld in full in the Agency's *Vaughn* Index." First EPA EFED Decl. ¶ 21.

The draft documents withheld include 21 draft Addenda, *see* Fifth *Vaughn* Index entry nos. 1, 3, 13, 15, 17, 19, 21, 22, 24, 27, 28, 36, 52, 72, 90, 92, 117, 125, 134, 137, 138, and "a draft response to comments," s*ee* Fifth *Vaughn* Index entry no. 75. With respect to the draft Addenda, EPA explains that these "include: (1) unformatted rough drafts of portions of [] what became the final documents; (2) early drafts of the documents where many of the policy issues discussed above resulted in revisions throughout the documents by staff with differences on how these issues were ultimately discussed and described, and; (3) drafts that had yet to undergo management and/or final legal review and reflect revisions and comments proposed by staff attorneys and managers with no final decision-making ability." First EPA EFED Decl. ¶ 19. EPA also explains how draft Addenda move from agency staff to management with decision-making authority. After the initial drafting, draft Addenda are "reviewed internally within the branch by the senior scientist and branch management," then, "depending on the complexities of the decision and the assessment process," they may be elevated "to the division level management during an informal meeting." *Id.* ¶ 20. "Once a draft version is ready to clear the division, it will be transmitted to the risk management division to ensure that the assessment accurately represents the regulatory decision under consideration," and once management in both

EFED and [Registration Division within the Office of Chemical Safety and Pollution Prevention ("RD")] are satisfied with the draft, "a final document is submitted to RD for inclusion in the decision record." *Id.*

EPA's explanations for its withholdings under the deliberative process privilege adequately show that draft documents, emails, and internal briefing documents at issue reveal internal discussion as part of an "iterative" process "where the premises for the risk assessment, the accuracy of assumptions, and the availability of all lines of evidence are critically evaluated." Second EPA EFED Decl. ¶ 6. Such internal discussions are protected by the deliberative process privilege. *See, e.g.*, *Goodrich Corp. v. EPA*, 593 F. Supp. 2d 184, 189 (D.D.C. 2009) (Bates, J.) ("[E]volving iterations of [a] model's inputs and calibrations reflect the opinions of the staff currently developing the model, which may not represent EPA's ultimate opinions relating to these matters."); *Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.*, 844 F. Supp. 770, 783 (D.D.C. 1993) (holding as protected by the deliberative process privilege a draft of an agency study analyzing impurities in a dietary supplement).

While documents designated as "drafts" are not *per se* covered under the deliberative process privilege, and may "lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public," *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982), here EPA has already released "polished" drafts of the Addenda, *see* Def.'s 2d Mem. at 15 ("EPA has released drafts at a more final stage of development and closer in substance to the final, published documents."); First EPA EFED Decl. ¶ 21; Fourth EPA PIRIB Decl. ¶ 4. Although CBD wants even earlier Addenda drafts, "as a general matter, 'drafts' of documents are exempt from disclosure under the deliberative process privilege," *Goodrich Corp.*, 593 F. Supp. 2d at 189 (citing *Dudman Commc'ns Corp. v. Dep't of*

*Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987) and *Russel v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)), when they reflect the deliberative back-and-forth of "'the ideas and theories which go into the making of the law' and not 'the law itself,'" *Arthur Andersen*, 679 F.2d at 258 (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971)).

In sum, EPA is entitled to summary judgment on the withholding of the 80 disputed records under Exemption 5's attorney-client privilege and deliberative process privilege, except as to the additional releases of segregable information, discussed *infra* Part III.C.

###    C.    SEGREGABILITY

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Producing segregable information is an essential ingredient for agencies' FOIA compliance, and "[b]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)). For those findings, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Id.* at 1117.

Even with that presumption, "the agency must provide a 'detailed justification' for its non-segregability" but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data*, 566 F.2d at 261). Affidavits attesting to the agency's "line-by-line

review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice. *Id.*; *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").

Consistent with this well-settled law, EPA was previously directed, with respect to any withheld documents, to "adequately explain why further nonexempt material cannot be segregated from any exempt material," *Ctr. for Biological Diversity*, 279 F. Supp. 3d at 153, and to do so with "a particularized explanation of non-segregability for *each* document," *id.* at 152. To this end, EPA has averred that "EPA staff [] conducted a review of each responsive record for segregability of non-exempt material," Fourth EPA PIRIB Decl. ¶ 12, and "performed redactions where non-exempt material could be reasonably segregated and released non-exempt portions," *id.* Moreover, EPA previously averred that it "conducted a line-by-line review of each record responsive to CBD's two FOIA Requests for segregability of non-exempt material," First EPA PIRIB Decl. ¶ 38, and "released all reasonably segregable, non-exempt information to CBD," *id.* Corroborating this description of the steps EPA took to segregate and release non-exempt information is the fact that of the 80 disputed records, half were released in redacted form. *See* Fifth *Vaughn* Index (entries 2, 4, 5, 8, 14, 16, 18, 20, 23, 25, 29, 30, 33, 37, 40, 45, 47, 48, 49, 51, 53, 55, 56, 57, 60, 61, 62, 68, 74, 81, 82, 83, 91, 94, 95, 106, 120, 122, 129, 131). Of the disputed emails, all but two have been released with redactions. Thus, in light of EPA's declarations, *Vaughn* index, and demonstrated good-faith effort to release redacted emails, the

Court concludes that EPA has satisfied the segregability requirement with respect to the withheld emails.

Likewise, with respect to the draft Addenda and "draft response to comments" document, EPA's declarations state that any potentially non-exempt material is "inextricably intertwined with privileged information," First EPA EFED Decl. ¶ 21, and "not further segregable in any reasonable or meaningful way in light of the length and complexity of the documents," *id.*; *see also* Fifth EPA PIRIB Decl. ¶ 15 ("Any language used [in] the draft documents that remained in the final versions are interspersed throughout the documents, often with extensive edits, making them inextricably intertwined with privileged information and not further segregable considering the length and scope of these documents."). Therefore, EPA's declarations and *Vaughn* index are sufficient to establish non-segregability of the draft Addenda and "draft response to comments" document.

By contrast, with respect to the PowerPoint presentations, the Court heeded the D.C. Circuit's guidance that "it [is] generally preferable for courts to make at least a preliminary assessment of the feasibility of segregating nonexempt material." *Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 257 (D.C. Cir. 2016). In this regard, review of the descriptions of these presentations identify sections of the documents as "provid[ing] background, context and issues faced by staff during the early development of the" Addenda. *See* Fifth *Vaughn* Index at 15, 60, 64, 65, 73, 75, 87, 89, 90, 96, 122. These descriptions suggested that these fairly lengthy presentations contain "'logically divisible sections,'" that may be "amendable to segregation and disclosure." *Nat'l Ass'n of Criminal Def. Lawyers*, 844 F.3d at 257 (quoting *Mead Data*, 566 F.2d at 261 n.54). Upon *in camera* review, the Court determined that the introductory slides of the PowerPoint presentations

generally reflect non-deliberative, factual information that should be disclosed. *See Heffernan v. Azar*, 317 F. Supp. 3d 94, 125 (D.D.C. 2018) ("[F]actual information which does not bear on the policy formulation is not subject to the deliberative-process privilege.").  Therefore, EPA is directed to segregate and release the following pages from the documents listed in its Fifth *Vaughn* Index: entry no. 12, pages 1 through 8, and page 18; entry no. 58, pages 1 through 6; entry no. 59, pages 1 through 6; entry no. 66, pages 1 through 5; entry no. 67, pages 1 through 4; entry no. 84, pages 1 through 5; entry no. 89, pages 1 through 5; entry no. 107, page 1, and pages 3 through 6; entry no. 109, page 1, and pages 3 through 6; and entry no. 123, pages 1 through 6.

Finally, the Court conducted an *in camera* review of the non-PowerPoint briefing documents, which range from one to four pages in length.  Factual information in these documents is inextricable from the remainder of the documents, and therefore the agency's non-segregability determination was proper.

## IV.    CONCLUSION

For the foregoing reasons, the defendant's Renewed Motion for Summary Judgment is GRANTED in part and DENIED in part, and the plaintiff's Renewed Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part.  Specifically, since EPA has demonstrated the adequacy of its search and that Exemption 5's attorney-client privilege and deliberative process privilege protects the withheld records, the agency is granted summary judgment on Counts IV and V of the Complaint.  EPA is denied summary judgment on Count VII and is directed to further segregate and disclose those portions of the documents listed above, *supra* Part III.C, by April 15, 2019.  CBD is granted summary judgment on Count VII, but otherwise denied summary judgment.

The parties are further directed to submit, by April 19, 2019, a final joint status report regarding the status of the release of segregable information as directed, upon which release final summary judgment will be entered for EPA.

An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:  March 27, 2019

_____
BERYL A. HOWELL
Chief Judge